IN THE DISTRICT COURT OF GARVIN COUNTY, STATE OF OKLAHOMA

PAULS VALLEY HOSPITAL AUTHORITY
d/b/a PAULS VALLEY GENERAL
HOSPITAL,

      Plaintiff,

v.

NEWLIGHT HEALTHCARE, LLC; LTC
GROUP, LLC; and FIRST UNITED BANK
AND TRUST CO.,

      Defendants.

Case No. CJ-2018- 1 2 1



STATE OF OKLAHOMA }
GARVIN COUNTY      } SS.
**F I L E D**

AUG 1 5 2018

AT 9:15 O'CLOCK _____ M.
LAURA LEE, Court Clerk
BY _____ DEPUTY

**PETITION**

**Count 1**

    1. Defendant NewLight Healthcare, LLC, and Defendant LTC Group, LLC (collectively, the "Defendant Managers"), were, until approximately July 3, 2018, the manager of the Pauls Valley General Hospital ("PVGH" or the "Hospital"), the hospital operation owned by Plaintiff pursuant to a Management Services Agreement dated November 12, 2013 (**Exhibit A**).

    2. On October 3, 2016, Plaintiff and Defendant Managers entered into a Security Agreement (the "Security Agreement") (**Exhibit B**).

    3. The Security Agreement was amended on December 1, 2016 (**Exhibit C**).

    4. The Security Agreement, as amended, was entered into in conjunction with Plaintiff's delivery to Defendant a Promissory Note dated December 1, 2016 (**Exhibit D**), and an amendment to an existing Management Services Agreement (**Exhibit E**). The documents named in this paragraph are, collectively, the "Contracts."

    5. While acting as manager for the Hospital, Defendant Managers were in control of (a) receipts of the Hospital's funds, (b) paying the Hospital's creditors, including the Defendant Managers, and (c) the Hospital's entire accounting and billing systems.

    6. On June 26, 2018, Defendant Managers gave to Plaintiff notice of purported defaults by Plaintiff in the Contracts and made demand (**Exhibit F**) for delivery of the Hospital's Accounts Receivable (the "Hospital Assets") to Defendant Managers.

    7. In addition, on July 31, 2018, Defendant Managers have given to Plaintiff notice (**Exhibit G**) (the "Notice") that they intend to sell the Hospital Assets.

    8. The Notice advised that Plaintiff was entitled to an accounting. The Notice directed Plaintiff

to call Defendant Managers' counsel to request such an accounting.

9. Pursuant to the Notice, on August 3, 2018, counsel for Plaintiff called Defendant Managers' counsel, Marc Taubenfeld, and was connected with his voice mail. A message was left for a return call and that Plaintiff wished to be provided an accounting.

10. In addition to compliance with the Notice, also on August 3, 2018, counsel for Plaintiff sent to counsel for Defendant Managers a letter (**Exhibit H**) demanding an accounting.

11. No accounting has been provided to Plaintiff.

12. Plaintiff is currently unable to ascertain whether the Defendant Managers have been overpaid for their services, but it appears Plaintiff has paid the Defendant Managers over $1,600,000.

13. Material disputes exist between the parties as to the amounts which Plaintiff may owe Defendant Managers after proper application of all payments made by Plaintiff to Defendant Managers pursuant to the Contracts and offsets for the damages described in Count 2.

14. In addition to the material disputes between the parties as to the amount which one party owes to another, Plaintiff has numerous claims against Defendant Managers related to Defendant Managers' neglect and mismanagement of the Hospital and other acts and/or omissions of Defendant Managers which have damaged Plaintiff's financial condition. Defendant Managers have utterly failed in their performance under the Management Services Agreement (**Exhibit A**) to the point of the Hospital's near financial failure and now seek to strip the Hospital of its near-cash assets on their way out the door.

15. On August 9, 2018, Defendant Managers gave Plaintiff their "Final Notice" (**Exhibit I**) that they intend to proceed to seize the Hospital Assets in satisfaction of amounts purportedly owing to Defendant Managers.

16. On August 10, 2018, Defendant Managers sent Plaintiff their "Demand for Financial Information and Records Access" (**Exhibit J**).

17. Also on August 10, 2018, Defendant Managers mailed 105 letters to most of Plaintiff's payors for services *falsely* advising them that Defendant Managers had a "first priority security interest in all of PVHA's accounts . . . ." Without admitting any valid interest of Defendant Managers, on the face of the "Transaction Documents" as defined in the Notice, Defendant Managers have, at best, a *junior* security interest in the assets behind defendant First United Bank and Trust Co. **Exhibit K** is an example of the 105 letters sent to the payors.

18. Defendant First United Bank and Trust Co. claims an interest in the Hospital Assets and is made a defendant in order that this Court can determine the extent of its interest.

19. Because of these disputes, a declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist among the parties

20. In light of the foregoing, immediate and irreparable injury, loss, and damage will result to the Plaintiff before the adverse party or the attorney for the adverse party can be heard in opposition to the request for a temporary restraining order. Therefore, a temporary restraining order is necessary to

preserve the *status quo* until the Court hears Plaintiff's request for temporary injunction. Such relief is appropriate because Plaintiff is likely to prevail on the merits of Plaintiff's claim because the Defendant Managers do not have a first security interest in the Hospital Assets, and the Plaintiff has valid claims against the Defendant Managers.

21. The harm to Plaintiff if the requested temporary restraining order is not granted outweighs the harm to Defendant Managers if it is granted because seizure and sale of the Hospital Assets by Defendant Managers will cause irreparable harm to Plaintiff in that such actions would, among other things, prevent the Hospital from paying its employees and its vendors, which would result in (a) the employees terminating their the employment with the  Hospital and seeking paying employment with other employees, (b) the vendors refusing to supply Hospital with supplies critical to its operation, (c) the Hospital being unable to properly care for its in-patients and emergency-room patients and consequently being subjected to liability for the lack of proper care, and (d) the Hospital shutting down and discontinuing all services, with virtually no hope of it ever reopening.

22. Plaintiff has no adequate remedy at law.

23. The interests of the public will be served by granting the requested orders because, due to the distance of other full-service hospitals from Pauls Valley, and due to the fact that the Hospital operates the only ambulance service for much of Garvin County, even the temporary shut-down of the Hospital would jeopardize the lives of the citizens of (and visitors to) Pauls Valley and its environs.

24. Plaintiff believes that Defendant will continue to seek to seize and sell Hospital Assets if a temporary restraining order is not entered.

25. Plaintiff's new Hospital manager has already corrected many of the errors and omissions of the Defendant Managers and is well on the way to saving the Hospital from financial ruin, provided the Defendant Managers are prevented from completing their contemplated actions.

26. Plaintiff demands:

   a. A temporary restraining order, a temporary injunction and a permanent injunction (1) prohibiting Defendant Managers from proceeding with any seizure and sale of the Hospital Assets and ordering them to immediately remit to the Hospital any of the Hospital Assets received by them from the Hospital's payors, and (2) directing the Defendant Managers to notify the Hospital's payors to disregard the letters sent to them from the Defendant Managers;

   b. An accounting from the Defendant Managers as to all amounts alleged to be owed by Plaintiff to Defendant under the Contracts or in any other manner showing application of all payments made by Plaintiff to Defendant since the commencement of the Contracts;

   c. Declaratory Judgment as to the amount the court finds may be owing from one party to another;

   d. A determination of the extent and priorities of the parties' interests in the Hospital Assets;

   e. Attorney fees and costs as may be allowed by law or contract; and

    f.  Such further legal and/or equitable relief as this court finds appropriate.

## Count 2

1.  Plaintiff incorporates the allegations of Count 1.

2.  The Defendant Managers have breached the Management Services Agreement, as amended. Due to the recency of the termination of Management Services Agreement, as amended, Plaintiff has not had sufficient time to completely analyze the performance of the Defendant Managers, but so far Plaintiff has uncovered evidence of the following breaches by the Defendant Managers:

    a.  Failure to properly utilize an inventory management system for medical supplies.

    b.  Failure to properly utilize an upfront co-pay or deductible policy

    c.  Failure to ensure contract compliance by coding company.

    d.  Failure to ensure contract compliance by billing company for Hospital and its EMS.

    e.  Overstaffing of Hospital in light of patient volume.

    f.  Failure to properly supervise staff.

    g.  Failure to implement controls for verifying Hospital vendor eligibility and entering into contracts with unlicensed and/or unqualified vendors.

    h.  Improper payment of Hospital employees.

    i.  Failure to timely and fully submit billing data to billing company.

    j.  Failure to provide adequate financial oversight, review financial statements and advise Plaintiff of Hospital's true financial condition.

    k.  Failure to properly budget.

    l.  Failure to advise Hospital board regarding financial policies and procedures.

    m.  Lending money to employees without proper approval process.*

    n.  Failure to comply with various government programs and causing the Hospital to suffer penalties in excess of $400,000.

3.  As a result of the breaches of the Defendant Managers, the Plaintiff has suffered damages in excess of $2,000,000.

4.  Plaintiff demands:

    a.  Judgment jointly against the Defendant Managers for the amount of Plaintiff's damages;

    b.  Attorney fees and costs as may be allowed by law or contract; and

    c. Such further relief as this court finds appropriate.

*These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

GARVIN AGEE CARLTON, P.C.


BY_____
Brett Agee, OBA #12547
brett.agee@gaclawyers.com
P.O. Box 10
Pauls Valley, OK  73075
405-238-1000
Fax: 405-238-1001
Attorneys for Plaintiff

### Statement Under Penalty of Perjury
### (In lieu of affidavit, pursuant to 12 Okla. Stat. § 426)

I am the acting CEO of the Hospital. I state under penalty of perjury under the laws of Oklahoma that, to the best of my knowledge after reasonable inquiry under the circumstances, the foregoing is true and correct.


Date signed: August 14, 2018    Signature_____

Place signed:  Pauls Valley, Oklahoma    Printed name: Mark Roberts

### Pauls Valley General Hospital
### MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (the "**Agreement**") is made and entered into effective as of the 12th day of November, 2013 ("**Effective Date**") by and between **NewLight Healthcare, LLC** a Texas limited liability company **or its assignee** ("**Manager**"), and **Pauls Valley Hospital Authority,** a Public Trust Authority ("**Owner**").

W I T N E S S E T H :

WHEREAS, Owner owns and operates a licensed, Medicare certified PPS hospital named Pauls Valley General Hospital located at 100 Valley Drive, Pauls Valley, OK 73075("Hospital"); and

WHEREAS, Manager is in the business of managing and providing administrative services to hospitals; and

WHEREAS, Owner desires to contract with Manager for the active, daily operation and full service management of Hospital; and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants herein contained, the receipt and adequacy of which are for all purposes acknowledged and confessed herein, Owner and Manager hereby agree as follows:

1.      **Appointment and Authority**.

    1.1.   Appointment.   Owner hereby appoints Manager as the sole and exclusive manager and administrator of the Hospital to perform the management and administrative services and duties listed herein for Hospital during the Term, and Manager hereby accepts such appointment, subject at all times to the terms and provisions set forth herein.  Owner understands and agrees that Manager may have other clients and provides management services to other hospitals and entities, so that Manager is not and shall not be obligated to provide management services solely to Hospital.   Manager shall be the exclusive management company providing management and administrative services to Hospital during the Term.

    1.2.   Authority.   Owner herby grants Manager all necessary authority to coordinate, supervise, oversee and perform the management, administrative and consulting services, and duties set forth herein. Manager is expressly authorized to provide such services in any reasonable manner Manager deems appropriate to perform such services and duties, including utilizing third parties and vendors to provide services to the Hospital.   Unless an expense is expressly designated as a Manager Expense in this Agreement, all expenses

1

incurred by Manager in providing management services pursuant to this Agreement shall be Hospital Expenses.

1.3. <u>Hospital Control</u>. It is expressly acknowledged and agreed by the parties that Owner has, and at all times during the Term shall exercise, the ultimate control and direction of the assets and affairs of Hospital, including, without limitation, all medical, administrative and professional matters of Hospital as may be set forth by the Hospital's Board of Directors ("Board"). Owner has the ultimate responsibility for supervision, management and operation of the Hospital, which includes, but is not limited to, adopting and approving policies of the Hospital and reviewing the performance of Manager in the performance of its services under this Agreement.

1.4. <u>Independent Contractors</u>. In performing their respective duties hereunder, the parties shall be and shall act as independent contractors, and nothing in this Agreement is intended and nothing shall be construed to create an employer-employee relationship, partnership, joint venture, or other type of relationship, or to allow any party to exercise control or direction over the manner or method by which the other party performs the services that are the subject of this Agreement. The parties acknowledge and agree that (i) no employee of one party will be treated as an employee of the other party for federal income tax purposes, (ii) no party will withhold on behalf of the other party any sums for income tax, unemployment insurance, social security, or any other withholding pursuant to any law or requirement of any governmental body, or make available any to any employee of the other party any of the benefits afforded to its own employees, (iii) all of such payments, withholdings, and benefits, if any, are the sole responsibility of the party incurring the liability, and (iv) each party will indemnify and hold the other parties harmless from any and all loss or liability arising with respect to such payments, withholdings, and benefits, if any.

1.5. <u>No Authority to Bind</u>. Neither party will have the authority to bind the other party, contractually or otherwise, except as specifically authorized in this Agreement.

1.6. <u>Judgments in Good Faith Proper</u>. Notwithstanding any other provisions contained herein to the contrary, in no event shall Owner, or any manager, officer, employee or member of Owner make any claim against Manager on account of any alleged errors of judgment made in good faith in connection with the performance of Manager's services under this Agreement.

1.7. <u>Patient Referrals</u>. The parties agree that the benefits to Owner do not require, are not payment for, and are not in any way contingent upon

EXHIBIT __A__
Page __2__ of __26__

the admission, referral or any other arrangement for the provision of any item or service to any of Hospital's patients.

**2.** **Manager's Responsibilities.** Manager shall use commercially reasonable efforts to provide the management, consulting and administrative services set forth in this Section 2 on a full-time basis.

2.1. General Responsibility. Manager shall implement and carry out all aspects of the administrative operation of Hospital and Owner hereby grants to Manager the commensurate authority for all such activities. Manager shall comply with the written policies and procedures of the Owner provided that, if the Owner fails to establish such policies or procedures, Manager will prepare and implement such policies and procedures as Manager reasonably deems necessary or appropriate, and, to the extent permitted by applicable law, Owner is deemed to approve such changes until such time as new policies and procedures are approved by Owner.

2.2. Recruiting Key Personnel. If requested by Owner in writing, Manager shall assist Owner with the recruitment and screening of candidates for any open CEO position or other key employees. Unless otherwise agreed by the parties in writing, the CEO shall be an employee or contractor of Owner and shall report to the Owner. All costs relating to the employment of, or contracting with, the CEO shall be Hospital Expenses.

2.3. Interim CEO and CFO. If requested by Owner in writing, Manager shall use its good faith efforts to provide an interim CEO and/or or other key employees to Hospital until such time as any such position is filled on a full-time basis. Owner shall compensate Manager for any such interim CEO or other key employees as set forth in Section 5.5.

2.4. Contracts. Manager shall advise and assist Owner in securing and retaining contracts in the name of and for the account of Owner with service providers deemed reasonably necessary by Manager for the operation of the Hospital. Such contracts shall be subject to the written approval of the Owner and shall in each case be a Hospital Expense.

2.5. Provider Recruitment. If requested by Owner in writing, Manager shall use Manager's reasonable efforts to advise Hospital on and assist Hospital with recruiting additional qualified physicians and mid-level practitioners (collectively, "Providers") to establish medical practices in the community served by Hospital to meet community needs and promote the utilization of Hospital services. Such efforts may include, but are not limited to, the following:

a. Institution of a Provider need program by reviewing admitting records by physician specialty;

3

b.    Identification and screening of potential candidates;

c.    Personal contact with Providers desirous of relocating to the community served by Hospital; and

d.    Introduction of such Providers to members of Hospital's Medical Staff and applicable Hospital executives during interview trips.

The notice to Manager requesting the services in this Section shall include a budget for providing such services, and Manager shall not incur any costs in excess of such budget without Owner's written approval. Any costs incurred in the recruitment of such Providers (such as Provider moving expenses, travel, loans and income guarantees) shall be a Hospital Expense.

2.6.    <u>Purchasing</u>. Manager shall assist Hospital in ordering, procuring, and purchasing inventory and supplies, and such other ordinary, necessary or appropriate materials, items or services which Manager or Owner deem to reasonably necessary in the operation and maintenance of the Hospital, including, without limitation, utilities, concessions, drugs, equipment, expendable supplies, furniture or furnishings, inventory items, linens, machinery, medicines, services and supplies, which shall be subject to approval or within guidelines provided by Owner. Any purchase by Manager in the performance of services under or otherwise ancillary to this Agreement shall be a Hospital Expense. Manager and Owner agree that Manager is not a "Merchant" as defined in the Uniform Commercial Code as adopted in the State of Texas and that MANAGER MAKES NO WARRANTIES, EXPRESSED OR IMPLIED WITH RESPECT TO ANY PURCHASE MADE ON OWNER'S BEHALF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY.

2.7.    <u>Maintenance and Repair</u>. Manager shall make, install or cause to be installed in the Owner's name and at the Owner's expense all reasonably necessary repairs, replacements, additions and improvements in and to Hospital, its furnishings and equipment, in order to keep and maintain the same in good repair, working order and condition in the same general manner as other hospitals of a similar nature in the geographic area in which the Hospital is located, subject to approval or guidelines provided to Manager by Owner in writing.

2.8.    <u>Regulatory and Contractual Requirements</u>. Unless otherwise requested by Owner in writing, Manager shall cause all things to be done in and around Hospital as Manager deems necessary to comply with the requirements of any applicable law or statute, ordinance, rule, regulation or order of any governmental or regulatory body respecting the use of Hospital or the construction, maintenance, or operation

thereof, and with all orders and requirements of the local Fire Marshall or any other similar authority. Unless otherwise requested by Owner in writing, Manager shall further provide or arrange for the performance of duties with respect to the operation of Hospital required by any applicable standard, ruling or regulation of the United States Department of Health and Human Services, the Department of Health of the State, or of any other governmental agency, or entity exercising authority to administer, regulate, accredit or otherwise set standards for facilities such as Hospital subject to approval or guidelines provided to Manager by Owner in writing.

2.9. Insurance. Manager shall periodically review the insurance program of Hospital and make recommendations with respect thereto to Owner. Subject to the prior approval of Owner, with Manager acting as agent for and at the expense of Owner, Manager shall assist Hospital in the negotiation of any contracts for and maintenance of all reasonable and appropriate policies of insurance on an occurrence basis of the type, extent, amount and cost of coverage which is consistent with sound management of the Hospital, insuring Owner, Manager and Hospital and their respective agents and employees against the risks customarily insured, consistent with reasonable industry standards. Such insurance shall include, without limitation, property and casualty coverages for buildings and contents, comprehensive general liability, professional liability, blanket fidelity bond coverage, boiler explosion, comprehensive automobile liability, statutory workers' compensation coverage, business interruption and excess liability coverage, which coverage shall name Manager as an additional named insured to the extent the interest of Manager appears. Upon written request, Manager shall timely provide Board with a certificate or certificates issued by such insurers evidencing such insurance, which certificate or certificates shall be cancelable only upon not less than 30-day prior written notice of insurer to Manager and Owner.

