Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 1 of 72

1

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF OKLAHOMA

3

4
PAULS VALLEY HOSPITAL              )
5    AUTHORITY d/b/a PAULS VALLEY    )
GENERAL HOSPITAL,                 )
6                                    )
          Plaintiff,                )
7                                    )
               vs.                  )  Case No. CIV-18-826-HE
8                                    )
NEWLIGHT HEALTHCARE, LLC, a       )
9    Texas limited liability         )
company; LTC GROUP, LLC, a        )
10   Texas limited liability         )
company; and FIRST UNITED         )
11   BANK AND TRUST COMPANY,         )
                                  )
12        Defendants.               )
                                  )
13

14

15

16          TRANSCRIPT OF MOTION HEARING

17        BEFORE THE HONORABLE JOE HEATON

18      MONDAY, SEPTEMBER 10, 2018; 4:00 p.m.

19          OKLAHOMA CITY, OKLAHOMA

20

21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | For Plaintiff: |
| 4 | Brett Agee |
| | Post Office Box 10 |
| 5 | Pauls Valley, Oklahoma 73075 |
| 6 | |
| 7 | |
| | For Defendants NewLight Healthcare and LTC Group: |
| 8 | |
| | Ryan T. Leonard |
| 9 | Christa L. Sullivan |
| | 100 Park Avenue |
| 10 | Suite 500 |
| | Oklahoma City, Oklahoma 73102 |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | C O N T E N T S |
| 16 | |
| 17 | WITNESSES:                                    Volume   Page |
| 18 | FRANK AVIGNONE |
| 19 | DIRECT EXAMINATION BY MR. AGEE ......................1      25 |
| | CROSS-EXAMINATION BY MR. LEONARD ...................1      43 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1          (Proceedings held on September 10, 2018.)

2               THE COURT:  Good afternoon.  We're here on Pauls

3     Valley Hospital Authority versus NewLight Healthcare and

4     others, Civil Case 18-826.

5          If counsel would make your appearances, please.

6               MR. AGEE:  Yes, Your Honor.  Brett Agee for the

7     plaintiff.

8               THE COURT:  All right.

9               MR. LEONARD:  Ryan Leonard for defendant NewLight

10    Healthcare and also defendant LTC Group.  This is -- also

11    Christa Sullivan, who is here with both defendants.

12              THE COURT:  All right.  Until fairly recently, this

13    was Judge Friot's case.  He -- I think you could probably tell

14    from his order, the difficulty is that he is out of town or,

15    in fact, out of the country for the next couple of weeks and

16    is not in a position to deal with the items here that are

17    obviously kind of short-fuse items, and so that's why he

18    handed the case off.

19         He did transfer it completely to me under the random draw

20    process so that I guess I can do whatever kind of mischief I

21    think the case needs rather than just resolving the immediate

22    motion.

23         I would tell you that my expectation is that, once Judge

24    Friot returns, unless something has happened to make it

25    inappropriate, I will likely return the case to him in two or

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    three weeks.  But in any event, we'll see how that plays out.

2         Let me ask just by way of background, Mr. Agee, the

3    papers that have been submitted here indicated that there was

4    some kind of a meeting of the Hospital Authority on the 5th of

5    September to consider closing the hospital.

6         Did that meeting happen?  What's the status of the

7    hospital at this point?

8              MR. AGEE:  Your Honor, that meeting did occur.  No

9    action was taken on that item.  The city, as I understand it,

10   was able -- of course, the city is a separate entity from the

11   Hospital Authority.

12        But, as I understand it, the city has advanced the funds

13   to cover the payroll that was necessary to keep the hospital

14   open.

15             THE COURT:  All right.  Is the -- there was also

16   some reference to -- and I'm asking you to answer this only if

17   you comfortably can.  If you can't, I understand.

18        I recall in the papers there was some indication of a

19   bankruptcy filing on behalf of the hospital some years ago.

20             MR. AGEE:  That is correct.

21             THE COURT:  As I was sitting here wading through the

22   dispute here as to rights in the receivables or proceeds of

23   the receivables, I was struck by the fact that that sort of

24   argument ordinarily arises in the context of negotiating a

25   cash collateral order in a bankruptcy proceeding.

1          Do you have any expectation that we're going to be

2    dealing with that?

3          MR. AGEE:  Is your question do I think we're going

4    to end up in bankruptcy again?

5          THE COURT:  Yes.

6          MR. AGEE:  Not that I know of.  I've not heard any

7    discussions towards that end.

8          THE COURT:  All right.

9          MR. AGEE:  That was a very pricey bankruptcy for the

10   city.  It's -- I believe it's a Chapter 9.  Those are very

11   unusual, very specialized, and the expense of going through

12   that is enormous.

13         THE COURT:  Well, I don't know.  Would it be a

14   Chapter 9 proceeding for the Hospital Authority, which I

15   understand is a trust of some kind?  Of course, even if it's

16   Chapter 11, they're expensive too.

17         MR. AGEE:  I believe the proceeding that has already

18   occurred and is now finished was a Chapter 9 filing on behalf

19   of the Pauls Valley General Hospital Authority.

20         THE COURT:  All right.  Let me ask, Mr. Agee, while

21   I've got you on your feet, just to try to get a more focused

22   grip on what's really at issue here, I take it, from both the

23   original petition you filed in state court and the submissions

24   from the defendant, there is no dispute that there was a

25   promissory note executed in favor of NewLight, there was a

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   security interest granted to them which embraced receivables?

2              MR. AGEE:  That is correct, Your Honor.

3              THE COURT:  Is there any dispute as to whether that

4   was perfected?

5              MR. AGEE:  No, Your Honor.

6              THE COURT:  So we've got a perfected security

7   interest in receivables.

8         With respect to the note, is there any dispute that there

9   is some amount still owed on the note?

10             MR. AGEE:  Your Honor, there is certainly a dispute

11   as to what is owed on the note.  NewLight was managing the

12   hospital and had complete control of all of the hospital's

13   books and records.

14        We are still in the process of trying to figure out what

15   payments had been made and compare those to the credits that

16   NewLight has acknowledged, but we think that we have found

17   additional payments that have not been made.

18        But even beyond that, we believe that we have an offset

19   that would more than exceed any amount that is due under the

20   note and even the master service agreement or the hospital

21   management agreement, and that is the claim for mismanagement;

22   in other words, breach of the contract to manage the hospital

23   in a prudent manner.

24             THE COURT:  Well, refresh my memory.  It's been a

25   while since I worried about something like this.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 7 of 72

7

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1      But if there is a chosen action out there based on

2   mismanagement or whatever, are you entitled to offset that

3   here in such a fashion as to -- I mean, if the question is was

4   there a default on the promissory note, does the fact that

5   there's some other claim out here that might ultimately be an

6   offset necessarily prevent you from being in default?

7           MR. AGEE:  Well, I think we're certainly entitled to

8   assert the offset at this juncture.

9      And if our contention is correct, that NewLight owes more

10  money to the Hospital Authority than the Hospital Authority

11  owes to them, then it makes no sense for them to be out there

12  taking all the money that would force the hospital to shut

13  down.

14     I'm not aware of any authority that prevents us from

15  asserting that offset.

16          THE COURT:  Let me back up one step.  Maybe I should

17  have started with this in the beginning.

18     This is a removed case?

19          MR. AGEE:  That's correct.

20          THE COURT:  There has been no motion to remand

21  filed, but is the plaintiff here disputing the propriety of

22  the removal?

23          MR. AGEE:  Your Honor, we have gotten conflicting

24  information regarding the First United Bank, which was named

25  as a party in state court and, of course, is still a party in

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    this matter, although First United is not here today, but --

2          THE COURT:  Well, as I understand it, they filed a

3    disclaimer at least.  I mean, I think the only fight we've got

4    over here today is over receivables; is that right?

5          MR. AGEE:  I believe that's correct, but I'm not

6    certain that --

7          THE COURT:  I think First United has disclaimed any

8    interest in the receivables.

9          MR. AGEE:  That is my understanding.  I'm not

10   certain that that is a correct analysis by First United that

11   they don't have an interest because information that we had is

12   that First United was a participant --

13         THE COURT:  Well, maybe they were giving money away.

14   But if they filed a disclaimer, that would suggest they're not

15   pursuing anything.

16         MR. AGEE:  They're not at this point.

17         THE COURT:  So it would sound to me like that means

18   the removal is probably valid.  I mean, do you have any

19   serious objection to that at this point?  Where do you stand

20   relative to that?

21         MR. AGEE:  I want to finish an investigation, but it

22   very well could turn out that their disclaimer is valid.  In

23   that event, I don't think we would be seeking to remove, but

24   I'm not quite yet to the point --

25         THE COURT:  Seeking to object to the removal?

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 9 of 72

9

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1          MR. AGEE:  Yes.  Excuse me.  Seeking to remand, yes.

2          THE COURT:  Okay, all right.  Mr. Leonard, let me

3   hear from you as to your overview of where we are here.

4          MR. LEONARD:  Your Honor, I --

5          THE COURT:  Why don't you go ahead and use the

6   podium.  That will make it easier for the court reporter.

7          MR. LEONARD:  Your Honor, I thought the Court's

8   comments addressed really the pertinent issue, which is that

9   my client does have a perfected security interest.

10         My client managed the hospital.  The hospital was in

11   bankruptcy in 2013.  My client came in.  They're a company out

12   of Austin, Texas.  They manage hospitals in Texas and

13   Oklahoma.  They manage a total of five hospitals.  They assist

14   with the management of 80 nursing homes.  They're a large

15   outfit.

16         They came in and took over the management of Pauls Valley

17   Hospital in November of 2013.  They managed the hospital for

18   three years.

19         In October of 2016, the hospital approached them for a

20   $250,000 loan.  There was a cash issue.  My client loaned the

21   hospital $250,000, perfected their security interest.

22         To my knowledge, there is no dispute about the existence

23   of the loans, the promissory note, or the perfected security

24   interest.

25         Several months later, on December 1st of 2016, they

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 10 of 72

10
PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    loaned them an additional million dollars –– $1,050,000.  The

2    250 was paid back, so there's an outstanding balance in the

3    approximate amount of –– it's a little less than a million

4    dollars, 980-some thousand dollars, I believe –– it's in the

5    pleadings –– on the promissory note.

6        Then because of the hospital's cash issues, my client

7    voluntarily agreed to defer its compensation under the

8    management services agreement.  So they weren't paid for the

9    remaining two and a half years that they managed the hospital.