2.10. Legal Services. If requested by Owner in writing, Manager shall assist Owner and Hospital in selecting, contracting for, arranging for and/or rendering to Hospital, with the approval of the Board, such business, legal and financial management consultation and advice as may be reasonably required or requested by Hospital and directly related to the operation of the Hospital. Manager shall not be responsible for rendering any legal advice, tax advice, or personal financial services to Hospital or Owner related to its independent corporate existence or affairs or to any employee or agent of Hospital. Within the limits of Manager's knowledge and expertise and as Manager deems appropriate, Manager shall assist Owner in retaining legal counsel and supporting such counsel in instituting or defending, as the case may be, in the name of Owner or Hospital as a Hospital Expense, all actions arising out of the operation of Hospital, and any and all legal actions or proceedings reasonably necessary for the operation of Hospital. Any

5

such legal and attorney fees and costs shall be a Hospital Expense. Manager shall cooperate with such counsel to the extent permitted by applicable law.  Manager shall not be required and shall not be deemed to have guaranteed any obligation or expense of Owner, even if Manager contracts for particular goods or services on Owner's behalf.

2.11.  <u>Third Party Payment Programs and Cost Reports</u>.  Manager shall oversee and ensure the preparation and timely filing of all claims, cost reports, or other documentation required by the Medicare Program, Medicaid Program, and any other third-party payor for the operations of the Hospital during the Term.  Owner will continue to be responsible for signing Medicare and Medicaid cost reports.  Owner shall remain solely liable for any underpayments, overpayments, recaptures, charges, assessments, actions, payments or penalties, legal or otherwise, involving claims filed with any third party payment program, whether such actions, payments or penalties are incurred prior to, during, or after the Term.

2.12.  <u>Financial Services.</u>

a.  <u>Financial Consulting Services</u>.  Manager shall oversee the following services:

i.  Monthly financial statement preparation as detailed in Sections 2.13(b) below;

ii.  Monthly analysis of financial performance;

iii.  Budget preparation as described in Section 2.13(g) below;

iv.  Financial analysis of existing and proposed service lines;

v.  Liaison with Hospital's outside audit firm as indicated;

vi.  General oversight of Hospital's employees involved in financial transaction including accounts payable staff, payroll staff and other financial services employees;

vii.  Bank and balance sheet account reconciliation services and review of reconciliations;

viii.  Services relating to any ad hoc information needs of the Hospital;

ix.  Accounts payable invoice processing pursuant to Section 2.13(d);

6

EXHIBIT A
Page 6 of 26

x.     Cash receipts reconciliation with Hospital's bank accounts; and

xi.     Payroll processing services pursuant to Section 2.13(d).

b.     <u>Financial Information</u>.  Manager shall oversee the preparation of the following financial information on a monthly basis:

i.     Balance Sheet;

ii.     Income Statement; and

iii.     Other relevant financial and operational reports.

c.     <u>Credits and Collections</u>.  Manager shall develop and implement credit and collection policies and procedures and take reasonable steps to effectuate timely billing by Hospital, including, without limitation, the issuance of bills for items and/or services furnished by Hospital, the collection of accounts and monies owed to Hospital, including the institution of legal proceedings by Owner and/or Hospital to collect such accounts and to enforce the rights of Owner as creditor under any contract or in connection with the rendering of any service all as a Hospital Expense.  It is expressly understood that the extent to which Manager will endeavor to collect such accounts, the methods of collecting, the settling of disputes with respect to charges and the writing off of fees that may be or appear to be uncollectible shall be at the reasonable discretion of Manager, and Manager does not guarantee that extent to which any accounts or monies billed will be collected.

d.     <u>Payment of Accounts and Indebtedness</u>. Within the limits of Manager's knowledge and expertise, Manager shall assist Hospital with and oversee the processing and payment of accounts payable including preparing and transmitting checks, vouchers and other documents necessary for the payment of payroll, trade accounts, amounts due on short and long-term indebtedness, taxes, rents and other obligations of Hospital. Owner shall remain ultimately responsible for all amounts due pursuant to these accounts and indebtedness.

e.     <u>Accounting and Financial Records</u>.  Manager shall reasonably establish and administer accounting procedures, controls, forms, and systems for the development, preparation and safekeeping of records and books of accounting relating to the business and financial affairs of Hospital. Manager shall assist Hospital with bookkeeping and accounting services required for the operation of the Hospital. Such services will include (a) the maintenance, custody and supervision of business records, papers,

7

documents, ledgers, journals and reports relating to the business operations of the Hospital; (b) the preparation of the financial reports set forth in Section 2.13(b); (c) the planning of the business operations of the Hospital; and (d) the payment of accounts payable and collection of accounts receivable.

f.   <u>Depositories for Funds</u>.   Manager shall maintain accounts and investments in such banks, savings and loan associations, and other financial institutions as Manager may reasonably select, with such balances therein (which may be interest-bearing or non-interest bearing) as Manager deems appropriate, taking into account the cash flow operating needs of Hospital and Owner's desire to maintain as much of its funds in interest bearing accounts as is reasonably feasible, and the disbursement from such accounts of such amounts of Hospital's funds as Manager shall reasonably determine to be appropriate in the performance of Manager's services under this Agreement.

g.   <u>Budget</u>.   Not later than the end of each fiscal year of Owner during the Term, Manager shall prepare in advance and deliver to Owner for Owner's approval a capital expenditure and operational budget for the Hospital's next fiscal year (the "Budget") outlining a program of capital expenditures for the next fiscal year (in which each proposed expenditure will be designated either as mandatory or desirable) and setting forth an estimate of operating revenues and expenses (including, without limitation, the Management Fee), together with an explanation of anticipated changes in the Hospital utilization, charges to patients, payroll rate and positions, non-wage cost increases, and all other factors differing significantly from the current fiscal year.   Upon approval by the Owner, the Budget shall become the "Approved Budget".   Owner's approval of the Budget shall not be unreasonably withheld or delayed.   Manager shall use commercially reasonable efforts to operate Hospital in accordance with the Approved Budget.   The inclusion of any item within the Approved Budget shall constitute all necessary approval of the Owner for Manager to take such actions to effect the budgeted item.

h.   <u>Access</u>.   Owner shall have the right to reasonably audit, examine and make copies of books of accounts maintained by Manager applicable to Hospital.   Such right may be exercised through any agent or employee designated in writing by Owner and acceptable to Manager.

2.13.   <u>Managed Care Contract Consulting</u>.   If requested by Owner in writing, Manager shall assist in the negotiation of and administration of all contracts with managed care organizations, health maintenance

NEWLIGHT HEALTHCARE
1790948.4

organizations, accountable care organizations, prepaid health plans, preferred provider organizations, self-insured employers, insurance companies, and other payors relating to the provision of Hospital services. Manager may recommend the use of a managed care contracting consultant or that Hospital join a particular network in order to assist with managed care contracting. The decision to engage any particular consultant or join any particular network is solely Owner's decision, and all associated costs and fees shall be a Hospital Expense.

2.14. <u>Licenses and Permits</u>. Manager shall oversee and ensure obtaining and renewal of , all necessary licenses and permits required in connection with the operation of the Hospital. Any such licenses and permits shall be issued in the name of the Owner or Hospital, as applicable. All fees and expenses incurred in connection with such licenses and permits shall be a Hospital Expense.

2.15. <u>Information Systems</u>. Manager shall supervise and manage the use of any and all software and/or hardware for the management information system utilized in the operations of the Hospital, provide modifications, enhancements and upgrades and provide new hardware and/or software to the extent reasonably necessary or appropriate. All right title and interest in any management information system or other software provided by Manager to Hospital shall remain Manager's sole and exclusive property.

2.16. <u>Advertising and Public Relations</u>. Manager shall provide marketing support services and assistance with community education to Hospital.. From time to time, Manager shall recommend to the Board various advertising and public relations initiatives subject to approval by the Board . All Board approved advertising, public relations and related marketing expenses incurred on behalf of Hospital shall be a Hospital Expense.

2.17. <u>Quality Assurance, Performance Improvement, Risk Management and Utilization Review</u>. Manager shall oversee and ensure support of Owners quality assurance, performance improvement, risk management and utilization review plans. The costs of such programs as may be authorized by the Board shall be a Hospital Expense.

2.18. <u>Strategic Planning</u>. Manager will assist Hospital and Owner in the development of long-term strategic planning objectives.

2.19. <u>Use of Premises</u>. Owner hereby grants Manager the right to use and occupy administrative offices within the Hospital and such other portions of the Hospital premises as may reasonably be required to provide Manager's services under this Agreement. Manager agrees to comply in all material respects with all applicable local rules,

9

ordinances, and other laws in the performance of its services under this Agreement.

2.20. <u>Events Excusing Performance</u>.  Manager shall not be liable to Hospital for failure to perform any of the services required herein in the event of strikes, lock-outs, calamities, acts of God, unavailability of supplies, or other events over which Manager has no control for so long as such events continue, and for a reasonable amount of time thereafter.

2.21. <u>Additional Services</u>.  In addition to the duties and obligations specified in this Section 2, upon the request of the Board and agreement by the Manager, Manager may perform additional services for such additional compensation mutually agreed upon in writing by Owner and Manager (which writing shall be deemed to be an addendum to this Agreement and incorporated herein).

2.22. <u>Limitation on Manager's Obligations</u>.  The parties acknowledge and agree that, notwithstanding Manager's agreement to ensure, implement, administer or otherwise perform any obligation under this Agreement, Manager shall only be obligated to perform such obligation to the extent such obligation is within the Manager's reasonable control.

3. **Personnel Matters.**

3.1. <u>Personnel Administration</u>.  Manager shall use commercially reasonable efforts to  advise and assist Owner with respect to recruiting, hiring, training, promoting, assigning, supervising and discharging the medical, nursing, administrative, and any other staff of Hospital. Manager shall also use reasonable efforts to advise and assist Owner with respect to the formulation, implementation, modification and administration of wage scales, rates of compensation, employee benefits, rates and conditions of employment, in-service training, attendance at seminars or conferences, staffing schedules, job descriptions and personnel policies with respect to all staff of Owner and/or Hospital.  Manager, in the name of Owner and following consultation with the CEO, as appropriate, may hire, discharge and supervise the work of all employees of Owner performing services in or about Hospital.  All salary, employee benefits, liability insurance, bonding and all other expenses, fees or costs of any kind related to such employees shall be a Hospital Expense. Subject to Owner's prior approval, the term "employee benefits" shall include any and all of the employer's contribution to F.I.C.A., unemployment compensation, and other employment taxes, vacation or other paid time off, all bonuses, pension plan contributions (if one), workers' compensation, group life, accident, and health insurance premiums, disability, health, welfare and other benefits, exclusive of any deferred compensation or stock plan absent the prior written approval of Owner.  Notwithstanding the

10

foregoing, Owner may independently employ, at Owner's own cost and expense, one or more employees, provided that such employees comply with all Hospital policies and assist in servicing Hospital, if needed, on a limited basis and not as a Hospital Expense. Under no circumstance shall Manager be liable to Owner, Hospital, or any third party in monetary damages or otherwise for any act or omission on the part of any person not a direct employee of Manager.

3.2.  <u>CEO</u>. If requested by Owner in writing, Manager shall recruit a CEO for Hospital who shall become an employee of Owner. Owner shall pay the CEO's salary, benefits and out-of-pocket expenses. Any and all payments required by this Section shall be a Hospital Expense.

3.3.  <u>Additional Key Employees</u>. If requested by Owner in writing, Manager shall recruit a Chief Financial Officer or other key employee (each a "Key Employee") who shall become an employee of Owner and all costs of the aggregate compensation, including all fringe benefits, paid or payable with respect to such Key Employees shall be solely a Hospital Expense.

3.4.  <u>Equal Employment Opportunity</u>. Manager and Owner expressly agree to abide by any and all applicable federal and/or state equal employment opportunity statutes, rules, and regulations, including, without limitation, Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Act of 1972, the Age Discrimination in Employment Act of 1967, the Equal Pay Act of 1963, the National Labor Relations Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, and the Occupational Safety and Health Act of 1970, all as may be from time to time modified or amended.

4.  **Owner's Obligation.** Owner hereby agrees to comply with all of the provisions of this Agreement and with all obligations of Owner and Hospital as otherwise herein set forth. In addition:

4.1.  <u>Budget</u>. Owner shall promptly review and approve Budgets for the operation of the Hospital. Owner shall also provide reasonable working capital funds for the Hospital and shall advance and provide funds in amounts sufficient to cover reasonable operating expenses set forth in the Approved Budget or otherwise expressly approved by Owner.

4.2.  <u>Communications regarding Financial, Contracts and Other Necessary Documents</u>. Owner agrees to promptly provide copies to Manager of any communications relating to financial, contractual, legal, or other obligations of the Hospital in any way relating to the services provided by Manager under this Agreement.

4.3.  <u>Legal Obligations</u>. Owner retains full responsibility for all Hospital matters relating to any acts, events, misconduct or omissions resulting

11

in any liability, in any form whatsoever, including but not limited to liability for legal, financial or contractual obligations, any and all state and federal legal and regulatory compliance matters, billing and claims, and third party claims against Hospital and/or Owner. The Owner retains full responsibility regardless of whether such actions occurred prior to, during, or following the Term, unless such liability was incurred by the Hospital due to gross negligence or fraud committed by Manager. In the event that Manager is named in a matter for which Owner retains full responsibility, Owner shall fully indemnify, and advance reasonable attorneys fees to, Manager for any costs or expenses related thereto.

4.4. <u>License of Hospital's Name and Logo</u>.   Owner hereby grants to Manager the nonexclusive right and license to use Hospital's name and logo solely to the extent required to provide Manager's services under this Agreement.

4.5. <u>Patient Records</u>.   At all times during and after the Term of this Agreement, all patient medical records shall be and remain the sole property of Hospital, and Owner agrees to make such records available to Manager to the extent required for Manager to perform its services under this Agreement.  To the extent permitted by law, Manager shall be permitted to retain copies of such records, at its expense, upon termination of this Agreement.

4.6. <u>Inspections</u>.   Owner shall, during and after the Term of this Agreement, make available to Manager for inspection by its authorized representatives, during regular business hours, at the principal place of business of Hospital, any Hospital records determined by Manager to be necessary to perform its services and carry out its responsibilities hereunder or necessary for the defense of any legal or administrative claim or action relating to the Hospital, the Manager or the records.

4.7. <u>Hospital Services</u>.   Owner, through the expertise and knowledge of Manager, shall provide hospital services to patients in material compliance at all times with ethical standards, laws and regulations applicable to the provision of such services.  Owner shall also ensure through the expertise and knowledge of Manager that any Hospital employee required to be licensed by the State of Oklahoma has all required licenses, credentials, approvals, and other certifications to perform his or her duties and services for the Hospital.

4.8. <u>Material Changes</u>.   Owner shall notify Manager in writing within 10 days of occurrence of any of the following:

    a.    Any action to revoke or nullify any of its licenses or permits, or its certification by Medicare or accreditation by the Joint Commission, or any successor thereof;

12

b.   Any changes in its ownership;

c.   Any action commenced against Hospital that could materially affect this Agreement; and

d.   Any other occurrence known to Owner, including any changes in any governmental law or regulation, which could materially impair the ability of Hospital to carry out its duties and obligations under this Agreement or that would impact or impair Manager's ability to provide services under this Agreement.

## 5.   **Management Fees and Expenses**.

5.1.   <u>Management Fee</u>.   Owner and Manager agree that the compensation set forth in this Section 5 is being paid to Manager in consideration of the substantial commitment made by Manager hereunder and that such fees are fair and reasonable and consistent with fair market value.   For the services rendered hereunder by Manager, Owner shall pay monthly to Manager as a management fee (the "Management Fee") an amount equal to:

a.   FOURTEEN THOUSAND TWO HUNDRED FIFTY ($14,250.00)   per month for months 1-12 following the Effective Date;

b.   FIFTEEN THOUSAND ($15,000.00) per month for months 13-24 following the Effective Date;

c.   FIFTEEN THOUSAND SEVEN HUNDRED FIFTY ($15,750.00) per month for months 25-36 following the Effective Date;

d.   SIXTEEN THOUSAND FIVE HUNDRED ($16,500.00) per month for months 37-48 following the Effective Date; and

e.   SEVENTEEN THOUSAND TWO HUNDRED FIFTY ($17,250.00) per month for months 49-60 following the Effective Date.

Such payments shall be due on the first and fifteenth  of each month. Upon the termination of this Agreement for any reason other than (i) Manager's material breach;  (ii) the sale, lease, or other similar disposition of all or substantially all of the Hospital and/or its assets to a third partyl (iii) in the event the sales tax, to be brought to a vote of the citizens of Pauls Valley no later than six (6) months from the date of this agreement, fails to pass; or (iv) by mutual written agreement of the parties; all remaining payments of the then-current term of this agreement (*i.e.*, either the remaining payments due under the initial term or a subsequent renewal term, but not both) shall immediately become due and payable. Payments received more than ten days late are subject to a three percent (3%) one-time late payment fee and interest charged at eighteen percent (18%) per annum beginning on

13

the day the payment became overdue.  Owner agrees to pay Manager for its reasonable costs of collecting any amounts due under this Agreement, including attorney and collection agency fees.

5.2. Travel Expenses.  In addition to the Management Fee specified in Section 5.1, Owner shall pay the travel expenses of Manager and all Key Employees.  Any payments required under this Section shall be due and payable under the same terms as specified in Section 5.1 above.

5.3. Expense Payments.  For other goods, supplies, and expenses obtained hereunder by Manager for or on behalf of Owner, Manager shall forward the invoices to Owner, and Owner shall pay in full such reasonable expenses within fifteen (15) days of receipt unless other arrangements are mutually agreed to in writing between the parties.

5.4. Nonpayment by Owner.  If any payment is not made by Owner when due, including without limitation those provided in Sections 5.2 and 5.3, Manager may, in addition to any other remedy available to it, immediately terminate this Agreement as provided in Section 9.1.

5.5. Interim Officers.  In addition to the Management Fee specified in Section 5.1, Owner shall pay $16,500.00 per month plus travel and lodging expenses upon placement of an Interim CEO by Manager. Owner shall pay $11,500.00 per month plus travel and lodging expenses upon placement of an Interim CFO by Manager.  If Owner agrees to allow one interim executive to perform both CEO and CFO duties this fee will be reduced to $25,000 per month plus travel and lodging expenses.  Any payments required under this section shall be due and payable under the same terms as specified in Section 5.1 above.

6. **Liability of Manager**.

6.1. Standard of Care.  Manager agrees to provide, with respect to all services provided by Manager under or pursuant to this Agreement, a fair and reasonable standard of care, skill and diligence such as would normally be provided by an experienced manager with respect to work similar to the services to be provided under this Agreement.