10       In April 2018, four or five months ago, they said enough

11   is enough, they didn't see the way out, and they placed the

12   hospital in notice of default.

13       Even after doing that –– and we've attached a number of

14   exhibits to our multiple pleadings.  And I apologize.  Some of

15   the exhibits are duplicative, but they pertain to each of the

16   individual motions.

17       They continued to work with the hospital.  Money came in

18   from the City of Wynnewood, for example.  My client took a

19   part of it, they let the hospital keep a part of it.

20       New management assumed management of the hospital in the

21   last couple of months.  I see several of those folks here.  My

22   client attempted to work with them.  At some point in

23   midsummer, it just became evident that enough was enough.

24       And so under the terms of the security agreement, my

25   client does have the right to seize the collateral, which are

1   the accounts receivable.

2         So in -- on July 30th of this year they gave -- actually,

3   on June 26th they gave the hospital, PVHA, final notice of its

4   termination, that they were terminating its rights to use the

5   accounts receivable.

6         All of that money is flowing from the hospital into the

7   Pauls Valley National Bank.  Well, the vice president of the

8   Pauls Valley National Bank sits on the board of the hospital.

9   It's a small town.

10        And so what they did was, even though my client NewLight

11  had terminated the rights to the collateral, PVHA ignored

12  that, the accounts receivable continued to flow into the bank,

13  the bank would then re-lend that money back out to the

14  hospital.

15        It's our understanding that the bank is doing that in

16  excess of its federal lending limit.  In Title 18 of the U.S.

17  Code there's a lending limit that any bank can have to one

18  individual customer.

19        It's our understanding, based upon information from the

20  bank itself, that all of this is occurring with the bank in

21  excess of its federal lending limit.

22        So in early August it was all coming to a head.  My

23  client -- this was before I was retained.  Their Texas counsel

24  sent out letters, consistent with their rights in the

25  perfected security agreement, to 105 payors of the hospital

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    saying "send the accounts receivable to us."

2        Section 7.2 of the security agreement provides for

3    exactly that, that they could obtain the accounts receivable

4    directly from the payors.  That was on August 9th or 10th.

5        Five days later, the state court lawsuit was filed.  So,

6    effectively, the hospital preempted NewLight by filing in

7    state court.

8        It's our understanding -- I've spoken with counsel for

9    First United Bank -- that they have disclaimed, as is on

10   record with this Court.  They don't claim an interest in this.

11       In our notice of removal filing, we set out why, even if

12   First United Bank is a defendant, we believe it's a nominal

13   defendant and, pursuant to the doctrine of fraudulent joinder,

14   should be disregarded.

15       We believe that the defendant was added solely for the

16   purpose of maintaining this case in Garvin County, which is

17   not a particularly favorable forum for my client.

18       So the bottom line is, my client has a perfected security

19   interest and -- they also got a state court TRO without notice

20   to my client.

21       In order to do that -- and I've set forth in the

22   pleadings, and we have -- in order to get a TRO, you've got to

23   meet the same standard as you do to get an injunction.  You've

24   got to be able to show the substantial likelihood of

25   prevailing on the merits in addition to the other factors.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 13 of 72

13

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

 1        And the problem that the hospital has -- and nobody

 2   disputes that if my client takes the accounts receivable, the

 3   hospital is not going to have any money, and that's

 4   undisputed.  That said, it's also undisputed that NewLight is

 5   owed $2.3 million.

 6        And I've seen the allegations of mismanagement in the

 7   state court petition, but, according to my client, that is the

 8   first time there's been any major complaint whatsoever

 9   regarding the management of the hospital was in the state

10   court filing.

11        So whether it's the initial TRO that they obtained -- two

12   hours ago there was an extension of the TRO that was filed --

13   the problem that the hospital has is that they can't show that

14   they have -- not only can they not show they've got a

15   substantial likelihood of prevailing, they can't show that

16   they've got any likelihood of prevailing at all.  We've seen

17   no evidence.

18        The state court petition was four pages.  It was verified

19   by a gentleman named Mark Roberts, who, according to a report

20   in the local newspaper, isn't even working there anymore.  He

21   only worked there for two months.

22        So, Your Honor, this is a difficult situation.  My client

23   is owed a lot of money.  And what are they supposed to do?

24        Right now, the hospital is just running around with their

25   collateral.  And the meeting occurred last week; there's

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  another meeting tomorrow.  Nobody wants to close the hospital.

2       On the other hand, this can't continue to go on.  All the

3  while, the hospital is just spending the accounts receivable.

4       If they vote to close either last Wednesday or tomorrow,

5  my client is out of luck.  There's no prospect for any

6  recovery.

7       And the state court TRO, with all due respect to the

8  court in which it was issued, we didn't have the opportunity

9  to present any argument in response.  It completely abrogates

10  my client's security interest, completely disregards it.  So

11  right --

12       THE COURT:  How much money are we talking about

13  here?

14       MR. LEONARD:  My client is owed $1 million roughly

15  on the promissory note.

16       THE COURT:  I understand that.  I was more concerned

17  with what are we talking about in terms of the ordinary flow

18  of receivables, I guess, is maybe the question.

19       MR. LEONARD:  My understanding from opposing

20  counsel -- my client thought, if the hospital were to close

21  tomorrow, that there would be approximately $1.4 to $1.8

22  million in accounts receivable that could be immediately

23  collected, which is the secured collateral of my client.

24       I talked to Mr. Agee's law partner last week.  We've --

25  I've asked for documentation, which we're entitled to under

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 15 of 72

15

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1      the security agreement.  My client asked for that a month ago

2      before I was hired.

3          We've had no documentation of the accounts receivable.

4      We're entitled to it under the security agreement.  They have

5      completely shut us off.

6          But Mr. Agee's law partner, a Mr. Carlton, who represents

7      PVHA and also represents Pauls Valley National Bank -- their

8      firm represents both the bank and the hospital -- he shared

9      with me that there was $1.2 million in collateral.  So it's

10     not an insignificant sum.

11         THE COURT:  How did your client come up with the

12     list of creditors to send the notices to?

13         MR. LEONARD:  They managed the hospital for five

14     years, and they knew who the payors were.

15         THE COURT:  So it's a dated list but some kind of

16     list?

17         MR. LEONARD:  That's my understanding, Your Honor.

18         We'd like there to be an easy resolution for this, and

19     there have been some exchange of offers.

20         There was an offer on Wednesday night, and the city could

21     have called a meeting on -- you know, they have to give 24

22     hours for an emergency meeting.

23         On Thursday morning I talked to opposing counsel and I

24     said, "Are you having the emergency meeting?"  And the answer

25     was "No."  And my clients just cannot continue to wait.

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1        So the next scheduled meeting is Tuesday.  All the while,

2   these accounts receivable are going to be spent, all of which

3   is in violation of my client's perfected security interest.

4        To answer the Court's question that was asked of

5   Mr. Agee, they can't just allege, you know, mismanagement in a

6   couple of pages of a lawsuit and abrogate my client's

7   perfected security interest, you know.

8        A year and a half from now, if there's a trial and

9   there's a judgment, then they could collect on that judgment,

10  but they can't just by alleging an offset.

11       My response to the Court's question is, that does not

12  abrogate my client's perfected security interest.  That's the

13  whole purpose of the UCC, which is being completely

14  disregarded by the Pauls Valley Hospital and the Pauls Valley

15  National Bank, which is why we have sought not only to

16  dissolve the state court TRO, because we believe it was

17  improperly entered -- there's no way that the hospital can

18  show the substantial likelihood on the merits.

19       Under the *Diné* case, which I cite, you don't just get --

20  you have to show all four.  The Tenth Circuit does not

21  recognize a modified test for establishing a preliminary

22  injunction.

23       You've got to show all four, including a substantial

24  likelihood of prevailing on the merits, which the hospital,

25  with their broadbrush allegations of mismanagement, cannot

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 17 of 72

17

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    show.  So we believe the state court TRO should be dissolved.

2         At the same time, we believe that we've got to have a

3    TRO, followed by a preliminary injunction, to obtain our

4    properly perfected collateral.  Otherwise, it's going to

5    disappear.  We don't know whether the hospital is going to

6    close tomorrow or a week from now.  We know the city paid --

7         THE COURT:  What exactly are you asking me to do?  I

8    mean, obviously part of what you're asking me is to dissolve

9    the existing TRO.

10        If I do that, then I presume you'd be in a position to go

11   ahead with whatever notices to creditors or whatever you

12   wanted to do.

13        Are you wanting me to, in effect, go retrieve money

14   that's already in the possession of the bank?  What exactly do

15   you have in mind?

16        MR. LEONARD:  Your Honor, we agree with the point

17   that once the state court TRO is dissolved, we can continue

18   with collecting the money directly from the payors.

19        Judge Friot entered an order on Friday that -- consistent

20   with Rule 65.  The TRO is in effect for 14 days following the

21   notice of removal.  The notice of removal was filed on the

22   26th, but the notice in state court was filed on the 27th.

23        So this Court's order -- or Judge Friot's order on Friday

24   said that the state court TRO is dissolved today.

25        That would allow my client to go forward with the

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 18 of 72

18

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1  collection activities, would not need the assistance of the

2  Court.

3      What we would like the assistance of the Court with,

4  because what's going to continue to happen is the money is

5  going to continue to flow into the Pauls Valley National Bank,

6  and the Pauls Valley National Bank is a creditor, but they're

7  a junior creditor to my client.

8      So we've asked for two things in our motion for a TRO

9  followed by a preliminary injunction.

10     We've asked that the PVHA be enjoined from further

11  depositing their accounts receivable at the Pauls Valley

12  National Bank.  That's a right that my client has with its

13  ownership interest in the accounts receivable.

14     If my client were -- if that security interest were being

15  respected, that money wouldn't be deposited in the Pauls

16  Valley National Bank.  It would be deposited in another

17  institution because the Pauls Valley National Bank, even

18  though they're a junior creditor, they can sweep the account.

19  And that's got to stop.  So we're asking for that.

20     We're also asking, consistent with my client's security

21  interest and the security agreement executed by the parties,

22  that the Court order that the security agreement, in fact, be

23  enforced, which would require that the accounts receivable be

24  paid directly to my client or, alternatively, that the money

25  at least be placed into escrow.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 19 of 72

19

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    Right now, the money is just disappearing.  It's going to

2   the Pauls Valley National Bank, a junior creditor, and it will

3   never be seen by my client again, who has a superior security

4   interest to the bank.