6.2. Other Persons.  Manager shall not be responsible for the acts or omissions of any of Owner's other contractors, or any subcontractor or any other persons performing any of the work on or in connection with Hospital or any consultants or other persons engaged by Owner with respect thereto, and Manager shall only be responsible for the performance of Manager's obligations hereunder in accordance with the terms of this Agreement.  In the event that Owner retains the services of any other contractors, subcontractors, consultants, or any other persons or entities performing any work on or in connection with

14

Hospital (regardless of whether such persons are introduced or referred to Hospital by Manager), Owner shall directly contract with such persons or entities and such relationships shall not be governed by the terms of this Agreement.  Furthermore, in the event that Owner retains the services of any other contractors, subcontractors, consultants, or any other persons or entities performing any work on or in connection with Hospital, regardless of whether such persons or entities are affiliated with Manager in any way, Manager shall not be liable for any acts or omissions of such persons or entities.  To the extent that any actions or enforcement are taken against Manager for such acts or omissions, Owner shall fully indemnify Manager for any costs or expenses related thereto.

6.3. <u>Limitation of Liability</u>.  Manager shall not be in any way responsible or liable for any acts or omissions of Owner, Hospital, any management company, operator, consultant, contractor, subcontractor or any other person or entity performing any work on or in connection with Hospital occurring prior to, during or after the Effective Date (other than the acts of omissions of Manager itself).  To the extent that any actions or enforcement are taken against Manager for such acts or omissions, Owner shall fully indemnify Manager for any costs or expenses related thereto. Owner agrees to maintain all prior insurance policies covering Hospital and any previous operators or managers in place and maintain "tail" coverage for the operations and management occurring prior to the Effective Date.

6.4. <u>No Obligation to Guaranty</u>.  MANAGER SHALL NOT BE LIABLE TO ANY PERSON OR ORGANIZATION FOR ANY DEBT, LIABILITY OR OBLIGATION OF OWNER OR HOSPITAL INCURRED OR CREATED PURSUANT TO THE AUTHORITY GRANTED TO MANAGER IN THIS AGREEMENT OR BY REASON OF ITS MANAGEMENT, DIRECTION OR CONDUCT OF THE HOSPITAL UNLESS MANAGER, BY WRITTEN AGREEMENT, EXPRESSLY ASSUMES OR GUARANTEES ANY SUCH LIABILITY IN WRITING.  MANAGER SHALL NOT BE REQUIRED, UNDER ANY CIRCUMSTANCES, TO GUARANTEE OR ASSUME ANY OBLIGATION OR LIABILITY OF OWNER OR HOSPITAL.  OWNER SHALL BE DEEMED TO CONTROL ALL ASPECTS OF THE MANNER IN WHICH OWNER'S AND HOSPITAL'S BUSINESS IS CONDUCTED.  MANAGER SHALL NOT BE LIABLE, BY VIRTUE OF THE PERFORMANCE OF ITS DUTIES HEREUNDER, FOR ANY BREACH OF ANY PAYOR OR OTHER AGREEMENT BETWEEN OWNER OR HOSPITAL AND ANY OTHER PARTY,

6.5. <u>Limitation on Damages</u>. IN NO EVENT WILL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY PUNITIVE, CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR INDIRECT DAMAGES, AS A RESULT OF ANY BREACH OF THIS AGREEMENT, TO THE FULL EXTENT THESE MAY BE DISCLAIMED BY LAW UNLESS SUCH CLAIMS

15

ARISE FROM THE GROSS NEGLIGENCE OR INTENTIONAL ACTS OF EITHER PARTY.

6.6. <u>Disclaimer of Warranties</u>.   Except as expressly set forth in this Agreement (i) Manager expressly disclaims all warranties, express or implied, except to the extent that any warranties implied by law cannot be validly disclaimed; (ii) Manager does not warrant that the services provided by Manager under this Agreement will produce any specific results for Owner or Hospital.  Owner acknowledges that it has relied on no warranties from Manager other than those expressly set forth in this Agreement.

6.7. <u>Consultants' Fees</u>.   Without limiting anything herein, and subject to Owner's prior approval, Owner shall be solely responsible for payment of all fees and other compensation charged by consultants, underwriters, bond or other legal counsel, expert witnesses or other persons engaged by Owner (or by Manager on behalf of Owner) with respect to obtaining governmental approval involving the implementation, construction or financing of Hospital, and for payment of all application or filing fees or other charges for obtaining permits or licenses relating to Hospital as well as for any other consultants retained to provide services to Hospital.  Manager shall be responsible for reviewing such fees and Owner shall promptly provide Manager with copies of all bills, invoices and other information relating to such fees upon receipt.

7.   **Confidentiality of Information and Proprietary Information**.

7.1. The parties agrees to keep confidential and not to use or to disclose to others either during the Term and for a period of two (2) years thereafter, except as expressly consented in writing by party owning the confidential information or as required by law, any secrets or confidential technology, proprietary information, customer list or trade secrets of the other party, or any matter or items ascertained by a party through their association with each other, the use or disclosure of which matter or item might reasonably be construed to be the contrary to the best interest of party owning the confidential information. Except as otherwise provided herein, upon termination of this Agreement, neither party will take nor retain, without prior written authorization from the other party, any papers, patient or client lists, fee books, patient records, files or other documents or copies thereof or other confidential information of any kind belonging to a party and pertaining to such party's operations, business, sales, financial condition or products. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant; but nothing herein shall be construed as the breaching party's consent to such relief.  Each party further agrees that if any restriction contained in

16

this Section is held by any court to be unenforceable or unreasonable, a lesser restriction may be enforced in its place and remaining restrictions contained herein shall be enforced independently of each other. Information that is in public domain or which a party acquires from persons or entities not associated with the party owning the confidential information shall not be deemed to be confidential or proprietary, and its use by the other party shall NOT be restricted by this Agreement.

7.2. <u>Proprietary Property</u>.   Each party agrees that the other party's proprietary property shall not be possessed, used or disclosed otherwise than may be necessary for the performance of this Agreement.   Each party acknowledges that its violation of this Agreement would cause the other party irreparable harm, and may (without limiting the other party's remedies for such breach) be enjoined at the instance of the other party. Each party agrees that upon termination of this Agreement for any reason, absent the prior written consent of the other party, it shall have no right to and shall cease all use of the other party's proprietary property, and shall return all such proprietary property of the other party in its possession to the other party.   Owner acknowledges that Manager's proprietary information includes, but is not limited to, all books, manuals, documents, materials, business or technical information, trade secrets, systems, strategies, and all other information concerning Manager's business, and plans or policies related to the Manager or its clients that is not otherwise available to the public. The parties acknowledge and agree that a breach of this Section 7.2 will result in irreparable harm to the non-breaching party and that the non-breaching party cannot reasonably or adequately be compensated in damages, and therefore, the non-breaching party shall be entitled to equitable remedies, including, but not limited to, injunctive relief, to prevent a breach and to secure enforcement thereof in addition to any other relief or award to which the non-breaching party may be entitled.

7.3. <u>Manager Business Records</u>.   At all times during and after the Term of this Agreement, all business records and information relating to the business activities of Manager, including all books of account and general administrative records and all information generated under or contained in the management information system relating to the business activities of Manager, shall be and remain the sole property of Manager.

7.4. <u>Confidentiality of Agreement</u>. The terms of this Agreement and in particular the provisions regarding compensation, are confidential and shall not be disclosed except as necessary to the performance of this Agreement or as required by law.  In addition, except for disclosure to its bankers, underwriters, investors, or lenders, or as necessary or desirable for the conduct of business, including negotiations with other

17

acquisition candidates, neither party hereto shall disseminate or release to any third party any financial information regarding the other (past, present, or future) that was obtained by such party in the course of the negotiation of this Agreement or in the course of the performance of this Agreement, without the other party's written approval; provided, however, the foregoing shall not apply to information which (i) is generally available to the public other than as a result of a breach of confidentiality provisions; (ii) becomes available on a non-confidential basis from a source other than the other party or its affiliates or agents, which source was not itself bound by a confidentiality agreement; (iii) the disclosing party in good faith believes is required to be disclosed by law including securities laws, or pursuant to court order; or (iv) is financial information presented on a consolidated or combined basis.

7.5.   <u>HIPAA</u>.   Manager and Owner agree to comply with the privacy, security, electronic transaction standards, and breach notification regulations implemented pursuant to the Health Insurance Portability and Accountability Act of 1996 as amended by the HITECH Act as well as applicable state and local privacy and security requirements.   To this end, the parties agree to execute and comply with the terms of the Business Associate Agreement attached hereto and incorporated herein by reference.

7.6.   <u>Intellectual Property</u>.   Manager shall be the sole owner and holder of all right, title and interest, to all intellectual property furnished by it under this Agreement, including, but not limited to the trade name "NewLight Healthcare," and all substantially similar variations of the same (collectively, the "Trade Names"), all computer software, copyright, services mark and trademark right to any material or documents acquired, prepared, purchased or furnished by Manager pursuant to this Agreement.   Owner shall have no right, title or interest in or to such material and shall not, in any manner, distribute or use the same without the prior written authorization of Manager; provided, however, that the foregoing shall not restrict Hospital from distributing managed care information brochures and materials without the prior written approval of Manager provided no proprietary property of Manager is contained therein.

## 8.   <u>Term of Agreement.</u>

8.1.   The term of this Agreement shall commence as of the Effective Date and shall be for an initial term of three years unless sooner terminated pursuant to Section 9 below ("Initial Term").

8.2.   This Agreement shall automatically be renewed for additional successive three-year terms (each a "Renewal Term" and, together with the Initial Term, the "Term") unless terminated in accordance

18

with the terms hereof or unless a party provides written notice to the other party of their intent not to renew this Agreement at least 60 days prior to the end of the then current Term. Any schedule incorporated into this Agreement following the Effective Date shall have an Effective Date of the date set forth in such Schedule and the Date of Termination of such Schedule shall be the termination date of this Agreement unless otherwise specified in such Schedule.

9. **Termination.**

9.1. <u>Immediate Termination</u>.   At any time, this Agreement may be terminated immediately upon provision of written notice of termination under the following circumstances:

a.   by either party, in the event the other party materially breaches any provision of this Agreement, other than Owner's failure to pay the Management Fee in a timely manner as required by Section 5, and such breach is not corrected within thirty (30) days following written notice thereof given by the non-breaching party;

b.   by Manager, in the event Owner fails to pay the Management Fee in a timely manner as required by Section 5, and such failure is not corrected as set forth in this Section;

c.   by Manager, if Hospital is excluded or suspended from participation in the Medicare and/or Medicaid program and such exclusion is not reversed or otherwise cured within thirty (30) days of the effective date of such exclusion or suspension;

d.   mutual written agreement of the parties;

e.   by either party in the event of the sale, lease, or other similar disposition of all or substantially all of the Hospital and/or its assets to a third party, or the condemnation or destruction of all or any material part of Hospital;

f.   by Owner, in the event the sales tax, to be brought to a vote of the citizens of Pauls Valley no later than six (6) months from the date of this agreement, fails to pass;

g.   by Manager, in the event that any act or omission on the part of Owner or Hospital results in the cancellation of Hospital's insurance coverage and new or substitute insurance coverage is not obtained effective as of the cancellation date of such prior coverage despite the reasonable efforts of Manager; or

h.   by either party if Hospital ceases to operate or loses its license to operate.

19

9.2. <u>Legislative or Regulatory Change</u>.  If there shall be a change in laws, regulations, or Medicare or Medicaid general instructions, the adoption of new legislation, or court order or other governmental order any of which materially affects the manner in which either party may perform or be compensated for its services under this Agreement, the parties shall immediately propose an amendment to this Agreement or basis for compensation.  If the parties are unable to agree upon a new services arrangement or basis of compensation within 30 days following notice of the change, either party may terminate this Agreement upon thirty (30) days advance written notice.

9.3. <u>Duties Upon Termination of Agreement</u>.  The termination of this Agreement for any reason shall not affect any right, obligation or liability which has accrued under this Agreement on or before the effective date of such termination.  Upon termination of this Agreement as a whole for any reason, authority of Manager under this Agreement shall immediately cease.  All expense repayments owed to Manager and incurred up to the date of termination pursuant to the terms of the Agreement shall be paid within fifteen (15) days from the date of invoice.

9.4. <u>Agreements Surviving Termination</u>.  The termination of this Agreement shall not terminate the right of Owner or Manager in its indemnification rights relating to events occurring during the Term of this Agreement.

10.  **<u>Miscellaneous Provisions</u>**.

10.1. <u>Proprietary Items</u>.  The systems, methods, procedures and controls employed by Manager in the performance of this Agreement are proprietary in nature, shall be and remain the property of Manager, and shall not at any time during the Term or following termination of this Agreement be utilized, distributed, copied or otherwise employed by Owner except in the operation of Hospital during the Term of this Agreement.

10.2. <u>Additional Assurances</u>.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of either party, the party requested shall execute such additional instruments and take such additional acts as the requesting party may deem reasonably necessary to effectuate this Agreement.

10.3. <u>Non-Disparagement</u>. Neither Owner nor Manager shall neither, directly or indirectly, engage in any conduct or make any statement disparaging or criticizing in any way each other or any of its affiliates, or any of their personnel nor, directly or indirectly, engage in any other conduct or make any other statement that could be reasonably expected to impair the goodwill of Manager or Owner or any of its

20

affiliates, or the reputation of Manager or Owner or any of its affiliates, in each case, except to the extent required by law, and then only after consultation with Manager or Owner as the case may be to the extent possible.

10.4.   <u>Consents, Approvals and Discretion</u>.   Except as otherwise provided herein, whenever this Agreement requires any consent or approval to be given by either party or either party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

10.5.   <u>Indemnification.</u>

a.      Owner shall indemnify, hold harmless, and defend Manager, its officers, directors, and employees, from and against any and all liability, loss, damage, claim, causes of action, and expenses (including reasonable attorneys' fees) to the extent not covered by insurance, caused or asserted to have been caused, directly or indirectly, by or as a result of (i) the performance of hospital services or any other acts or omissions by or under the supervision of Owner and/or its members, agents, employees, and/or subcontractors (other than Manager) during the Term, including any claim against Manager by a Owner or Hospital employee, which claim arises out of such Hospital employee's employment relationship with Hospital or as a result of services performed by such Hospital employee and which claim would typically be covered by workers' compensation; and (ii) arising directly or indirectly, in whole or in part, out of any matter related to the breach by Hospital or Owner of any provision of this Agreement or any gross negligence or acts or omissions by Hospital or Owner (including, but not limited to, any acts or omissions by or under the supervision of Owner, Hospital and/or their employees, directors, agents or contractors (other than Manager) during the Term hereof).

b.      Manager shall indemnify, hold harmless, and defend Owner, its officers, directors, and employees, from and against any and all liability, loss, damage, claim, causes of action, and expenses (including reasonable attorneys' fees), to the extent not covered by insurance, caused or asserted to have been caused, directly or indirectly, by or as a result of (i) the performance of any intentional acts, negligent acts, or omissions by Manager prior to termination of this Agreement, and (ii) arising directly or indirectly, in whole or in part, out of any matter related to the breach by Manager of any provision of this Agreement.

21

c.   If any claim or action of a third party ("Proceeding") shall be brought or asserted against an indemnified party or successor thereto (the "Indemnified Person") in respect to which indemnity may be sought under this Section 10.5 from an indemnifying person or any successor thereto (the "Indemnifying Person"), the Indemnified Person will give prompt written notice of such Proceeding to the Indemnifying Person who shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Person and the payment of all expenses; provided, that any delay or failure to so notify the Indemnifying Person shall relieve the Indemnifying Person of its obligations hereunder only to the extent, if at all, that it is prejudiced by reason of such delay or failure. The Indemnified Person shall have the right to employ separate counsel in any Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Person unless the Indemnified Person shall in good faith determine that there exist actual or potential conflicts of interest that make representation by the same counsel inappropriate.   In the event that the Indemnifying Person, within ten (10) days after notice of any such Proceeding, fails to assume the defense thereof, the Indemnified Person shall have the right to undertake the defense, compromise, or settlement of such Proceeding for the account of the Indemnifying Person, subject to the right of the Indemnifying Person to assume the defense of such Proceeding with counsel reasonably satisfactory to the Indemnified Person at any time prior to the settlement, compromise, or final determination thereof.   The Indemnifying Person shall not, without the Indemnified Person's prior written consent, settle or compromise any Proceeding or consent to the entry of any judgment with respect to any Proceeding for anything other than money damages paid by the Indemnifying Person.

d.   Neither party shall have any liability whatsoever for damages suffered on account of the willful misconduct or negligent actions or inactions of any employee, agent or independent contractor of the other party; provided, however, that the foregoing shall not relieve either party from its obligations under this Agreement. Each party shall be solely responsible for compliance with all state and federal laws pertaining to employment taxes, income withholding, unemployment compensation contributions and other employment related statutes regarding their respective employees, agents and servants.

NEWLIGHT HEALTHCARE
1790948.4

e.   This Section 10.5 shall survive termination or expiration of this Agreement.

10.6.  <u>Limited Waiver of Sovereign Immunity</u>.  To the extent permitted by applicable laws, Owner voluntarily waives its right to assert sovereign immunity from suit or liability in response to an action by Manager seeking enforcement of this Agreement.  Owner does not otherwise waive immunities existing under applicable laws, and it is expressly understood that the waiver here granted is a limited and not a general waiver, and that its effect is limited to specific claims under this Agreement. Nothing in this provision or in this Agreement shall be construed as a waiver of Owner's immunity from tort liability except as provided by applicable Oklahoma law.

10.7.  <u>Legal Fees and Costs</u>.  In the event either party incurs legal expenses to enforce or interpret any provision of this Agreement, the prevailing party will be entitled to recover such legal expenses, including, without limitation, reasonable attorney's fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

10.8.  <u>Choice of Law</u>.   The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma.

10.9.  <u>Benefit/Assignment</u>.   Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that neither party may assign this Agreement or any or all of its rights or obligations hereunder (except by operation of law) without the prior written consent, which consent may be unreasonably withheld or delayed.

10.10. <u>No Brokerage</u>.  The parties represent to each other that no broker has in any way been contracted in connection with the transactions contemplated hereby.

10.11. <u>Cost of Transaction</u>.   Upon completion of the transactions contemplated, the parties agree as follows:  (i) Owner will pay the fees, expenses and disbursements of Hospital and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto; and (ii) Manager will pay the fees, expenses and disbursements of its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

10.12. <u>Waiver of Breach</u>.  The waiver by either party of breach or violation of any provision of this Agreement shall not operate as, or be construed

23

to be, a waiver of any subsequent breach of the same or other provision hereof.

10.13. Notices.  Any written notices, demands or communications required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed as follows:

To Owner:       Pauls Valley Hospital Authority
                Attn: Secretary of Pauls Valley Hospital Authority
                PO Box 778
                100 W. Paul Avenue
                Pauls Valley, OK 73075; and

                James W. Carlton, Jr., Authority Counsel
                PO Box 10
                Pauls Valley, OK 73075

To Manager:     NewLight Healthcare, LLC
                Attention: Todd Biederman
                3267 Bee Caves Rd., Suite 107-511
                Austin, Texas 78746

Or to such other address, and to the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party.