5         THE COURT:  You mentioned a second ago something

6   about the lending limit that applies to the bank.  I'm not

7   clear how that applies to anything we're worried about here.

8         MR. LEONARD:  There's not -- obviously, you know, I

9   have been on the job about two and a half weeks in this case.

10   I've seen the correspondence back and forth.

11    The bank is obviously concerned because the

12   correspondence from the bank says that we're in excess of our

13   federal lending limit.  It's 18 U.S.C. --

14         THE COURT:  I guess the reason I say that is if

15   somebody is violating lending limits, the comptroller or the

16   FDIC or somebody is going to come in and worry about it.  I

17   assume it's not my job to worry about policing that.

18         MR. LEONARD:  That's correct, Judge.  Obviously, the

19   bank is trying to keep the hospital open.  They're obviously

20   willing to do -- they have been willing to do whatever it

21   takes to do so, but they're willing to do so at the expense of

22   NewLight, my client.

23         THE COURT:  All right.  Mr. Agee, let me hear from

24   you.  So far you've just responded to my questions, and you

25   ought to be entitled to tell me your side of this without

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 20 of 72

20

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    interruption.  Well, I'm not going to promise not to interrupt

2    you, but at least --

3               MR. AGEE:  Your Honor, Mr. Leonard is arguing that

4    we have no evidence, but we presented our evidence to the

5    judge of the District Court of Garvin County, and I have

6    witnesses here today who are prepared to testify.

7         This afternoon I did file a motion for an extension of

8    the temporary restraining order, but, of course, Mr. Leonard

9    has his own motion for a temporary restraining order in his

10   favor, but he has not presented any sort of evidence in the

11   way of a verified motion, an affidavit, and he has no

12   witnesses here today.

13        So we are not stipulating that his version of what

14   happened is true, but here he is at a hearing trying to

15   request a temporary restraining order, but there is no

16   evidence to support the facts that he's alleging.

17        We're here ready to present evidence to the Court of the

18   various aspects involving the temporary restraining order that

19   we seek to have continued.

20              THE COURT:  Well, what evidence that was presented

21   to the state court judge is it that you see is critical?

22        Maybe another way to say it is, if these folks testify --

23   and I'll give you the chance to put them on if you want to --

24   what do you anticipate they're going to tell me?

25              MR. AGEE:  Well, as is set forth in my motion -- and

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 21 of 72

21

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  I quoted almost the entire petition, but they will testify to

2  things such as –– that if NewLight, the defendant, is allowed

3  to seize all of the income that is going to the hospital, the

4  hospital will close.

5      We're talking about the only hospital –– public hospital

6  in Garvin County.  We're talking about a provider ––

7          THE COURT:  Well, that's part of why I asked the

8  question.  I, offhand, don't have any doubt that if this kind

9  of came down to a balance of hardships, you'd have a pretty

10 compelling case to tell me about for that very reason.

11     I guess what I'm also interested in knowing is what was

12 before the state judge as it related to the underlying default

13 situation?

14         MR. AGEE:  Well ––

15         THE COURT:  Are you prepared to –– well, let me back

16 up.  What was the reason why there wasn't any notice to the

17 other side?  What was the emergency that prevented them from

18 having the opportunity to be there when it went to the state

19 judge?

20         MR. AGEE:  Because the cash flow had been shut off

21 by NewLight by the unilateral sending of notices to creditors

22 and ––

23         THE COURT:  I guess my question is, I got you guys

24 here today with an order this morning and a couple of phone

25 calls.

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 22 of 72

22

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1    Did anybody make a phone call to the NewLight people to

2    let them be at that hearing?

3        MR. AGEE:  No.  Of course, Mr. Leonard was not

4    involved at that time.

5        THE COURT:  Who --

6        MR. AGEE:  All they had was the Texas counsel at

7    that time.

8    We felt that it was an emergency situation and that,

9    under the State statute, it said that we -- a temporary

10   injunction -- excuse me, a temporary restraining order could

11   be entered without notice to the other side in these types of

12   circumstances.

13       THE COURT:  Well, let me ask, if I understand,

14   what's really an issue here on the -- and I guess I'm back on

15   the heading of likelihood of success on the merits, which at

16   least embraces the question of whether or not the hospital is

17   in default.

18   I take it you are disputing that the hospital is in

19   default on its note to NewLight?

20       MR. AGEE:  Yes.

21       THE COURT:  That's based on what?

22       MR. AGEE:  It's based upon the fact that we are

23   still trying to figure out what payments have been made to

24   NewLight because we're dealing with a situation in which

25   NewLight was in control of the finances of the hospital, and

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1   then NewLight was making payments from the hospital funds to

2   NewLight.  We're still trying to do sort of an in-house audit.

3            THE COURT:  How does that translate into persuading

4   me here today that you're likely to win?

5            MR. AGEE:  Well, we have a dispute about what has

6   been paid on the debt that's evidenced by the promissory note.

7        But even beyond all of that, we have a laundry list of

8   things that have been discovered that NewLight was not doing

9   properly, things that they should have been doing that they

10  weren't doing, things that they were doing wrong that were

11  costing the hospital hundreds of thousands of dollars.

12           THE COURT:  Do you dispute Mr. Leonard's statement

13  that the first indication of that, in terms of assertion of a

14  claim, was the state court petition?

15           MR. AGEE:  I don't have knowledge of that.  But even

16  if that's true, it is very understandable because when a

17  company like NewLight is managing the hospital, you know,

18  they're the ones in control of the books and the information

19  that comes out.

20       And, you know, absent a full audit, we have to rely on

21  what NewLight is telling us.  If NewLight is covering up what

22  they're doing, then that's on NewLight; that's not on us.

23           THE COURT:  Is there a factual dispute as to whether

24  or not -- I think Mr. Leonard indicated for -- I don't know --

25  18 months or something like that NewLight had not been taking

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 24 of 72

24

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    a management fee.  Is that disputed?

2            MR. AGEE:  My understanding is that there was some

3    period in which NewLight was not being paid for managing, but

4    I don't know the exact amount of that or the length of time

5    that that went on.

6        But, again, our argument is that all of that is more than

7    wiped out by the losses that have been suffered by the

8    Hospital Authority as a result of NewLight's management.

9        I have witnesses here who can testify about those types

10   of losses.  Some of them involve government programs that have

11   very, very substantial penalties for not making the payments

12   when they're due or otherwise not following the governmental

13   rules.

14       And I can certainly put on these witnesses who will tell

15   the Court that NewLight did not properly manage the hospital

16   and cost the hospital a very, very substantial amount of

17   money.

18           THE COURT:  Call your first witness.

19           MR. AGEE:  Okay.  Your Honor, I'll call Frank

20   Avignone.

21           MR. LEONARD:  Your Honor, I don't mean to interrupt.

22   May I just make two very brief points in response that are

23   necessary?

24           THE COURT:  Sure.

25           MR. LEONARD:  We did file a verified counterclaim.

Case 5:18-cv-00826-F Document 22 Filed 09/13/18 Page 25 of 72

25

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1  So we did -- my client did swear on the counterclaim that was

2  filed.  It's Document Number 10.

3      My client also provided -- the first day I was hired a

4  full accounting was provided on August 17th.

5          THE COURT:  Use the microphone, if you would.  I'm

6  having a little trouble hearing you.

7          MR. LEONARD:  I apologize, Judge.  I didn't mean to

8  go out of order.

9      The -- we did file a verified counterclaim, so we have

10  complied with Rule 65 to obtain a temporary restraining order.

11      The first day I was hired, Friday, August 17th, two days

12  after the state lawsuit was filed, a complete accounting has

13  been provided to the other side with respect to all payments

14  on the promissory note and the management services agreement.

15      Lastly, my client -- it's been two and a half years since

16  they've been paid.  They've not been paid for a management fee

17  since January of 2016.

18          THE COURT:  All right.

19      (Witness duly sworn.)

20      WHEREUPON, FRANK AVIGNONE, after having been first duly

21  sworn, testifies in reply to the questions propounded as

22  follows:

23                     **DIRECT EXAMINATION**

24  BY MR. AGEE:

25  Q.   Would you state your name, please?

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 26 of 72

26

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    A.    Frank Titus Avignone, IV.

2    Q.    And what is your current occupation or profession

3    A.    I am chief executive officer of Alliance Health Partners

4    of Southwest Oklahoma, which is a management company.  I am

5    currently the CEO and chief executive officer of Pauls Valley

6    General Hospital.

7    Q.    What is the relationship between the Alliance entity that

8    you mentioned and Pauls Valley General Hospital?

9    A.    We have a management agreement in place between the

10   Hospital Authority and my company to manage the hospital

11   through this transition.

12   Q.    And how long have you been acting as CEO of the Pauls

13   Valley General Hospital?

14   A.    As of Tuesday of last week.

15   Q.    And before that, who was acting as CEO?

16   A.    We had a transition CEO in place by the name of Mark

17   Roberts.

18   Q.    The petition in state court was verified by an

19   individual.  Is that the same Mark Roberts that you're talking

20   about?

21   A.    Yes, sir.

22   Q.    Okay.  So even though you personally haven't been acting

23   as the CEO, how long has your company been managing the

24   hospital?

25   A.    We entered the hospital on July 6th, and Mark Roberts

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    took over active operations July 16th.

2    Q.   And what have you done to familiarize yourself with the

3    current financial condition of Pauls Valley General Hospital?

4    A.   So we brought in our partner, the Rybar Group out of

5    Michigan, and Mr. Rick Reid to start looking at all of the

6    financials that were available to us.

7         We're still working through what those financials look

8    like and also doing a complete audit of all of the payments

9    that have been made and all of the programs that the hospital

10   has been involved in, including payor contracts and Medicare,

11   Medicaid.

12   Q.   You said it was Tuesday of last week when you assumed the

13   position of CEO of Pauls Valley General Hospital.

14        Before that, were you actively involved in reviewing

15   things like the financial reports and records of Pauls Valley

16   General?

17   A.   Yes, sir.  I was responsible mainly for the acquisition

18   of those through the hospital's information system and any

19   other sources that we've been able to garner information from

20   and pass that back through to Rick Reid at the Rybar Group for

21   examination.

22   Q.   So since July 6th, when your company started managing the

23   hospital -- well, let me ask it this way:  Does your knowledge

24   of Pauls Valley General hospital date all the way back to July

25   6th, when your company first got involved?