10.14. Severability.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be in full force and effect, enforceable in accordance with its terms.

10.15. Divisions and Headings.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely convenience and shall have no legal effect whatsoever in construing the provisions of this Agreement.

10.16. Entire Agreement.  This Agreement contains the entire agreement between the parties and shall not be modified or amended in any manner except by an instrument in writing executed by the parties hereto.

10.17. Authorization for Agreement.  The execution and performance of this Agreement by Contractor and Hospital have been duly authorized by all necessary laws, resolutions and corporate or partnership action and

24

EXHIBIT  A
Page 24 of 26

this Agreement shall constitute the valid and enforceable obligations of the Contractor and Hospital in accordance with its terms.

10.18. <u>Licenses, Permits and Certificates</u>.   Manager and Owner shall each obtain and maintain in effect, during the Term, all licenses, permits and certificates required by law which are applicable to their respective performance pursuant to this Agreement.

10.19. <u>No Responsibility for Hospital's Fraudulent Acts</u>.   Manager shall not be liable for any direct, indirect or consequential damages, losses, taxes, interest or penalties arising from its discovery or failure to discover any errors, irregularities or illegal acts of Owner, Hospital or its employees, independent contractors, fiduciaries, agents or representatives, including, but not limited to, acts of fraud, embezzlement or defalcations.

10.20. <u>Government Receivables</u>.   The parties intend to fully comply with the laws and regulations of the United States under (i) 42 U.S.C. 1395u(b)(6) in connection with Medicare, (ii) 42 U.S.C. 1396a(a)(32) in connection with Medicaid, (iii) 32 C.F.R. 199.1 *et seq.* in connection with TRICARE and (iv) all other provisions affecting government receivables.   Accordingly, notwithstanding any provision to the contrary herein, in no event shall any term or condition of this Agreement require any action or other conduct which violates any such laws and regulations.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in multiple originals by their duly authorized officers, all as of the day and year first above written.

**OWNER:**
Pauls Valley Hospital Authority

By: _____

Name:  Gary Alfred

Title:  Authority Chairman

Date of Execution:  *11-18-13*

**MANAGER:**
NEWLIGHT HEALTHCARE, LLC

EXHIBIT A
Page 25 of 26

By: _Todd F. Biederman_

Name:  Todd Biederman

Title:  President and Chief Executive Officer

Date of Execution: _11-19-2013_

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is made as of October 3, 2016, by PAULS VALLEY HOSPITAL AUTHORITY, an Oklahoma public trust ("Debtor"), in favor of NEWLIGHT HEALTHCARE, LLC, a Texas limited liability company, and LTC GROUP, LLC, a Texas limited liability company (collectively with their successors and assigns, are collectively referred to herein as "Secured Parties"). PAULS VALLEY NATIONAL BANK ("Lender") enters into this Agreement for the purposes described herein.

A.      Pursuant to that certain Loan Agreement (the "Loan Agreement") dated April 1 , 2015, Pauls Valley National Bank ("Lender") made a loan to Debtor (the "Loan") which is evidenced by that certain Sales Tax Revenue Note, Taxable Series 2015 dated April 1, 2015 in the original principal amount of $2,041,000.00 (the "Note").

B.      Lender cannot loan additional funds to Debtor without additional collateral for the Loan and any other debts owed by Debtor to Lender.

C.      As an inducement to Lender to lend additional funds to Debtor, the Secured Parties entered into those certain Pledge Agreements (the "Pledge Agreements") dated of even date herewith with Lender wherein Secured Parties pledged certificates of deposit to Lender as additional collateral for the Loan.

D.      As consideration for entering into the Pledge Agreements, Secured Parties are requiring that Debtor enter into this Agreement with Borrower to grant Secured Parties a security interest in Debtor's accounts revenue as described herein and indemnify Secured Parties for any liability they might incur under the Pledge Agreements.

NOW, THEREFORE, as consideration for the Lenders making the Modifications, and in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Debtor and the Secured Parties hereby agrees as follows:

1.      Definitions. For the purposes of this Security Agreement, the following terms shall have the following meanings:

"Bank Liabilities" means and includes any and all indebtedness, obligations and liabilities of any kind arising in any way of Debtor to the Lender, now existing or hereafter created, under the Note, the other Credit Documents, or otherwise, including any amortization, future advances, whether obligatory or voluntary, under, or refinancings, renewals or extensions of or substitutions for, any existing or future debt and all liabilities and obligations of Debtor hereunder; as well as all costs, expenses, advances and liabilities that may be made or incurred by Lender in any way in connection with any of the Bank Liabilities or any collateral security therefor.

"Books and Records" means all of Debtor's books and records, including, but not limited to, records indicating, summarizing, or evidencing the Collateral, the Bank Liabilities, the NewLight Liabilities, and Debtor's property, business operations, or financial condition, computer runs, invoices, disks, cd-roms, tapes, processing software, processing contracts (such as contracts for computer time and services) and any computer prepared information, disks, cd-roms, tapes, or data of every kind and description, whether in the possession of Debtor or in the possession of third parties.

"Collateral" means all of the following described property owned by Debtor, whether now owned or hereafter acquired:

      (a)    ACCOUNTS, which means any "account," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by Debtor, and in any event shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor: accounts, accounts receivable, contract rights, bills, acceptances, and other forms of obligations arising out of the sale, lease or consignment of goods or the rendition of services by Debtor; together with any property evidencing or relating to the Accounts (such as guaranties, credit insurance), any security for the Accounts, and all Books and Records relating thereto; and

      (b)    PROCEEDS, which means any "proceeds," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by Debtor, and in any event shall include, without limitation: any and all Proceeds of any of the foregoing, including, without limitation, whatever is received upon the use, lease, sale, exchange, collection, any other utilization or any disposition of any of the Collateral described in this Section 1, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property and all insurance therefor.

"Credit Documents" means collectively, all credit accommodations, notes, investment agreements, loan agreements, guarantees, security agreements, mortgages, instruments, pledge agreements, assignments, acceptance agreements, commitments, facilities, reimbursement agreements and any other agreements, documents and instruments, now or hereafter existing, creating, evidencing, guarantying, securing or relating to any or all of the Bank Liabilities, together with all amendments, modifications, renewals, or extensions thereof, including, without limitation, the Note.

"Event of Default" means (i) any Event of Default as defined in the Note, the Loan Agreement, or any other Credit Document, (ii) failure of Debtor to pay any sum due pursuant to any of the Bank Liabilities or the NewLight Liabilities as and when due, whether by stated maturity, demand, acceleration or otherwise, (iii) the foreclosure or conveyance in lieu of foreclosure of all or any portion of the collateral provided in the Pledge Agreements; or (iv) any breach or violation of any representation, warranty, covenant or term of this Agreement, the Management Agreement, or any other agreement between Debtor and one or both of the Secured Parties.

"Management Agreement" means that certain Management Services Agreement dated November 12, 2013 by and between Debtor and NewLight Healthcare, LLC.

"NewLight Liabilities" means and includes any and all indebtedness, obligations. and liabilities of any kind arising in any way of Debtor to either or both of the Secured Parties, now existing or hereafter created, under the Management Agreement, this Agreement, or otherwise, including any amortization, future advances, whether obligatory or voluntary, under, or refinancings, renewals or extensions of or substitutions for, any existing or future debt and all liabilities and obligations of Debtor hereunder; as well as all costs, expenses, advances and liabilities that may be made or incurred by the Secured Parties in any way in connection with any of the NewLight Liabilities or any collateral security therefor.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas and any other applicable state.

    2.    Security Interest. As security for the due and punctual complete payment and full and complete performance of each of the NewLight Liabilities, Debtor hereby grants to the Secured Parties a

security interest in and general lien upon all of Debtor's right, title and interest in and to all the Collateral and any part thereof.

3.    Indemnity of Secured Parties. Debtor shall indemnify and hold harmless Secured Parties (for purposes of this subsection, the term "Secured Parties" shall include the managers, officers, employees, members, and agents of Secured Parties and any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Secured Parties) from and against, and reimburse them for, all claims, demands, liabilities, losses, damages, causes of action, judgments, penalties, costs and expenses (including, without limitation, reasonable attorney fees) which may be imposed upon, asserted against or incurred or paid by them by reason of, on account of or in connection with the Pledge Agreements, the Management Agreement, or on account of any transaction arising out of or in any way connected with the Collateral or with this Agreement. **WITHOUT LIMITATION, IT IS THE INTENTION OF DEBTOR AND DEBTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEY FEES) WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PARTY OR ANY STRICT LIABILITY. HOWEVER, SUCH INDEMNITIES SHALL NOT APPLY TO ANY INDEMNIFIED PARTY TO THE EXTENT THE SUBJECT OF THE INDEMNIFICATION IS CAUSED BY OR ARISES OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY.** The foregoing indemnities shall survive the termination of this Agreement, any foreclosure of the collateral provided in the Pledge Agreements or conveyance in lieu of foreclosure and the repayment of the Loan and the discharge, and release of the Credit Documents.

4.    Representations and Warranties. Debtor represents and warrants to the Secured Parties, which representations and warranties shall be continuing representations and warranties until all of the NewLight Liabilities are satisfied in full, as follows:

4.1    Locations. Debtor shall not change its chief place of business, chief executive offices and the office(s) where Debtor's records are kept concerning accounts, contract rights without providing Secured Parties thirty (30) days' prior written notice.

4.2    Trade Names. It conducts business under and through its legal name as set forth on the signature page hereto.

4.3    Formation and Authority. Debtor is duly organized and validly existing and in good standing under the laws of the State of Oklahoma and is qualified and licensed to do business in those jurisdictions where the conduct of its business or ownership of its properties requires such qualification or license. Debtor has the power and authority to own the Collateral, to enter into and perform this Security Agreement and any other documents or instruments executed in connection herewith, and to incur the NewLight Liabilities.

4.4    Duly Authorized; Not in Violation of Law. This Security Agreement and any other documents or instruments executed in connection herewith have been duly authorized, executed, and delivered, and constitute the legal, valid, and binding obligations of Debtor, enforceable against Debtor in accordance with their respective terms, except as enforcement may be limited by public policy, applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting, the enforcement of creditors' rights generally and by general principles of equity relating to enforceability (regardless of whether considered in a proceeding at law or in equity). This

Security Agreement and any other documents and instruments executed in connection herewith do not and will not violate any law, the charter, the bylaws or organizational documents of Debtor, or any other agreement or instrument to which Debtor or any of its property may be bound or subject.

4.5     No Consents Necessary.

(a)     No consent or approval of any person or entity, including, without limitation, any debt or equity holder of Debtor, any equipment lender or of any public authority, is necessary for the valid execution, delivery and performance of this Security Agreement by Debtor, or any document or instrument executed in connection herewith.

(b)     The filing of UCC financing statements naming Debtor as "debtor" and the Secured Parties as "secured party" in the appropriate filing offices, and the requisite filing requirements to perfect security interests in bank accounts and motor vehicles, no authorization, consent, approval or other action by, and no notice to or filing or recording with, any governmental, administrative or judicial authority or regulatory body is currently or is reasonably expected to be required either (i) for the grant by Debtor of the liens and security interests granted hereby or for the execution, delivery or performance of this Security Agreement by Debtor, or (ii) for the perfection of or the exercise by the Secured Parties of its rights and remedies hereunder.

4.6     Rights in Collateral.

(a)     Debtor is the sole owner of each item of Collateral in which it is granting a security interest hereunder, having good and marketable title thereto free and clear of any and all Liens.

(b)     No effective security agreement, financing statement, equivalent security or Lien, instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as has been filed in favor of the Secured Parties pursuant to this Security Agreement.

4.7     Regarding Accounts. Each Account represents a bona fide account arising in the ordinary course of Debtor's business completed in accordance with the terms and provisions contained in the documents available to the Secured Parties with respect thereto and may or may not be evidenced by a document.  There are no material setoffs, claims or disputes existing or, to the best of Debtor's knowledge, asserted with respect to any Account, and Debtor has not made any agreement with any Account debtor with any deduction therefrom except a discount or allowance allowed by Debtor in the ordinary course of its business for prompt payment.  To the best of Debtor's knowledge, there are no facts, events or occurrences that in any way impair the validity or enforcement of any Account or will likely reduce the amount payable thereunder as shown on the respective aged receivable trial balances, Debtor's books and records and all invoices and statements delivered to the Secured Parties with respect thereto.  Debtor has received no notice of proceedings or actions that are threatened or pending against any Account debtor that will likely result in any material adverse change in such Account debtor's financial condition.  Debtor has no knowledge that any Account debtor is unable generally to pay its debts as they become due.

5.     Further Assurances; Filing.

5.1     Delivery of Documents; Inspection of Collateral.  At any time and from time to time, upon the demand of the Secured Parties, Debtor will, at Debtor's expense: (a) immediately deliver and pledge to the Secured Parties, properly endorsed to the Secured Parties and/or accompanied by such instruments of assignment and transfer in such form and substance as the Secured Parties may request,

any and all documents as the Secured Parties may specify in their demand; (b) give, execute, deliver, file, and/or record any notice, statement, instrument, assignment, document, agreement, or other papers that may be necessary or desirable, or that the Secured Parties may request, in order to create, preserve, perfect, or validate any security interest granted pursuant hereto or intended to be granted hereunder or to enable the Secured Parties to exercise or enforce their rights hereunder or with respect to such security interest; (c) keep, stamp, or otherwise mark any and all documents and its Books and Records relating to the Collateral in such manner as the Secured Parties may reasonably require; and/or (d) permit representatives and agents of the Secured Parties access to its premises at any time reasonably requested by the Secured Parties to inspect the Collateral and the Books and Records and to audit and make abstracts from the Books and Records.

5.2     Filing of Financing Statement. At the sole option of the Secured Parties, and without Debtor's consent, the Secured Parties may file a carbon, photographic or other reproduction of this Security Agreement or any financing statement executed pursuant hereto as a financing statement in any jurisdiction so permitting.

5.3     Secured Parties' Collateral Custody Duties. With respect to the Collateral, or any part thereof, which at any time may come into the possession, custody or under the control of the Secured Parties or any of its agents, associates or correspondents, Debtor hereby acknowledges and agrees that the sole duty of the Secured Parties with respect to the custody, safekeeping and physical preservation of such Collateral, whether pursuant to Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account. Neither the Secured Parties, nor any of their respective partners, members, managers, directors, officers, employees, affiliates, agents, associates or correspondents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so.

6.     Covenants. Debtor hereby covenants and agrees that for as long as any NewLight Liabilities are outstanding:

6.1     Defense of Collateral. Debtor shall defend the Collateral against all claims and demands of all persons or entities at any time claiming the same or any interest therein other than the Secured Parties.

6.2     Notice of Changes in State of Formation, Form of Entity, Location of Chief Executive Office, Residence, Books and Records, Collateral. Debtor shall provide the Secured Parties with prompt prior written notice of: (a) any intended change in the form of entity of Debtor, and/or the state of formation; (b) any intended change in the chief executive office or residence of Debtor, and/or the office where Debtor maintains its Books and Records; and (c) the location or movement of any Collateral to or at an address other than Debtor's address as set forth on the signature page hereof.

6.3     Prompt Payment of Taxes; Delivery to the Secured Parties of Proof of Payment. Debtor shall promptly pay any and all taxes, assessments, and/or governmental charges upon the Collateral on the dates such taxes, assessments, and/or governmental charges are due and payable, except to the extent that such taxes, assessments, and/or charges are contested in good faith by Debtor by appropriate proceedings and for which Debtor is maintaining adequate reserves.

6.4     Notice of Adverse Changes, Events of Default, Seizures and Institution of Litigation. Debtor shall immediately notify the Secured Parties of: (a) the occurrence of any event or circumstance that is reasonably likely to result in a material adverse effect on Debtor's business, property, or financial condition, including, without limitation, any loss of or damage to any Collateral; (b) the occurrence of an Event of Default; (c) any seizure of the Collateral; (d) any claims or alleged claims of

third parties to the Collateral that, either singly or in the aggregate, is reasonably likely to have a material adverse effect on Debtor or the Collateral; and (e) upon obtaining knowledge thereof, the institution of any litigation, arbitration, governmental investigation or administrative proceedings against or affecting Debtor or any of the Collateral that, if adversely determined, is reasonably likely, either singly or in the aggregate, to result in an Event of Default or to have a material adverse effect on Debtor, its business, property, or financial condition.

6.5     Maintenance of Books and Records.  Debtor shall maintain complete and accurate Books and Records in accordance with generally accepted accounting principles in effect in the United States from time to time, and shall make all necessary entries therein to reflect the costs, values and locations of its Inventory and Equipment and the transactions giving rise to its Accounts and all payments, credits and adjustments thereto.

6.6     Additional Insurance.  Except with respect to any of Debtor's securities issued to the Secured Parties in connection with the Note, Debtor shall not issue any debt, equity or derivative securities after the date hereof, without the consent of the Secured Parties, such consent not to be unreasonably withheld.

6.7     Secured Parties as Attorney-in-Fact.  Debtor hereby irrevocably appoints Secured Parties (and any of their attorneys, officers, employees, or agents) as its true and lawful attorney-in-fact, said appointment being coupled with an interest, with full power of substitution, in the name of Debtor, or otherwise, for the sole use and benefit of Secured Parties in their sole discretion, but at Debtor's expense, to exercise, to the extent permitted by law, in Secured Parties' names or in the name of Debtor or otherwise, the powers set forth herein, whether or not any of the NewLight Liabilities are due, such powers, including but not limited to the powers at any time following demand for payment under the Note, or the occurrence of an Event of Default: (a) to demand, collect, receive payment of, settle, compromise or adjust all or any of the Collateral; (b) to sign and file one or more financing statements naming Debtor as debtor and Secured Parties, collectively, as secured party and indicating therein the types or describing the items of Collateral herein specified; and (c) to execute any notice, statement, instrument, agreement, or other paper that the Lenders may require to create, preserve, perfect, or validate any security interest granted pursuant hereto or to enable Secured Parties to exercise or enforce its rights hereunder or with respect to such security interest.

6.8     Liability of Attorney-in-Fact.  Neither Secured Parties nor their attorneys, officers, employees, or agents shall be liable for acts, omissions, any error in judgment or mistake in fact in its/their capacity as attorney-in-fact other than as a result of Secured Parties' gross negligence or willful misconduct. Debtor hereby ratifies all acts of Secured Parties as its attorney-in-fact other than as a result of the gross negligence or willful misconduct of Secured Parties. This power, being coupled with an interest, is irrevocable until the NewLight Liabilities have been fully satisfied. Secured Parties shall not be required to take any steps necessary to preserve any rights against prior parties with respect to any of the Collateral.

6.9     Effect of Extensions and Modifications.  Secured Parties may extend the time of payment, arrange for payment in installments or otherwise modify the terms of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, Debtor.