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

```
1    A.    Yes, sir, it does.
2    Q.    So your company essentially took over management at the
3    time that NewLight left; is that correct?
4    A.    Yes, sir.
5    Q.    And tell us about some of the things that you have found
6    since July 6th regarding the financial condition of Pauls
7    Valley Hospital and the former managing company, NewLight.
8    A.    So currently the financial condition of the hospital is
9    they have about $67,000 in the bank.  Their accounts payable
10   is at about $6.7 million approximately and still growing.
11         There were some payments that are known as SHOPP payments
12   that were supposed to have been made to Medicaid that were
13   missed.
14   Q.    And SHOPP is an acronym; right?
15   A.    And I couldn't tell you what it means because it's
16   another government acronym, but it has to do with payments
17   that Prospective Payment System hospitals make into the
18   Medicaid program that are then passed on to the smaller
19   hospitals in much more rural areas.
20         These are made quarterly.  There were several quarters in
21   which these payments were missed.  Over what period of time?
22   We're still trying to figure out.
23         In direct communications with the program directors, they
24   found it refreshing that they were talking to the hospital.
25   They had not received any calls or inquiries.
```

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 29 of 72

29

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1      The total is about $1.2 million, with 400,000 of that

2  being -- approximately 400,000 of that being penalties and

3  interest on payments that were not made.

4  Q.   So the payments that you were talking about under this

5  SHOPP program, those are payments from whom to whom?

6  A.   Those would have been made from the hospital to the

7  Medicaid program here in the state of Oklahoma.

8  Q.   Okay.

9           THE COURT:  I'm sorry.  Did you say "shock"?

10           THE WITNESS:  SHOPP.

11           THE COURT:  SHOPP?

12           THE WITNESS:  S-H-O-P-P, I believe.  I apologize, I

13  don't know the acronym.

14  Q.   (BY MR. AGEE)  So the approximately $400,000 in penalties,

15  that would be a penalty against whom?

16  A.   Against the hospital.  And it continues to grow.

17  Q.   And the -- what, in your opinion, is the reason that

18  Pauls Valley General Hospital has incurred approximately

19  $400,000 in penalties related to the SHOPP program?

20  A.   The payments weren't made on time, and there was no

21  follow up on those payments and no payment arrangements made

22  with the program would be the best guess that I could come up

23  with.

24      And as those payments aren't continued to be made, I

25  liken it to payroll taxes.  They continue to create a lot of

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1   penalties and interest, and eventually the hospital could get
2   in a lot of trouble with the program for not making those
3   payments.
4   Q.   Since we're talking about payroll, when your company took
5   over management of the hospital, do you believe that the
6   hospital was adequately staffed?
7   A.   I think it was at that point probably overstaffed in some
8   areas and understaffed in others.
9        They had a very active -- a reasonably active surgery
10  area that is understaffed, but they had way too much staff up
11  on the floor.  In some cases they were overstaffed in the E.R.
12  on some shifts.
13       We begun to change the staffing matrix and right size
14  staff.  We've been able to take about $66,000 out of the
15  overall payroll, and we look to take a lot more out this week
16  with some other things that we're going to do with the staff
17  and staff realignment.
18  Q.   Well, how long have you been involved in hospital
19  management?
20  A.   I've been in healthcare about 35 -- well, excuse me.  I'm
21  going to age myself.  Forty years now.  I have been working in
22  hospitals at one level of management or another for about 25
23  years of that.
24  Q.   What other aspects of the previous hospital management
25  did you find to be out of line?

1   A.    Well, I don't know if out of line, but Mr. Leonard

2   mentioned a $180,000 payment from Wynnewood for ambulance

3   services, that part was swept and part was sent to the

4   hospital.

5        My accountants can't find where any part of that went to

6   the hospital.  I'm not sure that's just not oversight, but the

7   issue was that it's not on the balance sheet.

8        It's not shown as income or a liability, which means,

9   when the auditors come in, someone is going to have to answer

10  for that particular issue.  My auditors have pointed that out.

11  There's been not a good solid set of financials presented to

12  the Hospital Authority in some time, as far as we can tell.

13       Again, I think this is a responsibility that –– so we

14  know way before we get into trouble financially in one of

15  these small hospitals.

16       I also think that there are some programs that were

17  entered into by the hospital that endangered the hospital

18  immediately, that could have shut the hospital down and has

19  shut other hospitals down in the state of Oklahoma, and then

20  some others that have placed certain services within the

21  hospital, such as laboratory, in immediate danger as well.

22       All of this combined is really just basic hospital

23  management, in my opinion, and certainly my colleagues'

24  opinions that work together to turn these hospitals around in

25  the state of Oklahoma.

1    Q.   You were talking about programs that could shut hospitals

2    down.

3    A.   Uh-huh.

4    Q.   Give us an example of something that you were concerned

5    about at Pauls Valley General Hospital that was some

6    irregularity in a program that you felt had a potential of

7    shutting the hospital down.

8    A.   Again, in my opinion, anytime one of these small

9    hospitals gets involved in a laboratory project where they are

10   bringing samples in from anywhere other than the local

11   community and testing those and then billing that back out to

12   the commercial insurance companies -- and whether that's

13   exactly what was going on or not, we're still not sure, but

14   some semblance of that -- puts the hospital at immediate

15   jeopardy.

16        Blue Cross/Blue Shield has had a lot in the press lately

17   around shutting their contracts off for hospitals that get

18   involved in these types of schemes.

19   Q.   What do you mean by "shutting off the contracts"?

20   A.   In other words, not paying any longer, actually

21   terminating their contract with the hospital for all services

22   for any Blue Cross patient, which in these small hospitals can

23   be as high as 40 percent of your overall commercial

24   reimbursement.

25   Q.   So if Blue Cross/Blue Shield decided that the way that

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 33 of 72

33

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1    Pauls Valley General Hospital had been handling a particular

2    program and then said we're not going to do business with

3    Pauls Valley General Hospital anymore, so when we get claims

4    from Pauls Valley General -- what would Blue Cross then do?

5    A.    So either Blue Cross can choose to pay those as out of

6    network or not choose to pay them at all, in which case the

7    hospital would basically be providing charity care for Blue

8    Cross patients.

9         I speak of this because we went through this at another

10   one of my hospitals, which is the first one in the state of

11   Oklahoma to get their contract back for straightening out some

12   of these types of scams.

13        Again, I don't know if this was exactly what was

14   occurring at Pauls Valley, but I can tell you that there was a

15   second lab being run out of the facility and that is looked at

16   as inappropriate.

17        We met with Blue Cross shortly after that, when we took

18   over, and they said that they had some suspicion that that

19   might be going on, but they weren't sure, and they were glad

20   to hear that we shut it down.

21   Q.    So am I understanding you correctly that you notified

22   Blue Cross of this -- of what had gone on, and now Blue Cross

23   seems to be at a comfort level so you haven't lost Blue Cross

24   as an insurer; is that correct?

25   A.    That's correct.  I mean, the lab had been shut down prior

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 34 of 72

34

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   to our entry into the management agreement with the hospital,

2   but we were aware of it and Blue Cross was aware of it as

3   well.

4   Q.   And the concern -- the operation of the laboratory that

5   was of concern to you, are we talking about operation while

6   NewLight was managing?

7   A.   That's correct.  That's my understanding.

8   Q.   Okay.  And just so I don't have to keep asking that

9   question, in all of the concerns that we're talking about

10  today, I want to limit them to the time that NewLight was

11  managing the hospital.

12  A.   Yes, sir.

13  Q.   Okay.  When you arrived at Pauls Valley General or your

14  company took over the management of Pauls Valley General, did

15  you find that there was an adequate system for inventory

16  management?

17  A.   I think there are some challenges around inventory

18  management for certain materials management, which is the area

19  where the hospital stores all of their supplies is fairly

20  open.

21       There were a number of keys that were there, and we do

22  know that there's been a lot of leakage with respect to

23  expense there.

24  Q.   What do you mean "leakage"?

25  A.   In other words, if a nurse needs a supply, that they may

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  be able to freely go into materials management and grab that

2  supply if it's not up on their floor in their floor stock,

3  which would be tracked.  And that means that it doesn't always

4  get charged or put down to the patient's bill.

5      Again, this is not a huge issue, but, again, it goes to

6  the basic concepts of running these hospitals and the

7  disciplines around that.

8  Q.   Did the inventory management system that was in place at

9  that time allow for a substantial amount of hospital supplies,

10 medical supplies, to be used for a patient but then there was

11 never any billing for those supplies?

12 A.   I think that's the case in a number of areas, but

13 materials management is definitely one.  We don't have the

14 final numbers yet and it's going to take us a long time to get

15 there, but we are working on that.

16 Q.   Okay.  When your company took over management of the

17 hospital, did you find an adequate policy that was actually

18 being utilized to collect co-pays and deductibles?

19 A.   To my understanding today, there was actually a policy in

20 place where co-pays and deductibles, in many cases, were not

21 collected, and that the policy and procedure that would have

22 been appropriate for a rural hospital was not being followed

23 at all, as far as collecting that cash up front.

24     There was some cash collections up front, but there

25 wasn't a good solid discipline about that aspect of the

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1    revenue cycle.

2    Q.    And based on your experience, when a hospital doesn't

3    collect a co-pay or a deductible at the time of the service,

4    what happens in terms of being able to collect that later?

5    A.    Well, the collection later is very difficult, obviously,

6    but it points to a bigger issue with the revenue cycle.

7          That is the very tip edge of all of the collections

8    that's going to happen with that patient going through the

9    entire process.

10         If those policies and procedures are not being followed

11   up front, chances that your claim on the back end will be

12   sound as well don't really hold up.

13   Q.    Did you find that there had been any contracts entered

14   into by Pauls Valley General involving unlicensed or

15   unqualified vendors?

16   A.    I think the most concerning one, whether unlicensed or

17   unqualified, was a pharmacy contract that had been entered

18   into that involved some compounding.

19         I don't understand all of the reasons for this or what

20   the actual end product was, but my understanding from my

21   attorneys is that they had entered a contract that we would

22   actually take base supplies from a pharmaceutical or chemical

23   company, we would compound those into certain creams and then

24   issue those without a prescription to the patients that were

25   ordered from out of state.

1       My attorneys challenged that with the company,

2   subsequently returned all of the raw materials that were

3   issued to the hospital, and terminated the contract

4   immediately with the company.

5       There are some compliance issues and some regulatory

6   issues around having a pharmacist on staff that could approve

7   that.  Sending the actually compounded product out of state,

8   which I don't understand, but my attorneys advised me that

9   that was not an appropriate thing for the hospital to be

10  involved in.