7.      Remedies.

7.1     Acceleration of Obligations; General Rights of the Secured Parties.  Upon the occurrence of an Event of Default, at the Secured Parties' sole option, all obligations, including duties and

payments, owed to Secured Parties pursuant to this Agreement, the Management Agreement, or any other agreement between Debtor and either Secured Party (collectively, the "Obligations"), shall immediately become due and payable in full, all without protest, presentment, demand or further notice of any kind to Debtor, all of which are expressly waived. Upon and following an Event of Default, the Secured Parties may, at their option, exercise any and all rights and remedies they have under this Security Agreement, the Management Agreement, any other agreement between Debtor and either Secured Party and/or applicable law, including, without limitation, the right to charge and collect interest on the principal portion of the Obligations at a rate equal to ten percent (10%) per annum, upon and after an Event of Default, maturity (whether by acceleration or otherwise) and entry of a judgment in favor of the Secured Parties with respect to any or all of the Obligations.

7.2    Additional Rights and Remedies.  In addition to the rights and remedies available to the Secured Parties as set forth above and any other rights or remedies available to the Secured Parties under applicable law, upon the occurrence of an Event of Default hereunder, or at any time thereafter, the Secured Parties may at their option, immediately and without notice, do any or all of the following, which rights and remedies are cumulative, may be exercised from time to time, and are in addition to any rights and remedies available to the Secured Parties under any other agreement or instrument by and between Debtor and the Secured Parties, as applicable:

(a)    Exercise any and all of the rights and remedies of a secured party under the UCC, including, without limitation, the right to require Debtor to assemble the Collateral and make it available to the Secured Parties at a place reasonably convenient to the parties;

(b)    Notify the account debtors for any of the Accounts to make payment directly to the Secured Parties, or to such post office box as the Secured Parties may direct;

(c)    Demand, sue for, collect or retrieve any money or property at any time payable, receivable on account of or in exchange for, or make any compromise, or settlement deemed desirable with respect to any of the Collateral; and

(d)    Upon twenty (20) days' prior written notice to Debtor (or one (1) day's notice by telephone with respect to Collateral that is perishable or threatens to decline rapidly in value), which Debtor hereby acknowledges to be sufficient, commercially reasonable and proper, the Secured Parties may sell any or all of the Collateral at any time and from time to time at public or private sale (using good faith efforts in such private sale), with or without advertisement thereof, and apply the proceeds of any such sale first to the Secure Parties' expenses in preparing the Collateral for sale (including reasonable attorneys' fees) and second to the complete satisfaction of the NewLight Liabilities in any order deemed appropriate by the Secured Parties in their sole discretion. Debtor waives the benefit of any marshaling doctrine with respect to the Secured Parties' exercise of its rights hereunder. The Secured Parties or anyone else may be the purchaser of any or all of the Collateral so sold and thereafter hold such Collateral absolutely, free from any claim or right of whatsoever kind, including any equity of redemption of Debtor any such notice, right and/or equity of redemption being hereby expressly waived and released.

8.    Miscellaneous.

8.1    Remedies Cumulative; No Waiver.  The rights, powers and remedies of the Secured Parties provided in this Security Agreement and the Management Agreement are cumulative and not exclusive of any right, power or remedy provided by law or equity. No failure or delay on the part of the Secured or any of them in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

8.2     Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been properly delivered and received by email where confirmation or receipt by the receiving party's receiver can be documented, by facsimile where confirmation of good transmission or receipt by the receiving party's receiver is documented, upon receipt when personally delivered by hand or by reputable overnight courier, or three (3) business days  after being mailed by first class certified or registered mail, postage prepaid, as follows:

(a)     If to the Debtor:

_____

_____

_____

(b)     If to the Secured Parties:

*New Light Healthcare, LLC   Attn: Todd Biederman*
*3267 Bee Caves Rd., Ste 107-517*
*Austin, TX  78746*

or to such other address or addresses as the party to whom such notice is directed may have designated in writing to the other party hereto.  A notice shall be deemed to have been given upon receipt by the party to whom such notice is directed, or if receipt is refused, on the day on which delivery was attempted.

8.3     Costs and Expenses.  Debtor shall promptly pay (or reimburse, as the Secured Parties may elect) all costs and expenses that the Secured Parties may hereafter incur in connection with the perfection and enforcement of this Agreement, the Management Agreement, the collection of all amounts due under this Agreement or the Management Agreement, and all amendments, modifications, consents or waivers, if any, to this Agreement or the Management Agreement.

8.4     Governing Law.  This Agreement has been entered into and shall be construed and enforced in accordance with the internal substantive laws of the State of Texas without reference to the choice of law principles thereof, except as provided in the UCC as adopted in such state as to matters of perfection and priority of security interests.

8.5     Integration.  This Security Agreement and the Management Agreement constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

8.6     Amendment; Waiver.  No amendment of this Security Agreement, and no waiver of any one or more of the provisions hereof shall be effective unless set forth in writing and signed by the parties hereto.

8.7     Successors and Assigns.  This Security Agreement shall be binding upon Debtor and the Secured Parties and, where applicable, their respective heirs, executors, administrators, successors and permitted assigns.

8.8     Assignment. Debtor may not assign its rights hereunder or any interest herein without the prior written consent of the Secured Parties, which consent may be withheld in their sole discretion, and any such assignment or attempted assignment by Debtor shall be void and of no effect with respect to the Secured Parties.

8.9     Severability.  The illegality or unenforceability of any provision of this Security Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Security Agreement or any instrument or agreement required hereunder. In lieu of any illegal or unenforceable provision in this Security Agreement, there shall be added automatically as a part of this Security Agreement a legal and enforceable provision as similar in terms to such illegal or unenforceable provision as may be possible.

8.10     Headings.  The headings of sections and sections have been included herein for convenience only and shall not be considered in interpreting this Security Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;**
**SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement on this date above first written.

ATTEST:

BY: _____

**DEBTOR:**

**PAULS VALLEY HOSPITAL AUTHORITY,**
an Oklahoma public trust

By: _____
Name: _____
Title: _____

**SECURED PARTIES:**

**NEWLIGHT HEALTHCARE, LLC,**
a Texas limited liability company

By: _____
Name: Todd F. Biederman
Title: President and CEO

**LTC GROUP, LLC,**
a Texas limited liability company

By: _____
Name: Todd F. Biederman
Title: President

## ACKNOWLEDGEMENT AND CONSENT

The undersigned, Pauls Valley National Bank, hereby acknowledges and consents for all purposes to Debtor entering into this Agreement, including Debtor granting the security interest in certain of its assets as described herein.

**LENDER:**

**PAULS VALLEY NATIONAL BANK**

By: _____

Name: _____

Title: _____

FIRST AMENDMENT
TO
SECURITY AGREEMENT

THIS FIRST AMENDMENT TO SECURITY AGREEMENT (this "Amendment") is entered into effective as of December 1, 2016 ("Commencement Date") by and among PAULS VALLEY HOSPITAL AUTHORITY, an Oklahoma public trust ("Debtor"), NEWLIGHT HEALTHCARE, LLC, a Texas limited liability company, and LTC GROUP, LLC, a Texas limited liability company (with their successors and assigns, are collectively referred to herein as "Secured Parties").

WHEREAS, Debtor and Secured Parties entered into that certain Security Agreement (the "Agreement") dated as of October 3, 2016 wherein Debtor granted to Secured Parties a secured interest in certain Collateral (as defined in the Agreement);

WHEREAS, Debtor desires to grant Secured Parties a secured interest in additional assets, to acknowledge that the Agreement provides security for additional Debtor liabilities, and to amend certain provisions of the Agreement as set forth herein;

NOW THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, Debtor and Secured Parties do hereby agree as follows:

1.    Defined Terms.  All capitalized terms used but not otherwise defined in this Amendment have the same meanings as in the Agreement.

2.    Revised and New Definitions in Section 1.

a.    The definition of "Collateral" in Section 1 of the Agreement is hereby deleted in its entirety and replaced with the following:

" "Collateral" means all of the following described property owned by Debtor, whether now owned or hereafter acquired:

(a)    ACCOUNTS, which means any "account," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by Debtor, and in any event shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor:  accounts, accounts receivable, contract rights, bills, acceptances, and other forms of obligations arising out of the sale, lease or consignment of goods or the rendition of services by Debtor; together with any property evidencing or relating to the Accounts (such as guaranties, credit insurance), any security for the Accounts, and all Books and Records relating thereto;

(b)    any moneys received for Medicare or Medicaid Electronic Health Record Stimulus or any cost report settlements (including any re-openings of prior cost reports); and

1

EXHIBIT C
Page 1 of 6

(c)     PROCEEDS, which means any "proceeds," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by Debtor, and in any event shall include, without limitation: any and all Proceeds of any of the foregoing, including, without limitation, whatever is received upon the use, lease, sale, exchange, collection, any other utilization or any disposition of any of the Collateral described in this Section 1, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property and all insurance therefor."

b.     Revised Definition of Event of Default.   The clause (iv) of the definition of "Event of Default" in Section 1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"(iv) any breach or violation of any representation, warranty, covenant or term of this Agreement, the Management Agreement, the NewLight Note, or any other agreement between Debtor and one or both of the Secured Parties."

c.     Revised Definition of NewLight Liabilities.   The definition of "NewLight Liabilities" in Section 1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"NewLight Liabilities" means and includes any and all indebtedness, obligations, and liabilities of any kind arising in any way of Debtor to either or both of the Secured Parties, now existing or hereafter created, under the Management Agreement, this Agreement, the NewLight Note, or otherwise, including any amortization, future advances, whether obligatory or voluntary, under, or refinancings, renewals or extensions of or substitutions for, any existing or future debt and all liabilities and obligations of Debtor hereunder; as well as all costs, expenses, advances and liabilities that may be made or incurred by the Secured Parties in any way in connection with any of the NewLight Liabilities or any collateral security therefor.

d.     New Definition of NewLight Note.   The following definition of "NewLight Note" is hereby added to the end of in Section 1 of the Agreement:

"NewLight Note" means that certain Promissory Note dated December 1, 2016 in the original principal amount of $1,050,000.00, or, if less, the total of advances made thereon, made by Debtor in favor of NewLight Healthcare, LLC, a Texas limited liability company.

3.     Revised Section 3.   Section 3 of the Agreement is hereby deleted in its entirety and replaced with the following:

"3.     Indemnity of Secured Parties.   Debtor shall indemnify and hold harmless Secured Parties (for purposes of this subsection, the term "Secured Parties" shall include the managers, officers, employees, members, and agents of Secured Parties and any persons or entities owned or controlled by, owning or controlling, or under common

2

EXHIBIT C
Page 2 of 6

control or affiliated with Secured Parties) from and against, and reimburse them for, all claims, demands, liabilities, losses, damages, causes of action, judgments, penalties, costs and expenses (including, without limitation, reasonable attorney fees) which may be imposed upon, asserted against or incurred or paid by them by reason of, on account of or in connection with the Pledge Agreements, the Management Agreement, the NewLight Note, or on account of any transaction arising out of or in any way connected with the Collateral or with this Agreement. **WITHOUT LIMITATION, IT IS THE INTENTION OF DEBTOR AND DEBTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEY FEES) WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PARTY OR ANY STRICT LIABILITY. HOWEVER, SUCH INDEMNITIES SHALL NOT APPLY TO ANY INDEMNIFIED PARTY TO THE EXTENT THE SUBJECT OF THE INDEMNIFICATION IS CAUSED BY OR ARISES OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY.** The foregoing indemnities shall survive the termination of this Agreement, any foreclosure of the collateral provided in the Pledge Agreements or conveyance in lieu of foreclosure and the repayment of the Loan and the discharge, and release of the Credit Documents."

4.     Revised Section 7.1. Section 7.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"7.1     Acceleration of Obligations; General Rights of the Secured Parties. Upon the occurrence of an Event of Default, at the Secured Parties' sole option, all obligations, including duties and payments, owed to Secured Parties pursuant to this Agreement, the Management Agreement, the NewLight Note or any other agreement between Debtor and either Secured Party (collectively, the "Obligations"), shall immediately become due and payable in full, all without protest, presentment, demand or further notice of any kind to Debtor, all of which are expressly waived. Upon and following an Event of Default, the Secured Parties may, at their option, exercise any and all rights and remedies they have under this Security Agreement, the Management Agreement, the NewLight Note, or any other agreement between Debtor and either Secured Party and/or applicable law, including, without limitation, the right to charge and collect interest on the principal portion of the Obligations at a rate equal to ten percent (10%) per annum (or in the case of the NewLight Note, twelve and three quarters of one percent (12.75%) per annum), upon and after an Event of Default, maturity (whether by acceleration or otherwise) and entry of a judgment in favor of the Secured Parties with respect to any or all of the Obligations."

EXHIBIT C
Page 3 of 6

5.   <u>Revised Section 8.1</u>.  Section 8.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"8.1   <u>Remedies Cumulative; No Waiver</u>.   The rights, powers and remedies of the Secured Parties provided in this Security Agreement, the Management Agreement, and the NewLight Note are cumulative and not exclusive of any right, power or remedy provided by law or equity.  No failure or delay on the part of the Secured or any of them in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy."

6.   <u>Revised Section 8.2(a)</u>.  Section 8.2(a) of the Agreement is hereby deleted in its entirety and replaced with the following:

"(a)   If to the Debtor:

Pauls Valley General Hospital
100 Valley Drive
Pauls Valley, Oklahoma  73075
Attn:  Board of Trustees"

7.   <u>Revised Section 8.3</u>.  Section 8.3 of the Agreement is hereby deleted in its entirety and replaced with the following:

"8.3   <u>Costs and Expenses</u>.  Debtor shall promptly pay (or reimburse, as the Secured Parties may elect) all costs and expenses that the Secured Parties may hereafter incur in connection with the perfection and enforcement of this Agreement, the Management Agreement, the NewLight Note, the collection of all amounts due under this Agreement, the Management Agreement, the NewLight Note, and all amendments, modifications, consents or waivers, if any, to this Agreement, the Management Agreement, or the NewLight Note."

8.   <u>Revised Section 8.5</u>.  Section 8.5 of the Agreement is hereby deleted in its entirety and replaced with the following:

"8.5   <u>Integration</u>.   This Security Agreement, the Management Agreement, and the NewLight Note constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof."

9.   <u>Commencement Date</u>.  This Amendment shall be construed and interpreted as if it were executed simultaneously with the Agreement and that the terms of this Amendment shall take effect as if they were part of the Agreement upon its execution and delivery.

10.   <u>Conflict</u>.  The terms of this Amendment prevail if there is a conflict with the terms of the Agreement.

EXHIBIT C
Page 4 of 6

11.     Ratification.  The Agreement, as amended and modified by this Amendment, is ratified and confirmed by the parties and remains in full force and effect.

12.     Authorization.  The signing and performance of this Amendment has been duly and validly authorized, executed, and delivered by Operator and Atrium, and this Amendment constitutes the valid and enforceable obligation of the parties in accordance with its terms.

13.     Entire Agreement.  The Agreement, as amended by this Amendment, contains the entire agreement among the parties with respect to the subject matter hereof. All prior negotiations and understandings are merged herein.

14.     No Presumption in Drafting.   The parties acknowledge that they have independently negotiated the provisions of this Amendment, that they have relied upon their own counsel as to matters of law and application and that no party has relied on any other party with regard to such matters. The parties expressly agree that there shall be no presumption created as a result of any party having prepared in whole or in part any provisions of this Amendment.

15.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Amendment and of signature pages by facsimile, or by PDF or similar imaging transmission, will constitute effective execution and delivery of this Amendment as to the parties and may be used in lieu of the original Amendment for all purposes.  Signatures of the parties transmitted by facsimile, or by .pdf or similar imaging transmission, will be deemed to be their original signatures for any purpose whatsoever.

[Signature page follows.]

EXHIBIT   C
Page 5 of 6

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be executed by their duly authorized representatives as of the Commencement Date.

ATTEST:

BY: _Kera Burk_____

**DEBTOR:**

**PAULS VALLEY HOSPITAL AUTHORITY,**
an Oklahoma public trust

By: _Gary Alfred_____
Name: _Gary Alfred_____
Title: _Chairman_____

**SECURED PARTIES:**

**NEWLIGHT HEALTHCARE, LLC,**
a Texas limited liability company

_Todd F. Bied_____
Todd F. Biederman, President and CEO

**LTC GROUP, LLC,**
a Texas limited liability company

_Todd F. Bied_____
Todd F. Biederman, President

6

EXHIBIT C
Page 6 of 6

# PROMISSORY NOTE

$1,050,000.00

December 1, 2016

FOR VALUE RECEIVED, the undersigned promises to pay to the order of NEWLIGHT HEALTHCARE, LLC, a Texas limited liability company (herein called "Lender"), the principal sum of ONE MILLION FIFTY THOUSAND AND NO/100 DOLLARS ($1,050,000.00), or, if less, the total of advances made hereon, together with interest in accordance with the terms and conditions herein.

Subject to the terms and conditions of this Promissory Note (this "Note"), the unpaid principal balance outstanding under this Note from time to time shall bear interest from the date of this Note and thereafter at the rate of nine and three quarters of one percent (9.75%) per annum. Interest accruing hereunder shall be computed on the basis of a 360-day year, and shall be assessed for the actual number of days elapsed. Payments under this Note shall be first applied to accrued and unpaid interest hereunder and the balance, if any, to principal.

On December 1, 2017 (the "Maturity Date"), the undersigned shall pay the unpaid principal balance of this Note plus all accrued and unpaid interest on the unpaid principal balance of this Note. Except as provided in the following paragraph, no payment shall be due prior to the Maturity Date.

Notwithstanding the foregoing, upon the undersigned's receipt of any moneys for Medicare or Medicaid Electronic Health Record Stimulus or any cost report settlements (including any re-openings of prior cost reports), the undersigned shall immediately pay such amounts on this Note, which shall first be applied to any accrued and unpaid interest and then to the unpaid principal balance of this Note.

The undersigned has the right to prepay, without penalty, at any time and from time to time prior to maturity, all or any part of the unpaid principal balance of this Note and all or any part of the unpaid interest accrued to the date of such prepayment, provided that any such principal thus paid is accompanied by accrued interest on such principal, if any. Any partial prepayments of principal shall be applied to installments thereof in the inverse order of maturity.

From and after the occurrence of any Default (as defined below), and so long as any such Default remains unremedied or uncured thereafter, the Indebtedness (as defined below) outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise Applicable Interest Rate, which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Lender within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest contracted for, charged, taken, reserved or received under this Note at any time exceed the Maximum Rate. The term "Maximum Rate", as used herein, shall mean at the particular time in question the maximum nonusurious rate of interest which,

1

under applicable law, may then be charged on this Note. If on any day the Applicable Interest Rate hereunder in respect of any Indebtedness under this Note shall exceed the Maximum Rate for that day, the rate of interest applicable to such Indebtedness shall be fixed at the Maximum Rate on that day and on each day thereafter until the total amount of interest accrued on the unpaid principal balance of this Note and Indebtedness equals the total amount of interest which would have accrued if there had been no Maximum Rate. If such maximum rate of interest changes after the date hereof, the Maximum Rate shall be automatically increased or decreased, as the case may be, without notice to the undersigned from time to time as of the effective date of each change in such maximum rate. For purposes of determining the Maximum Rate under the law of the State of Texas, the applicable interest rate ceiling shall be the "weekly ceiling" from time to time in effect under Chapter 303 of the Texas Finance Code, as amended.