11      There was another contract entered into with whom I

12  believe was the former CEO, Nathan Staggs.  He took a contract

13  to city council and had it signed to -- I believe the total

14  amount -- don't quote me -- was $178,000, of which the

15  majority of that was paid to him to scan and store medical

16  records from paper to electronic.

17  Q.   Now, Nathan Staggs was employed by whom?

18  A.   To the best of my knowledge, I think Nathan Staggs was a

19  NewLight employee.

20  Q.   Okay.  You said he had a contract that he got the city

21  council or Hospital Authority to approve for him to do what?

22  A.   To scan the paper records -- transport, scan, store, and

23  return the electronic copy with the paper copy of the existing

24  paper medical records to the hospital.

25  Q.   Okay.  Did that -- what issues do you have with that

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    arrangement?

2    A.    The management of PHI, or personal health information, is

3    a very sensitive issue.

4         Transporting thousands of paper records in a personally

5    owned vehicle from the hospital to someone's residence, which

6    is how I understand this was done, having people within that

7    company who did not have the appropriate business associate

8    agreement, which is an agreement between a covered entity and

9    a vendor that says it's okay and you will treat this personal

10   health information with all the appropriate security to avoid

11   any type of exposure or breach.

12        Transporting those records in a personally owned vehicle,

13   storing them in what we understand today -- we don't know this

14   to be certain, but we have had some evidence that they're

15   being stored improperly and that they're not being transported

16   by a certified organization to transport those records.

17        And I have refused receipt of those records until such

18   time as I can be shown that they are stored properly and that

19   there is a certified vendor that will transport those records

20   back to us.

21        We haven't been able to necessarily successfully access

22   the electronic portions that were received by the hospital

23   before my company took over.

24        And I have some concerns that the exposure, although

25   right now may not be imminent, that the exposure to any breach

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 39 of 72

39

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    of those records, should there be a car accident with a

2    personally owned vehicle or somebody get into a place that's

3    not properly locked up, could be substantial for the hospital

4    right now.

5         We just -- we just don't know because we don't have all

6    the facts, but those are the facts as we know them today.

7    Q.   All right.  What about billing for the hospital?  Who was

8    doing the billing at the time your company took over?

9    A.   I don't remember the name of the company, but we've -- my

10   understanding is we've had two separate billing companies.

11        We've looked at the percent collection rate for the

12   claims that have been -- the claims history that we have

13   access to today, and it looks to be around 10 or 12 percent.

14        Chargemaster is what we bill by when we bill insurance.

15   It's set at a seven times Medicare rate.  Traditionally, if

16   you were balancing one of these rural health systems against

17   operations, you typically do that at four percent of -- or

18   four times Medicare rate.

19        In bringing in a revenue cycle company, we've found a lot

20   of inconsistencies within some of the billing.

21        When we look at the current AR and we've run our

22   analytics against it -- and we have First National Bank of

23   Vinita here in Vinita, Oklahoma, as well as the Rybar Group,

24   running those analytics -- we're seeing right at about a

25   million dollars that could be collected if, in fact, those

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 40 of 72

40

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    claims that are outside of 30, 60, 90 days are collectible at

2    this point.  Anything at 120-days-old aging is probably not

3    collectible, even pennies on the dollar.

4    Q.    Did you find any problems with the billing during the

5    time that NewLight was managing?

6    A.    Other than we feel -- my company and the Rybar Group feel

7    it was inadequate and wasn't being done properly and followed

8    up on as far as making sure the hospital received all of the

9    remittance it should have.

10         And in documenting that remittance in the system, we're

11   finding a lot of question marks in our mind that we're still

12   investigating.

13         We can show remittance on one side for a certain amount,

14   but when we look how that is allocated to the claims, we can't

15   come up with the same number.

16   Q.    Do you have an opinion as to whether the billing system

17   that was in place under NewLight was an adequate one?

18   A.    I'd have to say no.  My understanding, from talking to

19   the CEO of that company, they're very small, they lost some

20   key employees.

21   Q.    Now, which company are we talking about now?

22   A.    I don't recall the name of this last one, but it was the

23   last one that was in place that we replaced with our billing

24   company, to which, I believe, there is a fair sum of money

25   that's owed on AP for them as well.

1      But my understanding is it is a very small billing

2   company, which isn't unusual, but they were not adequate in

3   any of their policies and procedures.

4      When we requested their policies and procedures and their

5   work flow processes, they could produce none of that.  In

6   conversations on the phone with the CEO, his only concern was

7   being paid for claims that we weren't collecting on.

8   Q.   Let's talk now about what you believe will happen if

9   Pauls Valley Hospital shuts down.

10      My first question is, if it shuts down, what are the

11   chances of it ever reopening?

12   A.   That hospital will never reopen.  This is a common theme

13   throughout rural America, as far as these small hospitals.

14      They were grandfathered in under certain laws at the

15   federal level.  If they close and lose their license, trying

16   to reopen them typically means a large expense on the physical

17   plant, not to mention restarting very slow and very small with

18   just an emergency room.

19      The economic impact to Pauls Valley itself will be

20   devastating.  We received texts, during the last meeting of

21   city council when a decision was being made to cease

22   operations, from one of the larger employer groups in town

23   that said if the hospital is not here, we have no reason to be

24   here.

25      Not to mention the fact that you have 130 employees who

1   will not be able to pay their bills, they will not be paying

2   taxes, they will not be paying utilities.

3         Not to mention the fact that it will be detrimental to

4   healthcare in general to not only the local communities but

5   the communities around Pauls Valley that currently would have

6   to drive 30 to 40 minutes to get to the next nearest tertiary

7   care center such as Purcell or Sulphur.

8   Q.   Does Pauls Valley General operate an ambulance service?

9   A.   They do.

10  Q.   And what area does that serve?

11  A.   It serves Pauls Valley, Wynnewood, and the surrounding

12  areas.

13  Q.   A good part of Garvin County?

14  A.   Yes, sir.

15  Q.   Okay.  And if the hospital closes, what happens to the

16  ambulance service?

17  A.   That would be shut down as well.

18  Q.   And what about the emergency room?

19  A.   Emergency room would be closed.

20        We have a state regulation that requires us to keep the

21  emergency room and some of the ancillary services, such as

22  radiology and laboratory, open for 30 days after we notify.

23  But if there is no money in the coffers to pay anybody, I

24  don't think anybody is going to work for free, and we would be

25  out of compliance almost immediately.

1    Q.   So federal law requires you to keep that open for at

2    least 30 days, but you don't see any way that you could do

3    that?

4    A.   I don't, no, sir.

5             MR. AGEE:  That's all I have of this witness, Your

6    Honor.

7             THE COURT:  Mr. Leonard.

8                    **CROSS-EXAMINATION**

9    BY MR. LEONARD:

10   Q.   Mr. Avignon, thank you for coming up today.

11        How many hospitals does Alliance manage?

12   A.   Currently two others other than Pauls Valley.

13   Q.   Which two are those?

14   A.   Seiling Regional Medical Center and Mangum Regional

15   Medical Center.

16   Q.   And where is Alliance based out of?

17   A.   Out of Dallas, Texas, and Tulsa, Oklahoma.

18   Q.   Is it fair to say that you and NewLight are competitors

19   in the management of smaller hospitals?

20   A.   It's probably fair to say, but I wasn't aware of your

21   company or NewLight until this -- until this hospital.

22   Q.   So if I understood your testimony correctly, you've been

23   on the job since Tuesday of last week as CEO of the Pauls

24   Valley Hospital; is that correct?

25   A.   That's correct.

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   Q.   But your company assumed management on July 6th after

2   NewLight's management terminated on July 3rd; is that correct?

3   A.   Yes, sir.

4   Q.   Prior to Tuesday of last week, you weren't officing at

5   Pauls Valley; is that right?

6   A.   That's correct.

7   Q.   So what was your role upon assuming management of the

8   hospital on July 6th?  How active were you in the operations

9   of Pauls Valley?

10  A.   My responsibilities had to do with making sure that we

11  were getting all of the data from the systems and working with

12  NewLight to make sure that we were getting all the data from

13  them in order to run the financials and start digging through

14  and finding where we needed to focus our energies to start the

15  turnaround of the hospital.

16  Q.   And was NewLight cooperative with you in that process?

17  A.   Fairly, yes, sir.

18  Q.   Is it fair to say that you're still in an

19  information-gathering stage?

20  A.   I think we've got some preliminary ideas about things,

21  but, yes, we will be in information-gathering mode for quite

22  sometime.

23  Q.   What knowledge can you share with the Court -- do you

24  have regarding the Pauls Valley Hospital's bankruptcy in 2013?

25  A.   Very little.

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   Q.   You don't have any idea why the hospital went into

2   bankruptcy in 2013?

3   A.   No.  My -- the Rybar Group and Rick Reid has a very good

4   knowledge and understanding of that, but that's not something

5   that I know anything about.

6   Q.   So that's not something you looked into before you signed

7   on to manage the hospital?

8   A.   Rick Reid did and advised us, yes.

9   Q.   And Rick Reid is somebody who works with you?

10  A.   Yes.  He works for the Rybar Group.

11  Q.   Are you aware of the promissory note that was entered in

12  between -- between NewLight and the Pauls Valley Hospital

13  group in approximately December of 2016?

14  A.   Yes, sir.

15  Q.   Was it your understanding that the face value of that

16  note was approximately $1 million?

17  A.   A million-fifty was my understanding.

18  Q.   And what's your understanding of the status of that

19  promissory note?

20  A.   That it's still outstanding.  I have some questions

21  around the amount that's still outstanding, but I think we're

22  pretty close on the number.

23  Q.   What number do you believe is still outstanding on the

24  note?

25  A.   Again, this is just vagaries here, but 800,000.  So it's

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    pretty close to your number.

2    Q.   So that would be 800,000 in principal; isn't that right?

3    A.   Yes, sir.

4    Q.   And are you aware that there's also interest associated

5    with that promissory note?

6    A.   Yes, sir.

7    Q.   So if I represented to you that the outstanding balance

8    on that note -- principal, interest -- was just shy of

9    $1 million, would that sound about right to you?

10   A.   Yes, sir.  To the best of my knowledge, yes.

11   Q.   Is it your understanding that note is currently in

12   default?

13   A.   Yes, sir, that's my understanding.

14   Q.   And are you aware of the notice of default that was given

15   by NewLight on April 16th of this year?