The amount from time to time outstanding under this Note, the Applicable Interest Rate, and the amount and date of any repayment shall be noted on Lender's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Lender to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Lender all amounts payable by the undersigned to Lender under or pursuant to this Note, when due in accordance with the terms hereof.

In the event that any payment under this Note becomes due and payable on any day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day, and, to the extent applicable, interest shall continue to accrue and be payable thereon during such extension at the rates set forth in this Note.

All payments to be made by the undersigned to Lender under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

If any Change in Law: (a) shall subject Lender to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or shall change the basis of taxation of payments to Lender of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Lender imposed by the jurisdiction in which Lender's principal executive office is located); or (b) shall impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender, or shall impose on Lender or the foreign exchange and interbank markets any other condition affecting this Note or the Indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Lender of maintaining any part of the Indebtedness hereunder or to reduce the amount of any sum received or receivable by Lender under this Note by an amount deemed by Lender to be material, then the undersigned shall pay to Lender, within fifteen (15) days of the undersigned's receipt of written notice from Lender demanding such compensation, such additional amount or amounts as will compensate Lender for such increased cost or reduction. A certificate of Lender, prepared in good faith and in reasonable detail by Lender and submitted by Lender to the undersigned, setting forth the basis for determining such additional amount or

2

amounts necessary to compensate Lender shall be conclusive and binding for all purposes, absent manifest error.

In the event that any Change in Law affects or would affect the amount of capital required or expected to be maintained by Lender (or any corporation controlling Lender), and Lender determines that the amount of such capital is increased by or based upon the existence of any obligations of Lender hereunder or the maintaining of any Indebtedness hereunder, and such increase has the effect of reducing the rate of return on Lender's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such Indebtedness hereunder to a level below that which Lender (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then the undersigned shall pay to Lender, within fifteen (15) days of the undersigned's receipt of written notice from Lender demanding such compensation, additional amounts as are sufficient to compensate Lender (or such controlling corporation) for any increase in the amount of capital and reduced rate of return which Lender reasonably determines to be allocable to the existence of any obligations of Lender hereunder or to maintaining any Indebtedness hereunder. A certificate of Lender as to the amount of such compensation, prepared in good faith and in reasonable detail by Lender and submitted by Lender to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other Indebtedness and liabilities of any kind of the undersigned (or any of them) to Lender, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to Lender or to a third party and subsequently acquired by Lender including, without limitation, any late charges; loan fees or charges; costs incurred by Lender in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving Lender as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness") are secured by the security interest and liens granted to Lender in that certain Security Agreement dated October 3, 2016 (as amended, the "Security Agreement") by and among Borrower, Lender, and LTC Group, LLC, as amended by that certain First Amendment to Security Agreement (the "Security Agreement Amendment") dated of even date herewith, such security interest and liens being perfected by filing that certain UCC Financing Statement with the County Clerk of Oklahoma County on October 12, 2016, under Document No. 2016012021050490, as amended or supplemented pursuant to the Security Agreement Amendment. Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has (have) given or give(s) Lender a deed of trust or mortgage

3

covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any Indebtedness owing on a demand basis upon demand, in each case, subject to any applicable notice and cure period provided under the Security Agreement, or if an Event of Default (as defined in the Security Agreement) occurs (subject to applicable notice and cure periods) and is continuing, then Lender, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, in accordance with the applicable Loan Documents, at its option and without prior notice to the undersigned (or any of them), except as may be expressly required by any applicable Loan Document, declare any or all of the Indebtedness to be immediately due and payable, sell or liquidate all or any portion of the collateral described in the Security Agreement, set off against the Indebtedness any amounts owing by Lender to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to Lender by any agreement with the undersigned (or any of them) or given to it under applicable law.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3.605 of the Texas Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that Lender has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, Lender may disclose all documents and information which Lender now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that Lender may provide information relating to this Note or relating to the undersigned to Lender's parent, affiliates, subsidiaries and service providers. The foregoing shall be at the sole cost and expense of Lender and will not result in any costs or out-of-pocket expenses to the undersigned.

The undersigned agree(s) to reimburse Lender, or any other holder or owner of this Note, for any and all costs and expenses (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or

4

attempting to collect this Note or the Indebtedness or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of Lender expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. Chapter 346 of the Texas Finance Code (and as the same may be incorporated by reference in other Texas statutes) shall not apply to the Indebtedness evidenced by this Note. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

This Note, the Security Agreement, and all other documents, instruments and agreements evidencing, governing, securing, guaranteeing or otherwise relating to or executed pursuant to or in connection with this Note or the Indebtedness evidenced hereby (whether executed and delivered prior to, concurrently with or subsequent to this Note), as such documents may have been or may hereafter be amended from time to time (the "Loan Documents") are intended to be performed in accordance with, and only to the extent permitted by, all applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law. It is expressly stipulated and agreed to be the intent of the holder hereof to at all times comply with the usury and other applicable laws now or hereafter governing the interest payable on the indebtedness evidenced by this Note. If the applicable law is ever revised, repealed or judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received under this Note or under any of the other Loan Documents or any other communication or writing between the undersigned and Lender related to the subject matter of the Loan Documents, or contracted for, charged, taken, reserved or received with respect to the Indebtedness evidenced by this Note, or if Lender's exercise of the option to accelerate the maturity of this Note, or if any prepayment by the undersigned or prepayment agreement results (or would, if complied with, result) in the undersigned having paid, contracted for or being charged for any interest in excess of that permitted by law, then it is the express intent of the undersigned and Lender that this Note and the other Loan Documents shall be limited to the extent necessary to prevent such result and all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note or, if fully paid, upon such other Indebtedness as shall then remain outstanding (or, if this Note and all other Indebtedness have been paid in full, refunded to the undersigned), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectable hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums

5

paid, or agreed to be paid, by the undersigned for the use, forbearance, detention, taking, charging, receiving or reserving of the Indebtedness of the undersigned to Lender under this Note or arising under or pursuant to the other Loan Documents shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such Indebtedness until payment in full so that the rate or amount of interest on account of such Indebtedness does not exceed the usury ceiling from time to time in effect and applicable to such Indebtedness for so long as such Indebtedness is outstanding.  To the extent federal law permits Lender to contract for, charge or receive a greater amount of interest, Lender will rely on federal law instead of the Texas Finance Code, as supplemented by Texas Credit Title, for the purpose of determining the Maximum Rate.  Additionally, to the maximum extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, implement any other method of computing the Maximum Rate under the Texas Finance Code, as supplemented by Texas Credit Title, or under other applicable law, by giving notice, if required, to the undersigned as provided by applicable law now or hereafter in effect.  Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

For the purposes of this Note, the following terms have the following meanings:

"Applicable Interest Rate" means, in respect of all or any part of the Indebtedness hereunder, the interest rate in effect in accordance with the terms of this Note.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Lender is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Austin, Texas.

"Change in Law" means the occurrence, after the date hereof, of any of the following: (i) the adoption or introduction of, or any change in any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not applicable to Lender on such date, or (ii) any change in interpretation, administration or implementation of any such law, treaty, rule or regulation by any Governmental Authority, or (iii) the issuance, making or implementation by any Governmental Authority of any interpretation, administration, request, regulation, guideline, or directive (whether or not having the force of law), including any risk-based capital guidelines.  For purposes of this definition, (x) a change in law, treaty, rule, regulation, interpretation, administration or implementation shall include, without limitation, any change made or which becomes effective on the basis of a law, treaty, rule, regulation, interpretation , administration or implementation then in force, the effective date of which change is delayed by the terms of such law, treaty, rule, regulation, interpretation, administration or implementation, and (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173) and all requests, rules, regulations, guidelines, interpretations or directives promulgated thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or promulgated, whether before or after the date hereof, and (z) all requests, rules, guidelines or directives promulgated by Lender for International Settlements, the Basel Committee on Banking Supervision (or any

6

successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall each be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central Lender or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supranational bodies such as the European Union or the European Central Lender).

No delay or failure of Lender in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege. The rights of Lender under this Agreement are cumulative and not exclusive of any right or remedies which Lender would otherwise have, whether by other instruments or by law.

THE UNDERSIGNED AND LENDER, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

THIS WRITTEN LOAN AGREEMENT (AS DEFINED BY SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE) REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[Signature page follows.]

EXHIBIT D
Page 7 of 8

**PAULS VALLEY HOSPITAL AUTHORITY,**
an Oklahoma public trust

By: _Gary Alfred_
Name: _Gary Alfred_
Title: _Chairman_

ATTEST:

_Kira Davis_

**ACKNOWLEDGED BY LENDER:**

**NEWLIGHT HEALTHCARE, LLC,**
a Texas limited liability company

By: _Todd F. Bird_
Name: _Todd F. Biederman_
Title: _President and CEO_

8

EXHIBIT __D__
Page __8__ of __8__

**FIRST AMENDMENT TO**
**MANAGEMENT SERVICES AGREEMENT**

This First Amendment to Management Services Agreement (this "Amendment") is executed as of November 29, 2016 (the "Amendment Date"), between NewLight Healthcare, LLC, a Texas limited liability company ("Manager"), and Pauls Valley Hospital Authority, a Public Trust Authority ("Owner").

WHEREAS, Manager and Owner entered into that certain Management Services Agreement dated November 12, 2013 (the "Management Agreement") pursuant to which Manager agreed to provide certain services for and on behalf of the Owner in exchange for a fee, all as more fully set forth in the Management Agreement; and

WHEREAS, Manager and Owner now desire to extend the term of the Management Agreement, all as more fully set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby agreed and acknowledged, intending to be legally bound hereby, Manager and Owner hereby amend the Management Agreement as follows:

1. Defined Terms. Capitalized terms not otherwise defined herein shall have the meaning attributable to such terms in the Management Agreement.

2. Extension of Term. Section 8.1 of the Management Agreement is hereby deleted and replaced in its entirety with the following:

> 8.1 The term of this Agreement shall commence as of the Effective Date and shall continue through November 30, 2026 (the "Initial Term").

3. Renewals. Section 8.2 of the Management Agreement is hereby deleted.

4. Termination. All existing provisions of Section 9.1 shall remain the same, and there shall be added thereto a new subparagraph "i" which shall read as follows:

> i. by Owner, for any reason, if:
>
> > 1. the effective termination date is after November 30, 2021, and Owner pays Manager according to the following schedule:
> >
> > > A. if the effective termination date is after November 30, 2021, but on or before November 30, 2022, an amount equal to 80% of the Total Remaining Fee;
> > >
> > > B. if the effective termination date is after November 30, 2022, but on or before November 30, 2023, an amount equal to 60% of the Total Remaining Fee; and

      C. if the effective termination date is after November 30, 2023, but before November 30, 2026, an amount equal to 40% of the Total Remaining Fee.

2. Written notice of such termination pursuant to this subparagraph 9(i) must be given by Owner to Manager at least one hundred twenty (120) days prior to the effective termination date.

3. As used in this subparagraph 9(i) "Total Remaining Fee" shall be the aggregate of the fees to be paid by Owner throughout the remainder of the Initial Term, which shall be the sum of: (1) the amount of compensation which, but for the termination pursuant to this provision, would have been payable to Manager pursuant to Section 5.1 for the period commencing on the effective termination date and ending at the end of the Initial Term; (2) the amount which, but for the termination pursuant to this provision, would have been payable by Owner for the compensation of a Chief Executive Officer for the period commencing on the effective termination date and ending at the end of the Initial Term (unless the parties have changed to direct control and the Owner has assumed all payment obligations for such officer); and (3) the amount which, but for the termination pursuant to this provision, would have been payable by Owner for the compensation of a Chief Financial Officer for the period commencing on the effective termination date and ending at the end of the Initial Term (unless the parties have changed to direct control and the Owner has assumed all payment obligations for such officer).

4. Any payments to be made by Owner pursuant to this subparagraph 9(i) must be made on the effective termination date by wire transfer of readily available funds to an account designated by Manager.

5.    Management Fee. Section 5.1 of the Management Agreement is hereby deleted and replaced in its entirety with the following:

    5.1   Owner and Manager agree that the compensation set forth in this Section 5 is being paid to Manager in consideration of the substantial commitment made by Manager hereunder and that such fees are fair and reasonable and consistent with fair market value. For the services rendered hereunder by Manager, Owner shall pay monthly to Manager as a management fee (the "Management Fee") an amount equal to:

      a. FOURTEEN THOUSAND TWO HUNDRED FIFTY ($14,250.00) per month for the first year following the Effective Date;

2414472.1

b. FIFTEEN THOUSAND ($15,000.00) per month for the second year following the Effective Date;

c. FIFTEEN THOUSAND SEVEN HUNDRED FIFTY ($15,750.00) per month for the third year following the Effective Date;

d. SIXTEEN THOUSAND FIVE HUNDRED ($16,500.00) per month for the fourth year following the Effective Date;

e. SEVENTEEN THOUSAND TWO HUNDRED FIFTY ($17,250.00) per month for the fifth year following the Effective Date; and

f. the monthly fee shall increase by FIVE HUNDRED DOLLARS ($500.00) each year thereafter throughout the Initial Term.

Such payments shall be due on the first day of each month. Upon the termination of this Agreement for any reason other than (i) Manager's material breach or (ii) the sale of all or substantially all of the Hospital to a third party, all remaining payments shall immediately become due and payable. Commencing on and continuing after August 1, 2017, payments received more than ten days late are subject to a three percent (3%) one-time late payment fee and interest charged at eighteen percent (18%) per annum beginning on the day the payment became overdue. Owner agrees to pay Manager for its reasonable costs of collecting any amounts due under this Agreement, including attorney and collection agency fees.

6.     Ratification of Management Agreement. The parties expressly acknowledge and agree that, except as expressly amended in this Amendment, the Management Agreement, as amended, remains in full force and effect and is ratified, confirmed and restated. This Amendment shall neither extinguish nor constitute a novation of the Management Agreement or the parties' obligations thereunder.

7.     No Reliance on Other Representations. Except for the terms and conditions specifically set forth herein, in executing this Amendment, neither party has received nor relied upon any oral or written representation, statement or communication of any other party regarding any past or present fact, circumstance, condition, state of affairs, legal effect or promise of future action and, specifically, no representations have been made by any attorney or agent of any party released about the nature or extent of any damages.

8.     Choice of Law. This Amendment shall be governed by and construed in accordance with the laws of the state of Oklahoma.

9.     Counterparts. This Amendment may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. One or more counterparts of this Amendment may be delivered via electronic or facsimile transmission, with the intention that they shall have the same effect as an original counterpart hereof.

EXHIBIT E
Page 3 of 4

IN WITNESS WHEREOF, the parties have entered into this Amendment as of the Amendment Date.

MANAGER:

NewLight Healthcare, LLC,
a Texas limited liability company

By: _Todd F Bied_____
Name: _Todd F Biederman_____
Title: _President and CEO_____

OWNER:

Pauls Valley Hospital Authority,
A Public Trust Authority

By: _Gary Alfred_____
Name: _GARY Alfred_____
Title: _Chairman_____

EXHIBIT _E_
Page _4_ of _4_

# MCGUIRE, CRADDOCK & STROTHER, P.C.

2501 N. HARWOOD, SUITE 1800
DALLAS, TEXAS 75201
www.mcslaw.com

MARC W. TAUBENFELD
DIRECT: 214.954.6809
mtaubenfeld@mcslaw.com

TELEPHONE: 214.954.6800
TELECOPIER: 214.954.6868

June 26, 2018

Pauls Valley Hospital Authority
100 Valley Drive
Pauls Valley, Oklahoma  73075
Attention: Board of Trustees

With a Copy To:
James W. Carlton Jr.
101 E. Grant Avenue P.O. Box 10
Pauls Valley, Oklahoma 73075
james.carlton@gaclawyers.com

Re:    **NOTICE OF MATURITY AND EVENTS OF DEFAULT, NOTICE OF TERMINATION OF RIGHT TO USE FUNDS COLLECTED FROM ACCOUNTS RECEIVABLES, AND DEMAND FOR TURNOVER OF ACCOUNTS RECEIVABLE PAYMENTS COLLECTED**

To the Board of Trustees of Pauls Valley Hospital Authority:

This law firm, McGuire, Craddock & Strother, P.C. (the "Law Firm"), represents **Newlight Healthcare, LLC**, a Texas limited liability company ("Lender"), in connection with the matters discussed herein. Reference is hereby made to (a) that certain Promissory Note dated December 1, 2016, executed by **Pauls Valley Hospital Authority**, an Oklahoma public trust ("Borrower"), payable to Lender in the original principal amount of $1,050,000.00 (the "Note"), (b) that certain Security Agreement dated October 3, 2016 executed by Lender, Borrower, and LTC Group, LLC, a Texas limited liability company, as amended by that certain First Amendment to Security Agreement dated December 1, 2016 (the "Security Agreement," and collectively with the Note, the "Loan Documents"), and (c) that certain Management Services Agreement dated November 12, 2013 between Borrower and Lender, as amended by that certain First Amendment to Management Services Agreement dated November 29, 2016 and that certain Second Amendment to Management Services Agreement dated April 1, 2017 (the "Management Services Agreement," and collectively with the Loan Documents, the "Transaction Documents"). All capitalized terms contained and not otherwise defined herein shall have the meanings ascribed to such terms in the Transaction Documents, as applicable.

According to the terms of the Note, the entire unpaid principal and accrued and unpaid interest owing on the Note was due and payable in full on December 1, 2017 (the "Maturity Date"). As of June 26, 2018, the outstanding principal balance of the Note was $800,000.00 and the outstanding amount of accrued interest and late fees on the Note were $215,706.67. Such

4658814v.1 5013/0002

EXHIBIT F
Page 1 of 4

Pauls Valley Hospital Authority
June 26, 2018
Page 2

amounts remain unpaid as of the date of this letter. Interest continues to accrue on the outstanding principal balance as set forth in the Loan Documents.

According to Section 5.1 of the Management Agreement, the management fees owed by Borrower to Lender under the Management Agreement are due and payable on the first day of each month. As of June 26, 2018, the outstanding amount of the management fees owed by Borrower to Lender under the Management Agreement was $1,397,366.82, and the amount owed by Borrower to Lender for accrued interest and late fees under the Management Agreement was $278,473.41. Such amounts remain unpaid as of the date of this letter. Additional amounts continue to accrue as set forth in the Management Agreement, including, but not limited to $15,613.32 in June amounts.