16   A.   I believe I was, yes, sir.

17   Q.   What about the fact that -- you've heard my comments

18   earlier that NewLight has managed the hospital since January

19   of 2016 without being paid a management fee.

20        Are you aware of that?

21   A.   As of this week, yes, sir.

22   Q.   And have you seen anything in your review of the

23   financials to show that NewLight has, in fact, been paid their

24   management fee since January of 2016?

25   A.   We're still going through the payments that were sent to

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  all vendors at this point.  I really couldn't comment on that

2  one way or the other, to be honest.

3  Q.   Because you just haven't seen any payments; is that

4  right?

5  A.   We have not seen evidence of direct payments, that's

6  correct.

7  Q.   All right.  Is it your knowledge that approximately $1.3

8  million in deferred management payments are outstanding?

9  A.   I'm not sure of the individual numbers, but I am well

10  aware that somewhere between 2.33 million is what I think is

11  claimed as owed, yes.

12  Q.   Have you ever seen a copy of the security agreement that

13  covered both the promissory note and the management services

14  agreement?

15  A.   My attorneys have, yes.

16  Q.   What knowledge can you tell us of the security agreement?

17  Has anybody told you that it wasn't properly perfected?

18  A.   My understanding is that it was all in order, yes.

19  Q.   It was all in order?

20  A.   (Nods head.)

21  Q.   So I heard your testimony about the various things.

22  You-all have been in there for couple of months and you found

23  a handful of things that, in your opinion, need to be

24  addressed.

25       The only specific dollar amount I heard was the $400,000

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 48 of 72

48

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  penalty on the SHOPP payments.  Has that $400,000 in penalties

2  been paid?

3  A.    There's, quite frankly, not enough money in the hospital

4  to pay $400 right now, and it's 1.2 overall, and that includes

5  the back SHOPP payments that still have not been settled for

6  the hospital.

7  Q.    But the back SHOPP payments were owed.  There's no

8  dispute about that; is that right?  So $800,000 was owed, then

9  you've got $400,000 in penalties; is that right?

10 A.    That's correct.

11 Q.    And do you know whether or not it's possible for those

12 penalties to be reduced through negotiation and even

13 possibility eliminated?

14 A.    We are speaking to -- Rick Reid is speaking to the

15 organization that manages that currently, and they are open to

16 having discussions about a payment plan but not a reduction at

17 this point.

18 Q.    On the penalties?

19 A.    On the penalties.

20 Q.    But those negotiations are ongoing; is that correct?

21 A.    And they will continue to be ongoing.

22 Q.    You talked about the medical records that were

23 transported by Nathan Staggs.

24       What personal knowledge do you have -- you said it

25 twice -- that those records were transported in a personally

```
1    owned vehicle?  How do you know that?
2    A.   We have witnesses at the hospital that came forward and
3    let us know, and Nathan Staggs even admitted that he had
4    transported those records to our HIM director in his truck and
5    that he wanted to bring them back in his truck.
6    Q.   Did he admit that to you?
7    A.   He admitted it to our HIM director.  No, he didn't admit
8    it to me.  I did not have those conversations with him.
9    Q.   Did you ever have any of these conversations that you've
10   just mentioned with Nathan Staggs?
11   A.   No.  I've had very little interaction with Mr. Staggs.
12              MR. LEONARD:  I don't have anything further, Your
13   Honor.
14              THE COURT:  Is it Mr. Titus?
15              THE WITNESS:  Avignone.
16              THE COURT:  I'm sorry?
17              THE WITNESS:  Avignone is my last name, sir.
18              THE COURT:  Avignone.  I'll mispronounce that
19   repeatedly --
20              THE WITNESS:  That's okay, sir.
21              THE COURT:  -- during the course of all of this.
22        Let me understand with respect to this SHOPP payment
23   thing.  You're indicating there were payments to Medicaid that
24   should have been made that weren't, and you're saying today
25   you couldn't pay 400,000 because the hospital doesn't have the
```

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   money.

2       Does your investigation suggest that the hospital had the

3   money then and just didn't do it or –– I mean, if it didn't

4   have the money then, are we talking about getting blood out of

5   a turnip situation or what?

6           THE WITNESS:  Revenues were much higher then than

7   they are currently.  And by looking at all the financials, in

8   the beginning it appeared that NewLight was doing a very good

9   job of managing the balance sheet.

10      But as time wore on and when those SHOPP payments stopped

11  being made, it's at that point that the financials –– you can

12  show a correlation between the decrease in the financials and

13  the balance sheet.

14          THE COURT:  All right.  Thank you.  You can step

15  down.

16      (Witness excused.)

17          THE COURT:  Call your next witness.

18          MR. AGEE:  Your Honor, it is 5:15.  May I inquire as

19  to the Court's ––

20          THE COURT:  Mr. Agee, I've got a criminal case

21  starting at 9:00 in the morning that's going to run all week.

22  I've got a case starting at nine o'clock Monday in Muskogee,

23  if I can get there, that's going to run all that week.

24      So my time to deal with this is going to be after 5:00.

25  I wish it wasn't because I'd rather do it some other way.  If

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 51 of 72

51

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1    you need to take a break now, we can do that.

2              MR. AGEE:  Yes.  Could we have just a short break?

3              THE COURT:  Let's take a five- or ten-minute break.

4    We'll reconvene here about 5:25.  Court's in recess.

5         (A recess was had from 5:15 p.m. to 5:25 p.m.)

6              THE COURT:  Mr. Agee, call your next witness.

7              MR. AGEE:  The other two witnesses I have would just

8    be duplicative.

9              THE COURT:  All right.  Mr. Leonard, will there be

10   evidence on the part of defendant?

11             MR. LEONARD:  Your Honor, I meant to address this

12   earlier.

13        At page 5 of our motion to dissolve the TRO -- so that

14   was filed on Wednesday, and then on Friday night about eight

15   o'clock we filed our motion for the TRO and preliminary

16   injunctions -- or preliminary injunction, and I addressed the

17   procedure.

18        It's my understanding -- hopefully I'm correct.  My

19   client called me this morning and they said, "Well what's

20   going to happen?"  I said, "I don't know."  "Are we going to

21   have a hearing?"  I wasn't sure.

22        They're in Austin, Texas.  Obviously, given the testimony

23   that was presented here today, they'd love to be on the stand

24   and rebut all of that.

25        My understanding was that today's hearing was on the

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 52 of 72

52

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1  temporary restraining order motion that we'd filed and the

2  motion to dissolve.

3      My understanding of Rule 65 is that you have the hearing

4  on the temporary restraining order, and then you have a

5  subsequent hearing on the preliminary injunction.

6      Obviously, this is very short notice.  My client could

7  not get on a plane between eleven o'clock and four o'clock

8  today and be here.

9      So my assumption was -- hopefully not terribly

10  incorrectly, was that we'd have -- there would be a hearing on

11  the motion for -- on our motion for the temporary restraining

12  order and then a subsequent hearing on the preliminary

13  injunction.

14      The plaintiffs -- Mr. Agee, there was -- there's been no

15  motion for preliminary injunction filed in this court.

16      There was an initial request for preliminary injunction

17  that was contained within the state court petition but no

18  separate briefing.

19      This case has been removed for at least two weeks now,

20  and there's been no subsequent request until about three

21  o'clock today.  There was a motion to continue the temporary

22  restraining order.

23      So my anticipation is if there were to be -- our request

24  today is for a temporary restraining order for the reasons set

25  forth in our motion, to get the accounts away from Pauls

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 53 of 72

53

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    Valley National Bank, redirected to my client and/or at the

2    least in escrow to be followed by a motion -- or a hearing on

3    the preliminary injunction motion.

4        If Mr. Agee has a -- you know, if they're seeking a

5    preliminary injunction, we'd have the opportunity to present

6    evidence to rebut what was presented today.

7        I thought today was on the temporary restraining order.

8            THE COURT:  Well, it is.  I mean, I haven't --

9    sometimes you combine the two hearings together.  I haven't

10   done anything to do that.

11       All right.  If you're through with evidence, give me your

12   five-minute wrap-up here of what you think you've just shown

13   me.

14           MR. LEONARD:  Your Honor, we -- consistent with

15   Judge Friot's order on Friday -- first, on the motion to

16   dissolve the TRO, Judge Friot ordered that it was dissolved

17   effective today.  It's our outstanding that that being the

18   case, that our collection activities are allowed to continue.

19       We do not believe that the hospital can meet --

20   obviously, nobody disputes, you know, the effect of what would

21   happen if the hospital closed -- closes.

22       That said, the hospital doesn't get to operate on my

23   client's collateral, which is -- there's no dispute --

24   Mr. Avignone himself acknowledged there's no dispute that my

25   client is a properly secured creditor who's owed $2.3 million.

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1          So as to the dissolution of the state court TRO, we think

2    it was improper in the first place.  It did not preserve the

3    status quo, as it purported to.

4          Rather, it allowed the hospital to use my client's

5    collateral for the last three weeks, which they otherwise

6    would not have been allowed to use.

7          So we think there's no way that they can show a

8    substantial likelihood of prevailing on the merits.  Under the

9    *Diné* test, you've got to show all four factors, including a

10   substantial likelihood to prevail, which they cannot show.  So

11   we believe that it should be dissolved.

12         We also believe that what is happening today is a

13   continued and ongoing abrogation of my client's perfected

14   security interest on the promissory note and the management

15   services agreement.  And as much as none of us want the

16   hospital to close, the hospital owes my client $2.3 million

17   that they've not been willing to pay.

18         They don't get to have a special relationship with the

19   Pauls Valley National Bank where the accounts receivable flow

20   into the bank and then the bank, on some special deal,

21   re-lends the money back out.  That cannot be allowed to

22   continue.

23         Our request, in our motion for temporary restraining

24   order, is that the PVHA, consistent with the security

25   agreement which has been properly perfected, be enjoined from

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 55 of 72

55

PVHA v. NewLight, et al.
Motion Hearing — September 10, 2018

1    further depositing their accounts receivable in the junior

2    creditor's, Pauls Valley National Bank, account.

3        It's our position that, pursuant to the security

4    agreement, we have the right to have those accounts receivable

5    paid directly to NewLight, and that's what we request this

6    Court order happen.

7        An alternative would be to escrow the funds in some other

8    institution.  But what's happening now is the junior creditor

9    is taking all the money, and that can't continue to happen

10   pursuant to our properly secured interest.