The definition of "Event of Default" in the Security Agreement includes any "failure of [Borrower] to pay any sum due pursuant to any of the ... Newlight Liabilities as and when due, whether by stated maturity, demand, acceleration or otherwise..." As of the date hereof, the failure by Borrower to pay the outstanding balance under the Note (both principal and interest owing thereunder) and the failure by Borrower to pay the outstanding compensation, accrued interest, and late fees owing under the Management Agreement each constitute an Event of Default (as defined in the Security Agreement and herein so called) (collectively, the "Existing Events of Default"). Accordingly, demand for payment of all such amounts is hereby made.

The Transaction Documents grant Lender a first priority security interest in all of Borrowers's's accounts, and irrevocably appoints Lender as its true and lawful attorney-in-fact, coupled with an interest. The security interest granted by Borrower to Lender was duly perfected by the filing of a UCC financing statement with the Oklahoma Secretary of State. The Transaction Documents provide that Lender may require Borrower to have its account debtors forward all payments, or have Borrower forward any such payments collected from Borrower's account debtors, to Lender directly or to an account designated by Lender.

Accordingly, demand is made that the Borrower forward any and all payments received or collected from Borrower's account debtors directly to Lender as follows:

1.     If paying by check, money order or other instrument, please mail such items to the following address:

**Lender Mailing (and Overnight) Address**:
Newlight Healthcare, LLC
3267 Bee Caves Road, Suite 517
Austin, Texas  78746
Attention: Chris Rutledge

All checks or other instruments should continue to be made out to the name of "Pauls Valley Hospital Authority, ℅ Newlight, specifying the Account number; or

2.     Transfer such amounts by the ACH System or wire transfer to the following account:

EXHIBIT F
Page 2 of 4

Pauls Valley Hospital Authority
June 26, 2018
Page 3

> Bank of America
> ABA #: 052001633
> Account #: 446019021469
> Account Name: NewLight Healthcare

The making of payment in a manner other than as directed herein may subject you to additional liability in the event Borrower fails to satisfy its obligations under the Transaction Documents.

**PLEASE BE AWARE** that, as of the date of this letter, Lender has the right to <u>immediately</u> exercise its rights and remedies under the Transaction Documents based upon the Existing Events of Default, including without limitation the right to <u>notify account debtors to make payments directly to Lender</u> and otherwise enforce the liens created by the Security Agreement. Although Lender did not previously exercise its rights or remedies with respect to the Existing Events of Default, Lender did not waive any of such rights or remedies. Lender has now decided to exercise such rights and remedies with respect to the Existing Events of Default and any other matter that becomes an Event of Default. <u>Notice is given to Debtor that Debtor's right to use any funds, proceeds, or amounts received or collected from Lender's collateral, and specifically all of Debtor's accounts receivable, is hereby terminated, and Debtor has no authority to use same for any purpose without Lender's written permission.</u> Pursuant to the demand contained herein, all such funds, proceeds or amounts received or collected from Debtor's accounts receivable are to be forwarded to Lender pursuant to the instructions contained herein.

Lender hereby reserves all of its other available rights, powers, remedies and privileges (and its right to immediately exercise such rights, powers, remedies and privileges), with no impairment or prejudice of such powers, rights, remedies and privileges, including without limitation the right to take such steps as may be appropriate to foreclose or otherwise enforce the liens created by the Transaction Documents or reduce any claim against Borrower to judgment. No single or partial exercise of any such right, power, remedy or privilege shall preclude any other or further exercise thereof or of any other right, power, remedy or privilege, and all such rights, powers, remedies and privileges are and shall continue to be cumulative.

Nothing in this letter, nor the taking of any action or the failure to take any action by Lender, shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect any of the rights, powers, remedies or privileges described above, or be construed to be a waiver or modification of, or an agreement to waive or modify, any Event of Default (including without limitation the Existing Events of Default) or any other breach or default by Borrower under any Transaction Document or otherwise. Notwithstanding any previous actions or inactions by Lender to the contrary, you are hereby notified that Lender requires strict compliance with the terms and conditions of the Transaction Documents.

Please note that any discussions or communications by Lender with any of Borrower's representatives regarding the Transaction Documents or any Event of Default (including without limitation the Existing Events of Default) are for discussion purposes only and any such



Pauls Valley Hospital Authority
June 26, 2018
Page 4

discussions or communications, or the acceptance of any amounts by Lender, shall not constitute offers, acceptances, contracts or courses of dealing and shall not modify or affect the Transaction Documents or any of Lender's rights thereunder or at law or equity. No officer or employee of Lender, nor any agent acting on Lender's behalf, is authorized to orally commit Lender to any agreement, or to any modification of the Transaction Document or any waiver of the terms and conditions thereof. No agreement, modification or waiver of any provision of any Transaction Document, nor consent to any departure by Borrower therefrom, shall be effective unless and until the same shall be in writing and signed by the Lender to the extent required under the applicable Transaction Document, and then any such agreement, modification or waiver shall be effective only in the specific instances and for the purpose for which given and to the extent therein specified.

Any description herein of the Transaction Documents is for Borrower's information and convenience only and shall not be deemed to limit, amplify, or modify the terms or otherwise affect the Transaction Documents.

Please contact Lender at your earliest convenience to address the matters discussed herein, either by phone (325-660-9689), email (accounts.payable@newlighthealthcare.com), or physical location (3267 Bee Caves Road, Suite 517, Austin, Texas 78746).

Respectfully,

Marc W. Taubenfeld

cc   Newlight Healthcare, LLC
     LTC Group, LLC

EXHIBIT F
Page 4 of 4

## NOTICE OF PRIVATE SALE OF DISPOSITION OF COLLATERAL
## PURSUANT TO THE UNIFORM COMMERCIAL CODE-SECURED TRANSACTIONS
### July 31, 2018

**To:**             Those persons listed on the attached mailing list.

**From:**           Newlight Healthcare, LLC
                    3267 Bee Caves Road, Suite 517
                    Austin, Texas  78746

**Name of Debtor(s):**    Pauls Valley Hospital Authority
                          100 Valley Drive
                          Pauls Valley, Oklahoma  73075

**Name of other
parties known to
have filed a financing
statement purporting
to cover the Sale
Collateral:**
                    First United Bank & Trust Co.
                    P. O. Box 600
                    Pauls Valley, OK 73075

                    SysInformation Healthcare Services, L.L.C.
                    3267 Bee Caves Road, Suite 107-511
                    Austin, TX 78746

                    PAULS VALLEY NATIONAL BANK
                    101 West Paul
                    Pauls Valley, Oklahoma 73075
                    Attention:  John Pratt and Patrick Grimmett


Newlight Healthcare, LLC (the "*Secured Party*") is the secured party intending to conduct this private sale.

Secured Party intents to sell those assets described on Exhibit A attached hereto, through a private sale under the Uniform Commercial Code at any time after August 20, 2018 (the "*Sale*"). The property listed on Exhibit A (the "*Sale Collateral*") is subject to the security interest of the Secured Party.

This notice is being sent to you pursuant to the Uniform Commercial Code (the "*UCC*"). The Secured Party reserves the right to sell the Sale Collateral in a single lot or in multiple lots, by way of one or more contracts, and on such terms and conditions as are agreed upon between the Secured Party and any purchaser of the Sale Collateral. The Secured Party reserves the right to add to, withdraw or otherwise modify or amend in any respect whatsoever all or any portion of the Sale Collateral listed in Exhibit A as being subject to the Sale, for any reason whatsoever.

You are entitled to an accounting of the unpaid indebtedness secured by the property that the Secured Party intends to sell. The Secured Party's charge for an accounting shall be in an amount

4683585v.2

equal to its costs and expenses (including attorneys' fees) incurred as a result of providing such accounting. You may request an accounting by calling Marc Taubenfeld at the telephone number listed below.

Except to the extent that such right is waived, the Debtor, any secondary obligor, or any other secured party or lienholder has the right to redeem the Sale Collateral at any time before the Secured Party has disposed of the Sale Collateral or entered into a contract for its disposition by tendering payment of all indebtedness secured by the Sale Collateral as well as any expenses reasonably incurred by the Secured Party in retaking, holding and preparing the Sale Collateral for disposition, in arranging for the Sale, and, to the extent provided in the Security Agreement and not prohibited by law, the Secured Party's reasonable attorneys' fees and legal expenses. If the proceeds of the Sale are less than the amount owed to Secured Party by the Debtor, the Secured Party reserves the right to seek to recover such amount from the Debtor and/or any secondary obligators in accordance with applicable law.

By selling and purchasing the Sale Collateral pursuant to the private Sale referenced herein, neither the Secured Party nor any purchaser of the Sale Collateral shall assume any liability or obligation whatsoever regarding any debts, expenses or liabilities of the Debtor or any other person or entity, and all such debts, expenses and liabilities shall not be assumed or deemed to be assumed by the Secured Party or any purchaser. Neither the Secured Party nor any purchaser shall be, or shall be deemed to be, a "successor" of or to any Debtor any other person or entity for any purpose.

The Secured Party reserves all of its rights and remedies, of any and every type or nature whatsoever, against the Debtor and all other persons and entities for any and all deficiencies under any obligations remaining due to the Secured Party after the Sale. The private Sale referenced herein is not intended to be, nor shall it be deemed to be, a "strict foreclosure" or "acceptance of collateral in full or partial satisfaction of obligation" as set forth in Section 9-620 of the UCC.

McGUIRE, CRADDOCK & STROTHER, PC

By: _____
Marc W. Taubenfeld

2501 N. Harwood
1800 St. Ann Court
Dallas, Texas 75201

Direct Dial (214) 954-6809
Telecopy (214) 954-6850

4683585v.2

EXHIBIT G
Page 2 of 4

**Exhibit A**
**Attached to and Forming a Part of**
**NOTICE OF PRIVATE SALE OF DISPOSITION OF COLLATERAL**
**PURSUANT TO THE UNIFORM COMMERCIAL CODE-SECURED TRANSACTIONS,**
**July 31, 2018**

All of the right, title and interest of Pauls Valley Hospital Authority ("**Debtor**") in and to all (a) Accounts, which means any "account," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by the Debtor, and in any event shall include, without limitation, each of the following, whether now owned or hereafter acquired by the Debtor: accounts, accounts receivable, contract rights, bills, acceptances, and other forms of obligations arising out of the sale, lease or consignment of goods or the rendition of services by Debtor; together with any property evidencing or relating to the Accounts (such as guaranties, credit insurance), any security for the Accounts, and all Books and Records relating thereto; (b) any moneys received for Medicare or Medicaid Electronic Health Record Stimulus or any cost report settlements (including any re-openings of prior cost reports); and (c) Proceeds, which means any "proceeds," as such term is presently or hereafter defined in Article 9 of the UCC, now owned or hereafter acquired by the Debtor, and in any event shall include, without limitation, whatever is received upon the use, lease, sale, exchange, collection, any other utilization or any disposition of any of the collateral described herein, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property and all insurance therefor.(collectively, the "Sale Collateral"), wherever located.

EXHIBIT G
Page 3 of 4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 31, 2018, I caused to be served by prepaid first class mail a true and correct copy of the foregoing **NOTICE OF PRIVATE SALE OF DISPOSITION OF COLLATERAL PURSUANT TO THE UNIFORM COMMERCIAL CODE-SECURED TRANSACTIONS** to the following:

PAULS VALLEY HOSPITAL AUTHORITY
100 Valley Drive
Pauls Valley, Oklahoma  73075
Attention: Board of Trustees

James W. Carlton Jr.
101 E. Grant Avenue
P.O. Box 10
Pauls Valley, Oklahoma 73075


MCGUIRE, CRADDOCK & STROTHER, PC

By: _____
Marc W. Taubenfeld

4683585v.2

EXHIBIT G
Page 4 of 4



**GARVIN AGEE CARLTON, P.C.**
LAWYERS • ESTABLISHED 1929

JAMES W. CARLTON, JR.
Attorney & Counselor at Law
Certified Public Accountant
james.carlton@gaclawyers.com
101 E. GRANT AVENUE ■ P.O. BOX 10
PAULS VALLEY, OK 73075
405-238-1000 Ext. 106 ■ FAX 405-238-1001

August 3, 2018

Marc W. Taubenfeld                                    VIA FIRST CLASS MAIL
2501 N. Harwood
1800 St. Ann Court
Dallas, TX 75201

Subject:    *Pauls Valley Hospital Authority* – Notice of Private Sale of Collateral
            Our Client: Pauls Valley Hospital Authority
            Our File No.: 188-012

Dear Mr. Taubenfeld:

I have received your Notice of Private Sale of Disposition of Collateral Pursuant to the Uniform Commercial Code-Secured Transactions dated July 31, 2018. As you state in the Notice, Pauls Valley Hospital Authority is entitled to an accounting of the unpaid indebtedness. I attempted to make such a request by calling you at the number stated at the end of the Notice, but I just got your voicemail.

I request a full accounting of all monies received by your client from any source related to the Pauls Valley hospital operation for the period January 1, 2015, through June 30, 2018.

The most recent itemization of amounts claimed to be owing to your client follows, which was provided to a representative of my client directly from representatives of your client:

EXHIBIT H
Page 1 of 3



GARVIN AGEE CARLTON, P.C.

PAGE | 2

| | Balance through July 7 |
|---|---|
| **LOC** | $ 800,000.00 |
| **LOC Late Payment Fee** | $ 50,000.00 |
| **LOC Interest Invoiced Through May** | $ 165,706.67 |
| **Total Due on LOC** | **$ 1,015,706.67** |
| | |
| **Outstanding Invoices** | $ 1,397,366.82 |
| **Interest and Late Fees on Invoices** | $ 278,473.41 |
| **Total Due on Invoices** | **$ 1,675,840.23** |
| | |
| **Total Invoiced to Pauls Valley** | **$ 2,691,546.90** |
| | |
| **Remove LOC Late Payment Fee** | $ (50,000.00) |
| **Remove Late Invoice Fees** | $ (278,473.41) |
| **Remove CFO Fees** | $ (67,500.00) |
| | $ 2,295,573.49 |
| **Uninvoiced Travel** | $ 7,637.49 |
| **Uninvoiced Legal** | $ 15,000.00 |
| **June Interest on LOC** | $ 9,180.00 |
| **July 1-5 Management/CEO/Lab Fees** | $ 8,185.48 |
| **July 1-5 Interest on LOC** | $ 2,107.29 |
| **Total Owed by Pauls Valley** | **$ 2,337,683.75** |

The information my client has provided to me indicates that your client received, during the period mentioned above, $1,740,507.62 from my client. A listing of the payments is enclosed. My client has nothing to show the application of the payments.

I believe that your client (which was serving as manager of the Pauls Valley General Hospital at all relevant times under the Management Agreement) is obligated under the Management Agreement to provide an accounting of these funds received. I do not believe that such an accounting is an expense which should be passed on to my client.

Please do not interpret this letter as an agreement to any of the figures in the above itemization.

Sincerely,

JAMES W. CARLTON, JR.

JWC/cg

Copy:

EXHIBIT __H__

Page __2__ of __3__

John R. Pratt, Jr.
Patrick Grimmett
Gary Alfred

EXHIBIT  H
Page 3 of 3

# McGuire, Craddock & Strother, P.C.

2501 N. Harwood, Suite 1800
Dallas, Texas 75201
www.mcslaw.com

Marc W. Taubenfeld
Direct: 214.954.6809
mtaubenfeld@mcslaw.com

Telephone: 214.954.6800
Telecopier: 214.954.6868

August 9, 2018

Via Federal Express
Pauls Valley Hospital Authority
100 Valley Drive
Pauls Valley, Oklahoma 73075
Attention: Board of Trustees

With a Copy To:
James W. Carlton Jr.
101 E. Grant Avenue P.O. Box 10
Pauls Valley, Oklahoma 73075

Re:   **NOTICE OF MATURITY AND EVENTS OF DEFAULT, NOTICE OF TERMINATION OF RIGHT TO USE FUNDS COLLECTED FROM ACCOUNTS RECEIVABLES, AND DEMAND FOR TURNOVER OF ACCOUNTS RECEIVABLE PAYMENTS COLLECTED**

To the Board of Trustees of Pauls Valley Hospital Authority:

This law firm, McGuire, Craddock & Strother, P.C. (the "Law Firm"), represents **Newlight Healthcare, LLC**, a Texas limited liability company ("Lender"), in connection with the matters discussed herein. Reference is hereby made to (a) that certain Promissory Note dated December 1, 2016, executed by **Pauls Valley Hospital Authority**, an Oklahoma public trust ("Borrower"), payable to Lender in the original principal amount of $1,050,000.00 (the "Note"), (b) that certain Security Agreement dated October 3, 2016 executed by Lender, Borrower, and LTC Group, LLC, a Texas limited liability company, as amended by that certain First Amendment to Security Agreement dated December 1, 2016 (the "Security Agreement," and collectively with the Note, the "Loan Documents"), and (c) that certain Management Services Agreement dated November 12, 2013 between Borrower and Lender, as amended by that certain First Amendment to Management Services Agreement dated November 29, 2016 and that certain Second Amendment to Management Services Agreement dated April 1, 2017 (the "Management Services Agreement," and collectively with the Loan Documents, the "Transaction Documents"). All capitalized terms contained and not otherwise defined herein shall have the meanings ascribed to such terms in the Transaction Documents, as applicable.

According to the terms of the Note, the entire unpaid principal and accrued and unpaid interest owing on the Note was due and payable in full on December 1, 2017 (the "Maturity Date"). As of August 9, 2018, the outstanding principal balance of the Note was $800,000.00 and the outstanding amount of accrued interest and late fees on the Note were $182,465.83.

4690576v.1 5013/0002

EXHIBIT I

Page 1 of 4

Pauls Valley Hospital Authority
August 9, 2018
Page 2

Such amounts remain unpaid as of the date of this letter. Interest continues to accrue on the outstanding principal balance as set forth in the Loan Documents. Pursuant to the Note, Lender is also entitled to recover its attorneys fees and costs incurred in pursuing collection, which amounts are in addition to the amounts indicated above.

According to Section 5.1 of the Management Agreement, the management fees owed by Borrower to Lender under the Management Agreement are due and payable on the first day of each month. As of August 9, 2018, the outstanding amount of the management fees and related fees owed by Borrower to Lender under the Management Agreement was $1,340,512.37. Such amounts remain unpaid as of the date of this letter. Additional amounts continue to accrue as set forth in the Management Agreement, including interest. Pursuant to the MSA, Lender is also entitled to recover its attorneys fees and costs incurred in pursuing collection, which amounts are in addition to the amounts indicated above.

The definition of "Event of Default" in the Security Agreement includes any "failure of [Borrower] to pay any sum due pursuant to any of the ... Newlight Liabilities as and when due, whether by stated maturity, demand, acceleration or otherwise..." As of the date hereof, the failure by Borrower to pay the outstanding balance under the Note (both principal and interest owing thereunder) and the failure by Borrower to pay the outstanding compensation, accrued interest, and late fees owing under the Management Agreement each constitute an Event of Default (as defined in the Security Agreement and herein so called) (collectively, the "Existing Events of Default"). Accordingly, demand for payment of all such amounts is hereby made.