11           THE COURT:  Mr. Agee.

12           MR. LEONARD:  Thank you, Your Honor.

13           THE COURT:  Let me ask on that point:  Mr. Leonard

14   has referred to the bank as essentially the holder of a

15   security interest junior to theirs in the receivables.

16       My recollection is some of your papers had suggested that

17   that was maybe in doubt.

18           MR. AGEE:  Yes.

19           THE COURT:  Is there any doubt about the priority of

20   the NewLight security interest relative to the bank, at least

21   in receivables that have not yet arrived in the bank?

22           MR. AGEE:  I don't believe so, Your Honor.

23       But with regard to the deposits, Pauls Valley National

24   Bank has the right, under the UCC, to offset those, but

25   what --

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1        THE COURT:  Once it's deposited in the bank by the

2    hospital?

3        MR. AGEE:  Yes.

4        THE COURT:  Okay.

5        MR. AGEE:  And what had not been addressed by

6    Mr. Leonard though is that, as the hospital continues to

7    operate, the hospital generates more receivables that continue

8    to come in.  So we're not talking about a number that just

9    goes down and it never goes up.  It can go up, it can go down.

10       With the new management that we have in place, if we just

11   have an opportunity to get this ship turned around -- and it's

12   already well underway.

13       But if the money is cut off, the hospital can't make it

14   long enough to make this thing work.  The hospital is going to

15   close if the money is cut off.

16       Of course, we realize that's not the sole determining

17   factor, but it certainly goes to irreparable harm and --

18       THE COURT:  How does NewLight get paid?

19       MR. AGEE:  Through the continued operation of the

20   hospital and through the efforts of the current management

21   company that is already making great strides in improving the

22   operation and the profitability of the hospital by increasing

23   the number of surgeries that are done there, by bringing in

24   new surgeons who will do more surgeries there, by making

25   better use of all of the hospital assets.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 57 of 72

57

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    But there's no evidence that the collateral is just being

2    continuously depleted.  As I said, it can go up and it can go

3    down, but the continued operation of the hospital is what's

4    critical to being able to pay whatever is owed.

5    And Mr. Leonard tried to characterize what Mr. Avignone

6    said as being an admission that there's $2.3 million owed.

7    What Mr. Avignone was testifying about is, from what he

8    can tell so far under the records and under the management

9    agreement and the promissory note, that's what's there, but

10   that doesn't address the issue of the counterclaims that the

11   hospital has, which could easily exceed the $2.3 million.

12   But the *Diné* factors that Mr. Leonard referred to are a

13   substantial likelihood of prevailing on the merits.  I think

14   we're the only ones here presenting evidence as to what the

15   problems were at the hospital.

16   Mr. Avignone testified that there were a number of errors

17   that were made that cost the hospital a lot of money, and we

18   don't have any evidence here to refute that.

19   The second element is irreparable harm unless the

20   injunction is issued.  And we've talked about that already.  I

21   don't think I need to hit that anymore.

22   The closure of the hospital would be devastating not just

23   financially to the people who work there but to the lives and

24   the safety of the people who work there and who live in Garvin

25   County.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 58 of 72

58

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1        Number three, the threatened injury outweighs the harm

2    that the preliminary injunction may cause the opposing party.

3        And we've talked about that as well.  Yes, Pauls Valley

4    National has a right to offset against deposits, but, as I

5    mentioned before, that's offset by the additional revenue that

6    is continuing to come in.

7        The receivables of the hospital should grow.  It's not

8    like they're just going to disappear unless the hospital

9    ceases operation.  If the hospital ceases operation, there

10   will be no further income or receivables generated.

11       So we see very little harm that our temporary restraining

12   order be continued, which is what we're requesting.  We see

13   very little harm to the other side, but the harm to the

14   hospital and to the community is tremendous.

15       Number four, the final factor, is that the injunction, if

16   issued, will not adversely affect the public interest.

17       Well, not granting –- or continuing our temporary

18   restraining order is going to cause a tremendous loss to the

19   community in terms of jobs and in terms of healthcare that we

20   can never get back.

21       Mr. Avignone testified about that.  If it shuts down,

22   it's never coming back.  And that's very, very unfortunate

23   that we have that situation, but that's just the economics and

24   the climate of today.

25       Mr. Leonard also mentioned that, you know, there had been

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    some attempts at settlement.  Those are ongoing.  There's a
2    Hospital Authority meeting tomorrow evening, and those things
3    will go on.
4         But if the hospital is closed, then NewLight might get a
5    little bit of money, but that well is going to dry up and it
6    won't be replenished.
7         So our request is that the temporary restraining order be
8    continued for a reasonable period of time to give us an
9    opportunity to file a motion for a preliminary injunction and
10   that the defendant's request for an injunction be denied.
11        THE COURT:  Well, I am certainly not unappreciative
12   of the stakes that are involved here.  I'm a small-town guy
13   myself, and I have watched over the years the difficulties
14   that small-town hospitals have had.
15        I think the witness mentioned the Seiling hospital, what
16   they're dealing with.  It's kind of close to home base for me,
17   and I've kind of watched from a distance the difficulties it's
18   had over the years.
19        There was a time 30 years ago when it was kind of a
20   specialty mini Mayo Clinic-type thing that was a remarkable
21   asset for the Seiling community and a remarkable asset for the
22   area being served by it.
23        I don't know really what's happened since, other than I
24   know that I've read enough newspaper reports and so on to
25   indicate that they're having trouble.  Perhaps that's why the

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 60 of 72

60

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    Alliance folks are out there now.

2         But anybody that's been paying attention knows that the

3    economics of the rural hospital business have changed

4    significantly over the last 20 or 30 years and largely in ways

5    that aren't favorable for rural hospitals.

6         Partly it's, I suppose, disputes over reimbursement rates

7    and all the other things that impact the economics of the

8    hospital and economies of scale and all those sorts of things

9    as the various kinds of products and services become more

10   specialized and difficult to supply.

11        So this dispute arises against the backdrop of a -- I

12   apologize for clearing my throat.  My allergies are going nuts

13   today.

14        This situation arises against a backdrop of what is, I

15   think, a pretty common set of difficulties for rural hospitals

16   evidenced, at least in part, I suppose, by the fact that the

17   Pauls Valley Hospital itself was in bankruptcy some years ago,

18   I'm sure, wrestling with the same dynamic.

19        What I have before me now is, of course, a request to

20   extend the existing TRO, plus an additional request from the

21   defendants to essentially enter a temporary restraining order

22   restricting the transmission of the payments.  Both of those

23   turn on assessment of the same four factors that govern

24   preliminary injunctions and TROs.

25        The -- as Mr. Leonard has pointed out, I think the

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 61 of 72

61
PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    Circuit has made it clear that all four of those -- it's not

2    just the Circuit.  It was a Supreme Court case, I think, that

3    was the basis for their conclusion that all four of those

4    elements have to be made out in order to justify that sort of

5    injunctive relief.

6        Here, it seems to me that some of the elements I have to

7    consider, in terms of relative harm, the public interest,

8    those sorts of things, cut in favor of the hospital in the

9    sense that the hospital plays a critical role in the delivery

10   of healthcare services for Pauls Valley and the surrounding

11   region.

12       And it -- I don't have any doubt that the harm to not

13   just the employees but the collateral damage to others, if the

14   result of this or any other proceeding is to close the

15   hospital, would be very substantial and substantial to a point

16   that they would likely outweigh the countervailing

17   considerations going the other way.

18       The -- it may well be that the harm here to the hospital,

19   if I don't grant the TRO, would be irreparable if it is, in

20   fact, the case that once closed, you can't reopen.  I suspect

21   that, with some set of gyrations, it's probably possible to

22   reopen it, but I don't doubt that is difficult.

23       What though I think the question here ultimately comes

24   down to is the element of likelihood of success on the merits.

25       And that issue really boils down to whether or not the

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   hospital is in default so as to potentially trigger the

2   collection options that NewLight has under the security

3   documents.

4       It appears to me, from the submissions of the parties and

5   the testimony I've heard here today, that there is no dispute

6   that the hospital executed a note in the original amount of a

7   million bucks or thereabouts to NewLight, that it was secured

8   by a security interest in accounts receivable, and that that

9   security interest has been properly perfected.

10      It also appears to me that there is no dispute but that

11  the note is in default.

12      The note, according to its terms, was, I think, due in

13  December 2017.  Various efforts have been made since then to

14  work things out or come to some alternative, but at least it

15  seems clear enough to me that it is in default.

16      Even listening to the testimony here today, there doesn't

17  appear to me to be any significant reason to doubt that there

18  remains unpaid on the obligation somewhere in the neighborhood

19  of $800,000, plus or minus, depending on principal and

20  interest.

21      It may well be that there is some claim out there based

22  on mismanagement that would result in some right to recoupment

23  or that would reduce the amounts owing on some net basis to

24  NewLight, but it seems to me that the default status of the

25  obligation here today on the note at least is clear.

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    I also am satisfied, based on the information we've

2  received, that there is a substantial unpaid management fee to

3  NewLight in the -- I guess 1.3 million or something like that

4  for the two to three years of management fees they have not

5  taken.

6    That's important here because even if I credit the

7  testimony suggesting that there was mismanagement by NewLight

8  such that it would create a right to recovery in the hospital

9  for -- you know, on some mismanagement theory, it seems to me

10  that in order to get to a point where it ultimately matters to

11  show that there's some net recovery due and owing to the

12  hospital rather than to NewLight requires a bunch of money to

13  get there.

14    And based on the description of things of the witness

15  here today, I am skeptical whether the plaintiff can

16  ultimately establish that.

17    Some of the instances of mismanagement that have been

18  alleged here strike me as being kind of beside the point in

19  the sense that they don't appear to have any obvious impact on

20  the financial status of the entities involved or that would

21  result in some kind of a basis for recoupment against

22  NewLight.

23    In particular, I guess, for example, the testimony about

24  moving medical records around in somebody's personal vehicle

25  rather than having a certified somebody do it.  That may well

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 64 of 72

64

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1   be true and it may well be a deviation from the standards that

2   should apply, but I don't see how that translates into the --

3   to a present claim against NewLight that would somehow be a

4   nonspeculative basis for offsetting against the amounts that

5   are otherwise due them.

6       The difficulties with the -- what was it?  The SHOPP

7   program, you know, I guess the -- you know, even if you say,

8   well, there's $400,000 in penalties that would not otherwise

9   have been incurred, that, of course, still doesn't get you

10  anywhere near the number you need to get to in order to show

11  some net basis for recovery in favor of the hospital.