The Transaction Documents grant Lender a first priority security interest in all of Borrowers's accounts, and irrevocably appoints Lender as its true and lawful attorney-in-fact, coupled with an interest. The security interest granted by Borrower to Lender was duly perfected by the filing of a UCC financing statement with the Oklahoma Secretary of State. The Transaction Documents provide that Lender may require Borrower to have its account debtors forward all payments, or have Borrower forward any such payments collected from Borrower's account debtors, to Lender directly or to an account designated by Lender.

Accordingly, demand is made that the Borrower forward any and all payments received or collected from Borrower's account debtors directly to Lender as follows:

1.      If paying by check, money order or other instrument, please mail such items to the following address:

**Lender Mailing (and Overnight) Address:**
Newlight Healthcare, LLC
3267 Bee Caves Road, Suite 517
Austin, Texas 78746
Attention: Chris Rutledge

All checks or other instruments should continue to be made out to the name of "Pauls Valley Hospital Authority, % Newlight, specifying the Account number; or



EXHIBIT I
Page 2 of 4

Pauls Valley Hospital Authority
August 9, 2018
Page 3

    2.      Transfer such amounts by the ACH System or wire transfer to the following account:

> Bank of America
> ABA #: 052001633
> Account #: 446019021469
> Account Name: NewLight Healthcare

The making of payment in a manner other than as directed herein may subject you to additional liability in the event Borrower fails to satisfy its obligations under the Transaction Documents.

**PLEASE BE AWARE that, as of the date of this letter, Lender has the right to immediately exercise its rights and remedies under the Transaction Documents based upon the Existing Events of Default, including without limitation the right to notify account debtors to make payments directly to Lender and otherwise enforce the liens created by the Security Agreement. Although Lender previously refrained from exercising certain of its rights or remedies with respect to the Existing Events of Default, Lender did not waive any of such rights or remedies. Lender has now decided to exercise such rights and remedies with respect to the Existing Events of Default and any other matter that becomes an Event of Default. NOTICE IS GIVEN TO DEBTOR THAT DEBTOR'S RIGHT TO USE ANY FUNDS, PROCEEDS, OR AMOUNTS RECEIVED OR COLLECTED FROM LENDER'S COLLATERAL, AND SPECIFICALLY ALL OF DEBTOR'S ACCOUNTS RECEIVABLE, IS HEREBY TERMINATED, AND DEBTOR HAS NO AUTHORITY TO USE SAME FOR ANY PURPOSE WITHOUT LENDER'S WRITTEN PERMISSION. Pursuant to the demand contained herein, all such funds, proceeds or amounts received or collected from Debtor's accounts receivable are to be forwarded to Lender pursuant to the instructions contained herein.**

Lender hereby reserves all of its other available rights, powers, remedies and privileges (and its right to immediately exercise such rights, powers, remedies and privileges), with no impairment or prejudice of such powers, rights, remedies and privileges, including without limitation the right to take such steps as may be appropriate to foreclose or otherwise enforce the liens created by the Transaction Documents or reduce any claim against Borrower to judgment. No single or partial exercise of any such right, power, remedy or privilege shall preclude any other or further exercise thereof or of any other right, power, remedy or privilege, and all such rights, powers, remedies and privileges are and shall continue to be cumulative.

Nothing in this letter, nor the taking of any action or the failure to take any action by Lender, shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect any of the rights, powers, remedies or privileges described above, or be construed to be a waiver or modification of, or an agreement to waive or modify, any Event of Default (including without limitation the Existing Events of Default) or any other breach or default by Borrower under any Transaction Document or otherwise. Notwithstanding any previous actions or

EXHIBIT I
Page 3 of 4

Pauls Valley Hospital Authority
August 9, 2018
Page 4

inactions by Lender to the contrary, you are hereby notified that Lender requires strict compliance with the terms and conditions of the Transaction Documents.

Please note that any discussions or communications by Lender with any of Borrower's representatives regarding the Transaction Documents or any Event of Default (including without limitation the Existing Events of Default) are for discussion purposes only and any such discussions or communications, or the acceptance of any amounts by Lender, shall not constitute offers, acceptances, contracts or courses of dealing and shall not modify or affect the Transaction Documents or any of Lender's rights thereunder or at law or equity. No officer or employee of Lender, nor any agent acting on Lender's behalf, is authorized to orally commit Lender to any agreement, or to any modification of the Transaction Document or any waiver of the terms and conditions thereof. No agreement, modification or waiver of any provision of any Transaction Document, nor consent to any departure by Borrower therefrom, shall be effective unless and until the same shall be in writing and signed by the Lender to the extent required under the applicable Transaction Document, and then any such agreement, modification or waiver shall be effective only in the specific instances and for the purpose for which given and to the extent therein specified.

Any description herein of the Transaction Documents is for Borrower's information and convenience only and shall not be deemed to limit, amplify, or modify the terms or otherwise affect the Transaction Documents.

Please contact Lender at your earliest convenience to address the matters discussed herein, either by phone (325-660-9689), email (accounts.payable@newlighthealthcare.com), or physical location (3267 Bee Caves Road, Suite 517, Austin, Texas 78746).

Respectfully,

Marc W. Taubenfeld

cc   Alliance Health
     c/o Frank T. Avignone IV and Todd Mobley

     Newlight Healthcare, LLC
     LTC Group, LLC

EXHIBIT I
Page 4 of 4

# McGuire, Craddock & Strother, P.C.

2501 N. Harwood Street, Suite 1800
Dallas, Texas 75201
www.mcslaw.com

Marc W. Taubenfeld
Direct: 214.954.6809
MTaubenfeld@mcslaw.com

Telephone: 214.954.6800
Telecopier: 214.954.6868

August 10, 2018

Via Federal Express
Pauls Valley Hospital Authority
100 Valley Drive
Pauls Valley, Oklahoma  73075
Attention: Board of Trustees

With a Copy To:
James W. Carlton Jr.
101 E. Grant Avenue P.O. Box 10
Pauls Valley, Oklahoma 73075
Via email: james.carlton@gaclawyers.com

Re:     **DEMAND FOR FINANCIAL INFORMATION AND RECORDS ACCESS**

To the Board of Trustees of Pauls Valley Hospital Authority:

This law firm, McGuire, Craddock & Strother, P.C. (the "*Law Firm*"), represents **Newlight Healthcare, LLC**, a Texas limited liability company ("*Lender*"), in connection with the matters discussed herein.  Reference is hereby made to (a) that certain Promissory Note dated December 1, 2016, executed by **Pauls Valley Hospital Authority**, an Oklahoma public trust ("*Borrower*" or "*Debtor*"), payable to Lender in the original principal amount of $1,050,000 (the "*Note*"), (b) that certain Security Agreement dated October 3, 2016 executed by Lender, Borrower, and LTC Group, LLC, a Texas limited liability company, as amended by that certain First Amendment to Security Agreement dated December 1, 2016 (the "*Security Agreement*," and collectively with the Note, the "*Loan Documents*"), and (c) that certain Management Services Agreement dated November 12, 2013 between Borrower and Lender, as amended by that certain First Amendment to Management Services Agreement dated November 29, 2016 and that certain Second Amendment to Management Services Agreement dated April 1, 2017 (the "*Management Services Agreement*," and collectively with the Loan Documents, the "*Transaction Documents*").  All capitalized terms contained and not otherwise defined herein shall have the meanings ascribed to such terms in the Transaction Documents, as applicable.

According to the terms of the Note, the entire unpaid principal and accrued and unpaid interest owing on the Note was due and payable in full on December 1, 2017 (the "*Maturity Date*").  As of August 9, 2018, the outstanding principal balance of the Note was $800,000 and the outstanding amount of accrued interest and late fees on the Note were $182,465.83.  Such amounts remain unpaid as of the date of this letter.  Interest continues to accrue on the outstanding principal balance as set forth in the Loan Documents.  Pursuant to the Note, Lender is also entitled to recover

4691287v.1 5013/0002

EXHIBIT J
Page 1 of 4

Pauls Valley Hospital Authority
August 10, 2018
Page 2



its attorneys' fees and costs incurred in pursuing collection, which amounts are in addition to the amounts indicated above.

According to Section 5.1 of the Management Agreement, the management fees owed by Borrower to Lender under the Management Agreement are due and payable on the first day of each month. As of August 9, 2018, the outstanding amount of the management fees and related fees owed by Borrower to Lender under the Management Agreement was $1,340,512.37. Such amounts remain unpaid as of the date of this letter. Additional amounts continue to accrue as set forth in the Management Agreement, including interest. Pursuant to the MSA, Lender is also entitled to recover its attorneys' fees and costs incurred in pursuing collection, which amounts are in addition to the amounts indicated above.

The definition of "Event of Default" in the Security Agreement includes any "failure of [Borrower] to pay any sum due pursuant to any of the … Newlight Liabilities as and when due, whether by stated maturity, demand, acceleration or otherwise…" As of the date hereof, the failure by Borrower to pay the outstanding balance under the Note (both principal and interest owing thereunder) and the failure by Borrower to pay the outstanding compensation, accrued interest, and late fees owing under the Management Agreement each constitute an Event of Default (as defined in the Security Agreement and herein so called) (collectively, the "*Existing Events of Default*"). Lender has previously made and continues to make demand for payment of all such amounts.

Section 6.5 of the Security Agreement states as follows:

6.5     Maintenance of Books and Records. Debtor shall maintain complete and accurate Books and Records in accordance with generally accepted accounting principles in effect in the United States from time to time, and shall make all necessary entries therein to reflect the costs, values and locations of its Inventory and Equipment and the transactions giving rise to its Accounts and all payments, credits and adjustments thereto.

Section 5.1 of the Security Agreement states as follows:

5.1.     Delivery of Documents; Inspection of Collateral. At any time and from time to time, upon the demand of the Secured Parties, Debtor will, at Debtor's expense: (a) immediately deliver and pledge to the Secured Parties, properly endorsed to the Secured Parties and/or accompanied by such instruments of assignment and transfer in such form and substance as the Secured Parties may request, any and all documents as the Secured Parties may specify in their demand; (b) give, execute, deliver, file, and/or record any notice, statement, instrument, assignment, document, agreement, or other papers that may be necessary or desirable, or that the Secured Parties may request, in order to create, preserve, perfect, or validate any security interest granted pursuant hereto or intended to be granted hereunder or to enable the Secured Parties to exercise or enforce their rights hereunder or with respect to such security interest; (c) keep, stamp, or otherwise mark any and all

EXHIBIT J
Page 2 of 4

Pauls Valley Hospital Authority
August 10, 2018
Page 3



documents and its Books and Records relating to the Collateral in such manner as the Secured Parties may reasonably require; and/or (d) *permit representatives and agents of the Secured Parties access to its premises at any time reasonably requested by the Secured Parties to inspect the Collateral and the Books and Records and to audit and make abstracts from the Books and Records.*

Lender hereby makes demand that Debtor immediately deliver to Lender the financial information and documents and/or provide the access to the records listed below:

1.    Read-Only access to all deposit, checking, and other such accounts of Debtor;

2.    Bank statements for the last 3 months (including transactions) and a list of transactions month to date in Excel format;

3.    Last 3 month's financial statements in Excel format;

4.    Detailed Accounts Receivable data that ties to the most recent financial statement in Excel format, including, but not limited to:

    (a)    Information to uniquely identify the services provided to the patient (claim number, patient number/member ID, etc.)
    (b)    Dates of service to the patient
    (c)    Dates of remittance requests to payers
    (d)    Remittance amount requested from payer
    (e)    Amount of money received from payer
    (f)    Amount currently outstanding from payer; and

5.    Detailed Accounts Receivable data, from the date of the most recent financial statement to current, with the same subcategories of information as requested in number 4 above.

In addition, as set forth in paragraph 5.1(d) of the Security Agreement, Lender requests that Debtor permit representatives and agents of the Lender access to its premises at any time reasonably requested by the Lender to inspect its Collateral and the Books and Records (as defined in the Security Agreement) and to audit and make abstracts from the Books and Records. Representatives of Lender are available for this visit to access the financial records on **Thursday, August 16, 2018 (and Friday, August 17, 2018, if a second day is necessary)**.

Nothing in this letter, nor the taking of any action or the failure to take any action by Lender, shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect any of the rights, powers, remedies or privileges described above, or be construed to be a waiver or modification of, or an agreement to waive or modify, any Event of Default (including without limitation the Existing Events of Default) or any other breach or default by Borrower under any Transaction Document or otherwise. Notwithstanding any previous actions or inactions by Lender to the contrary, you are hereby notified that Lender requires strict compliance with the terms and conditions of the Transaction Documents.

EXHIBIT J
Page 3 of 4



Pauls Valley Hospital Authority
August 10, 2018
Page 4

Please note that any discussions or communications by Lender with any of Borrower's representatives regarding the Transaction Documents or any Event of Default (including without limitation the Existing Events of Default) are for discussion purposes only and any such discussions or communications, or the acceptance of any amounts by Lender, shall not constitute offers, acceptances, contracts or courses of dealing and shall not modify or affect the Transaction Documents or any of Lender's rights thereunder or at law or equity.  No officer or employee of Lender, nor any agent acting on Lender's behalf, is authorized to orally commit Lender to any agreement, or to any modification of the Transaction Document or any waiver of the terms and conditions thereof.  No agreement, modification or waiver of any provision of any Transaction Document, nor consent to any departure by Borrower therefrom, shall be effective unless and until the same shall be in writing and signed by the Lender to the extent required under the applicable Transaction Document, and then any such agreement, modification or waiver shall be effective only in the specific instances and for the purpose for which given and to the extent therein specified.

Any description herein of the Transaction Documents is for Borrower's information and convenience only and shall not be deemed to limit, amplify, or modify the terms or otherwise affect the Transaction Documents.

Please contact me at your earliest convenience to address the matters discussed herein, including confirming the date or dates that Lender's representative will come to Debtor's facility to review and inspect the Collateral and the Books and Records.

Respectfully,

Marc W. Taubenfeld

cc   Alliance Health
     ℅ Frank T. Avignone IV and Todd Mobley

     Newlight Healthcare, LLC
     LTC Group, LLC

EXHIBIT J
Page 4 of 4


NEWLIGHT
HEALTHCARE

August 8, 2018

Blue Cross and Blue Shield of Oklahoma
PO Box 3283
Tulsa, OK 74102-3283

**NOTICE OF LIEN IN ACCOUNTS RECEIVABLE
OWED TO PAULS VALLEY HOSPITAL AUTHORITY AND
DEMAND FOR PAYMENT TO NEWLIGHT HEALTHCARE, LLC**

Re:     Pauls Valley Hospital Authority 100 Valley Drive, Pauls Valley,
          Oklahoma 73075 ("*PVHA*")

Dear Sir or Madam:

PVHA is indebted to Newlight Healthcare, LLC, a Texas limited liability company ("*Newlight*").   PVHA owns and operates the facility commonly known as Pauls Valley General Hospital.   To secure repayment of its debt, PVHA granted Newlight a lien in all of its accounts receivable.   PVHA's records indicated that you are obligated to make a payments to PVHA on an account that is encumbered by Newlight's lien.

PVHA is in default of its payment and other obligations to Newlight.   As a result of these defaults by PVHA, Newlight is entitled to receive direct payment of the accounts owed to PVHA. Upon receipt of this notice, you must make payments on any account you owe to PVHA directly to Newlight.   Please be advised that if you make further payments to PVHA instead of delivering payment directly to Newlight, your payment to PVHA will not discharge your obligation to pay to Newlight the amount you owe on the account subject to Newlight's lien in the event PVHA fails to pay its debt to Newlight.

Additional details regarding PVHA's debt to Newlight, Newlight's security interest, and the procedures for making payment directly to Newlight are presented below

The debt PVHA owes Newlight is evidenced by, among other instruments, a Promissory Note dated December 1, 2016, executed by PVHA, payable to Newlight in the original principal amount of $1,050,000 (the "*Note*") and included amounts owing to Newlight under a Management Services Agreement dated November 12, 2013 between PVHA and Newlight, as amended by that certain First Amendment to Management Services Agreement dated November 29, 2016 and that certain Second Amendment to Management Services Agreement dated April 1, 2017 (the "*Management Services Agreement*").

PVHA's debts to Newlight are secured by the lien granted in the Security Agreement dated October 3, 2016 executed by PVHA, Newlight, and LTC Group, LLC, a Texas limited liability company, as amended by that certain First Amendment to Security Agreement dated December 1, 2016 (the "*Security Agreement*") The Note, Management Services Agreement, and the Security Agreement are collectively referred to as the "*Transaction Documents*".

3267 Bee Caves Rd., Ste. 107-511, Austin, Texas   78746   l   o: 512-212-4851   l   f: 512-692-2977
www.NewLightHealthcare.com
4615084v.1 5013/0002

EXHIBIT  K
Page  1  of 3

August 8, 2018
Page 2

     The Transaction Documents grant Newlight a first priority security interest in all of PVHA's accounts and irrevocably appoint Newlight as PVHA's true and lawful attorney-in-fact, coupled with an interest.   The security interest granted by PVHA to Newlight was duly perfected by the filing of a UCC financing statement with the Oklahoma Secretary of State.   The Transaction Documents specifically provide that Newlight may require PVHA to have its account debtors forward all payments to it directly or to an account designated by Newlight.

     Accordingly, demand is made that Blue Cross and Blue Shield of Oklahoma make all payments due and owing to PVHA directly to Newlight as follows:

     1.    If paying by check, money order or other instrument, please deliver such items to the following address:

> **Lender Mailing (and Overnight) Address**:
> Newlight Healthcare, LLC
> 3267 Bee Caves Road, Suite 517
> Austin, Texas   78746
> Attention: Lee Hughes or Chris Rutledge

All checks or other instruments should continue to be made out to the name of "Pauls Valley Hospital Authority, ℅ Newlight, specifying the account number and invoice number with respect to which payment is being made; or

     2.    If paying electronically, transfer such amounts by the ACH System or wire transfer to the following account:

> Bank of America
> ABA #: 052001633
> Account #: 446019021469
> Account Name: NewLight Healthcare

     Making payment in a manner other than as directed herein may subject you to additional liability in the event PVHA fails to satisfy its obligations to Newlight under the Transaction Documents.



EXHIBIT K
Page 2 of 3

August 8, 2018
Page 3

    If you have any questions concerning where to make your payments, please feel free to call Lee Hughes at Newlight, either by phone (325-660-9689), email (lee.hughes@newlighthealthcare.com), or physical location (3267 Bee Caves Road, Suite 517, Austin, Texas 78746). We appreciate your assistance and attention to this matter.

        Very truly yours,

        NEWLIGHT HEALTHCARE, LLC

        By: _____

        Chris Rutledge, its Director of Corporate Finance
        chris.rutledge@newlighthealthcare.com
        206-465-5882

cc:  PAULS VALLEY HOSPITAL AUTHORITY
     100 Valley Drive
     Pauls Valley, Oklahoma 73075
     Attention: Board of Trustees

     James W. Carlton Jr. *(Via James.Carlton@gaclawyers.com)*

EXHIBIT K
Page 3 of 3