12      But it would seem to me that there's a significant

13  likelihood here.  I mean, I haven't heard anybody suggest that

14  this is, you know, a situation where the management company

15  was out, you know, diverting assets to some improper purpose.

16      It may well simply have been a situation where the

17  hospital didn't have the money.  That appears to have been the

18  circumstance that everybody's been wrestling with for two or

19  three years, as evidenced by the advances and so on that were

20  made by NewLight.

21      So I guess the bottom line is at this point I am

22  unpersuaded that the hospital will prevail on the merits of

23  the issues here such that it would be in a sufficient amount

24  to offset the amounts that are due and owing to NewLight.

25      I'm frankly not -- you know, we've mentioned the Uniform

Case 5:18-cv-00826-F  Document 22  Filed 09/13/18  Page 65 of 72

65

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  Commercial Code here, and I –– nobody has yet tried, nor have

2  I, to track this through the fine points of the Code in terms

3  of, you know, the degree to which an obligor can offset, you

4  know, recoupment amounts.

5      I understand NewLight here is not a holder in due course,

6  so potentially they're subject to some defenses and so on that

7  could be a basis for recoupment.

8      So I'm assuming there's theoretically a path to getting

9  to that, but based on what I've heard here, I simply am

10  unpersuaded that the hospital can ultimately win on the

11  question of whether they owe money to NewLight and whether

12  that obligation is in default.

13      Again, I'm –– I frankly hate reaching that conclusion

14  because I recognize it may well have terrific consequences for

15  the hospital and the city, but it simply is not the case that

16  just because you really, really, really, really, really need

17  the money that you can take it from somebody else that has the

18  entitlement to it.

19      It seems to me that that is more or less what we're

20  dealing with here so long as there is, in fact, a default on

21  the obligation of the hospital to NewLight.  For the reasons

22  I've indicated, I think that is true.

23      It seems to me –– and I said this at the outset of the

24  beginning –– at the outset of the hearing –– the dynamic we're

25  talking about here where the hospital badly needs capital from

1    somewhere to maintain its operations, if the source of that

2    capital is the operating capital and the receivables being

3    generated in the course of operations, that where that --

4    where those receivables have been pledged, that the way that

5    gets -- the way the legal system resolves that is somebody

6    gets you in bankruptcy.

7       You go through the exercise of trying to -- you know,

8    either under Chapter 11 -- or if it's 9 based on the municipal

9    nature of this, there's a procedure there for trying to strike

10    a reasonable balance between the needs of the company for the

11    operating capital and the rights of secured creditors in the

12    receivables.  That's what cash collateral orders do, as I

13    understand it.

14       So I think there are possibilities out there that

15    potentially give the hospital some options that they may need

16    to look at.

17       But as difficult as the situation is, I am not persuaded

18    on the present showing that the hospital is likely to win this

19    argument to the point that I would conclude that the

20    hospital's not in default on its obligations.

21       If they're in default, the remedies that NewLight has

22    attempted to exercise here are ones that are plainly

23    contemplated by the security agreements and that they're

24    entitled to rely on.

25       So as a result, it seems to me that I am obliged to deny

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1  the motion to extend the TRO, and I believe that the -- on the

2  present showing, that the -- that NewLight is likely to

3  prevail.

4      Now, the question as to whether to order something beyond

5  that, it seems to me that what is appropriate to happen here

6  is essentially to direct that the receivables, as they come

7  in, be escrowed.  Whether that's with the existing -- if

8  they're in an escrow arrangement, I don't know that there's

9  any need to require it to be at some other bank.

10     At least they would be segregated in such a way that we

11 don't get into the competing situation of a possessory lien of

12 the bank trumping the lien of NewLight based on their security

13 interest in the receivables.

14     So it seems to me that NewLight is entitled to go forward

15 with their efforts to have the creditors pay the amounts to

16 them.

17     I believe they have shown, under the circumstances here,

18 a basis for an order from the Court directing that those

19 payments, as they come in, be placed in an escrow arrangement.

20     So to that extent, I am going to grant the request for a

21 TRO from the defendant here.

22     I would encourage everybody to keep talking.  You know, I

23 don't see that -- I would guess for NewLight to be paid

24 entirely, they're going to need a functioning entity.  So

25 they've got an interest in keeping the hospital open even

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 68 of 72

68

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    though they're no longer managing it.  Obviously, the hospital

2    and the City of Pauls Valley has a substantial interest in

3    that.

4         So I would just encourage the parties to actively pursue

5    the settlement discussions that you've already had underway

6    and see if there is a way to keep the place open.

7         But for the reasons I've indicated, I don't think that I

8    can properly extend or enter TROs that would, in effect, let

9    the hospital continue to use the collateral of NewLight in

10   light of the circumstances here as to default on the

11   obligation.  So that's the order I will enter.

12        We don't, at this point, have a preliminary injunction

13   order from -- or preliminary injunction motion from the

14   plaintiff.  I don't think we've got one from the defendant.

15        So does anybody have anything beyond a request for TRO

16   pending in front of me?

17             MR. LEONARD:  Your Honor, if I may, we did -- our

18   motion was a motion for TRO and for preliminary injunction.

19   It was envisioned that the TRO request would be made first, to

20   be followed by a preliminary injunction motion.

21             THE COURT:  Well, let me ask the parties:  In light

22   of what I've said here, what do you want to do?  You know, I'd

23   like to give you a hearing date, you know, at some early

24   opportunity if that would help move the ball forward.

25        As I say, you know, you've had the bad fortune to get

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 69 of 72

69

PVHA v. NewLight, et al.
Motion Hearing - September 10, 2018

1    here when I'm probably the most jammed up, in terms of

2    dockets, than I've been in about 10 years, but I'll try to

3    make it work if somebody can figure out what that means.

4           MR. LEONARD:  Your Honor, if I may, so the TRO that

5    the Court has just -- if I understand correctly, it would

6    expire in approximately 14 days.

7        So I think we would at this point -- I'm hopeful we can

8    make progress amongst ourselves between then, but I think we

9    would -- possibly at some point within that 14-day period, we

10   would like to further our request that the ruling that the

11   Court made today be transformed into a preliminary injunction.

12          THE COURT:  Here's what I'm going to do.  This is

13   not going to make my friends in Muskogee very happy.

14       I am scheduled to be trying a case in Muskogee next week,

15   the 17th through the 21st.  But what I think I'm going to do

16   at this point is that I'm going to set the motion for

17   preliminary injunction in this case for nine o'clock on

18   Friday, the 21st.  That's within the 14 days.

19       I would assume, given the nature of the dynamics of this,

20   something is going to give before then, but at least we'll set

21   that date as a target date to hear further proceedings.

22       All right.  So let's leave it on that schedule.  My clerk

23   advises me that, conceivably, that's extendable under certain

24   circumstances.

25       You know, as I said at the beginning, Judge Friot may be

1  back and you may be dealing with him, but I would guess I will

2  likely retain this until the preliminary relief matters are

3  concluded since I've had the benefit of this discussion here

4  today.

5       Let's go forward on that basis.  I'll try to get an order

6  out as quickly as possible memorializing what I just said

7  here.

8       Anything else from the parties at this point?

9            MR. AGEE:  Your Honor, we would not be opposed to a

10  referral to a magistrate judge for a settlement conference.

11           THE COURT:  What do you say about that?

12           MR. LEONARD:  Your Honor, as we have been, we're

13  certainly open to continue talking.  That said, we wouldn't

14  want that to in any way affect my client's right to proceed in

15  the event those talks aren't fruitful.

16           THE COURT:  Yeah, I'm willing to do something like

17  that, Mr. Agee.  I guess I'm just trying to get a feel here

18  for whether that's a practical solution to the problem.

19       I mean, given the urgency of the financial situation

20  here, I'm thinking you guys have probably got to get in the

21  back room tomorrow and figure this out.

22       If we set it for a settlement conference before a

23  magistrate judge, I mean, we can do that, but that's probably,

24  you know, several days away.

25           MR. AGEE:  Well, I understand that.  We can

PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1    certainly continue to try to resolve this even before a

2    scheduled settlement conference date.

3         But one of the difficulties that we encounter is that the

4    Hospital Authority is a public trust and, therefore, is

5    subject to the Open Meeting Act.

6         And I'm well aware that for a settlement conference, we

7    would have to have a quorum of the Hospital Authority in order

8    to be able to make any decision, but we could get those people

9    together on one day and instead of, you know, offers -- one

10   offer going from us to them and then they --

11        THE COURT:  So you're saying you need help rounding

12   your clients up?

13        MR. AGEE:  Yes, sir.  That's a very succinct way of

14   putting it.

15        THE COURT:  All right.  Well, I'm happy to do that

16   if that'll help.  I'll check and we'll see.  Settlement judges

17   are picked randomly as well, but I'll do that in the morning

18   and see if we can't get a settlement conference set for

19   hopefully as quickly as possible and see where we end up.

20        MR. AGEE:  Ideally, I would think before the hearing

21   on the 21st.

22        THE COURT:  We can try, we can try.  Okay.

23        What else?  Anything else?

24        MR. AGEE:  I have nothing further today, Your Honor.

25        MR. LEONARD:  Nothing further, Your Honor.

Case 5:18-cv-00826-F   Document 22   Filed 09/13/18   Page 72 of 72

72
PVHA v. NewLight, et al.
Motion Hearing – September 10, 2018

1          THE COURT:  All right.  We'll go forward on that

2    basis.  Good luck to all of you in trying to get something

3    worked out.  Like I say, I hate the practicalities of this,

4    but we are where we are.  Court's in recess.

5          (Adjourned at 6:05 p.m.)

6

7          *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8                    REPORTER'S CERTIFICATE

9

10         I, SHERRI GRUBBS, Federal Official Court Reporter in

11   and for the United States District Court for the Western

12   District of Oklahoma, do hereby certify that pursuant to

13   Section 753, Title 28, United States Code that the foregoing

14   is a true and correct transcript of the stenographically

15   reported proceedings held in the above-entitled matter and

16   that the transcript page format is in conformance with the

17   regulations of the Judicial Conference of the United States.

18

19         Dated this 14th day of September, 2018.

20

21         /S/ SHERRI GRUBBS_____

22         SHERRI GRUBBS, RPR, RMR, RDR, CRR
           State of Oklahoma CSR No. 1232.
23         Federal Official Court Reporter

24

25